CHRISTOPHER D. SULLIVAN (State Bar No. 148083)
**Diamond McCarthy LLP**
150 California Street, Suite 2200
San Francisco, California 94111
Telephone: (415) 692-5201
E-Mail: csullivan@diamondmccarthy.com

DENNIS E. BOYLE (*Pro Hac Vice*)
BLERINA JASARI (*Pro Hac Vice*)
**Whiteford Taylor & Preston LLP**
1800 M Street, NW, Suite 450 N
Washington, D.C.  20036
Telephone: (202) 659-6808
E-mail: dboyle@wtplaw.com
        bjasari@wtplaw.com

Counsel for FEDERAL AGENCY OF NEWS, LLC, and EVGENGIY ZUBAREV

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | |
|---|---|
| FEDERAL AGENCY OF NEWS LLC, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>　　　　　　Defendant. | Case No. 5:18-cv-07041-LHK<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:  Hon. Lucy H. Koh<br>Date:   July 18, 2019<br>Time:   1:30 p.m.<br>Crtm.:  8, 4th Floor |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................. 4

II.     STATEMENT OF FACTS ................................................................................ 4

III.    LEGAL STANDARD........................................................................................ 7

IV.     FACEBOOK VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHT ...................... 8

    A.    Facebook Is A Public Forum............................................................................ 9

    B.    Facebook Is Heavily Entwined With The U.S. Government ......................... 12

V.      THE COMMUNICATIONS DECENCY ACT CANNOT EXCUSE CONSITUTIONAL

        VIOLATIONS ................................................................................................ 16

VI.     FACEBOOK BREACHED THE TERMS OF SERVICE ................................................. 19

    A.    Facebook Breached Express and Implied Obligations Under The Contract................. 19

    B.    Facebook Breached Its Implied Covenant of Good Faith and Fair Dealing ................. 23

VII.    FACEBOOK VIOLATED TITLE II OF THE CIVIL RIGHTS ACT OF 1964.............. 23

    A.    Facebook Is A Public Accommodation Within The Meaning of Title II....................... 23

    B.    Facebook Discriminated Against Plaintiffs On The Basis Of Their National Origin.... 24

VIII.   FACEBOOK VIOLATED THE CALIFORNIA UNRUH CIVIL RIGHTS ACT .......... 25

IX.     CONCLUSION.................................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308 (1968) ............... 7, 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 5

*Barnes v. Yahoo!, Inc*., 570 F.3d 1096 (9th Cir. 2009) ................................................. 16

*Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994) ..................................................... 5, 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 5

*Bland v. Roberts*, 730 F.3d, 385 (4th Cir. 2013) ..................................................... 9, 10

*Boland, Inc. v. Rolf C. Hagen (USA) Corp*., 685 F. Supp. 2d 1094 (E.D. Cal. 2010) ................ 22

*Buckey v. Los Angeles*, 957 F.2d 652 (9th Cir. 1992) ................................................... 5

*Cahill v. Liberty Mutual Ins. Co*., 80 F.3d 336 (9th Cir. 1996) ...................................... 4

*Carroll v. FedFinancial Federal Credit Union*, -- F. Supp. 3d --, 2018 WL 3212023, at *4-*6
    (E.D. Va. 2018) ............................................................................... 23

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ........................... 7

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) .......................................... 16

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................ 5, 12

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978) ......................................................... 12

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ................................................... 11, 14

*Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142 (1991) .................................. 26, 27

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1983) ................................................... 11

*Hudgens v. NLRB*, 424 U.S. 507 (1975) ................................................................ 8

*Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824 (2005) .................................... 27

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ....................................................... 7, 8

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).................................................................. 12

*Marsh v. Alabama*, 326 U.S. 501 (1946) ................................................................................ 7, 8

*Melara v. Kennedy*, 541 F.2d 802 (9th Cir. 1976)..................................................................... 11

*Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009).............................................................. 26, 27

*National Association of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012) ............ 23

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ........................................................................ 4

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ......................................................... 6, 9

*Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980)......................................................... 8

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) .............................................. 9, 10

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ............................................................ 24

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)........................................... 11, 12, 14

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)................................................. 9, 15, 16

**Statutes**

42 U.S.C. § 1983........................................................................................................................ 23

42 U.S.C. § 2000........................................................................................................................ 23

47 U.S.C. § 230.................................................................................................................... passim

Cal. Civ. Code § 51.............................................................................................................. 26, 27

Cal. Civ. Code § 52.................................................................................................................... 26

**Rules**

Fed. R. Civ. P. 12.................................................................................................................... 4, 5

Fed. R. Civ. P. 8......................................................................................................................... 4

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Plaintiffs, Federal Agency of News, Inc. ("FAN"), and Evgeniy Zubarev (collectively "Plaintiffs"), by and through undersigned counsel, hereby oppose Defendant Facebook, Inc.'s ("Facebook") Motion to Dismiss and, in support thereof, submit this Opposition and the attached Memorandum of Points and Authorities, and rely on all pleadings and papers on file, and such other matters as may be presented to this Court.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Complaint states valid claims upon which relief can be granted.

## I.     INTRODUCTION

Facebook is incorrect in the arguments presented in its Motion.  Facebook failed to meet its burden for showing the correct standard for dismissal by presentation of factual evidence in support of its claims.  As such, Facebook's Motion to Dismiss should be denied in its entirety.  Plaintiffs have valid causes of action and desire to ascertain the reason for the unlawful denial of Facebook's services to them.  Facebook discriminated against Plaintiffs and their Russian member base, and Facebook's conduct should not be condoned by the granting of its Motion to dismiss this action.

## II.     STATEMENT OF FACTS

In 2003, Chairman and Chief Executive Officer of Facebook, Mark Zuckerberg, established the online social media and social networking services company, Facebook. Compl. (Doc. No. 1) ¶ 19.  What started as a controversial platform quickly became a global community featuring a directory of photographs and personal information, open to everyone at least 13 years old with a valid e-mail address. Compl. Ex. 2, Facebook, Terms of Service, at 2.  Facebook has pervasive influence with 2.2 billion monthly users and still continues to grow its user base. Compl. ¶ 61.

FAN, a Russia based news agency incorporated in 2014, was one of Facebook's users until it was removed from the platform in April 2018. *Id.* ¶ 4.  Its purpose is and was to gather, transmit, and supply domestic and international news to its audience through a variety of media, including Facebook. *Id.* ¶ 2.  It is an independent, authentic, and legitimate news agency which strives to inform and educate Russian readers throughout the world. *Id.* ¶ 26.  As of October 2018, FAN was ranked among the Top 35 most visited websites in Russia by LiveInternet, one of the largest Russian internet blogging platforms; among the Top 20 by Mail.ru, a Russian internet company which reaches approximately 86% of Russian internet users per month; and among the Top 25 by Rambler, a Russian search engine and one of the biggest Russian web portals.  Mr. Zubarev is the sole shareholder and General Director of FAN. *Id.* ¶ 27.

Many of FAN's subscribers are also Facebook users who frequently accessed content published by FAN through Facebook.  As an independent news outlet in Russia, FAN relies heavily on Facebook's web-based platform to reach its subscribers directly and without censorship.  As such, it is vital to FAN's independence to maintain its platform on Facebook.

Following the 2016 U.S. presidential election, Facebook ramped up its efforts to combat "fake" news stories[1] and began to cooperate with the U.S. government to shut down "inauthentic" Facebook accounts which were allegedly controlled by the Russia-based Internet Research Agency ("IRA") – an agency which allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy. *Id.* ¶ 10.

---

[1] While it is unclear exactly what Facebook meant went it used "fake" to describe the websites it was delisting, the fact is that FAN never published any false news stories and has always adhered to the highest journalistic standards.  Furthermore, FAN has never used false or fictitious names to register a website.

5

Representatives of Facebook and Zuckerberg himself have repeatedly stated that Facebook has cooperated with the U.S. government in ridding its web-based platform from publishers based in Russia. *Id.* ¶¶ 16-19.  On September 21, 2017, Facebook's General Counsel, Colin Stretch, explicitly stated that Facebook would provide the U.S. Congress with information related to 3,000 advertisements Facebook believed were connected with inauthentic Facebook accounts and Pages. *Id.* ¶ 17.  Stretch further explained that Facebook would continue its own review and investigation and do its part to make sure congressional investigators have the information they need. *Id.* ¶ 18.

On September 21, 2017, Zuckerberg published a video on Facebook emphasizing the fact that Facebook is actively working with the U.S. government on its ongoing investigations into Russian interference and providing information to the U.S. Department of Justice Office of Special Counsel ("Special Counsel"), headed by Robert Mueller.[2] *Id.* ¶ 19.

Furthermore, Facebook representatives and Zuckerberg made clear that Facebook was removing Facebook accounts for no other reason but for the fact that they originated in Russia. *Id.* ¶ 16.  On September 6, 2017, Facebook's Chief Security Officer, Alex Stamos, announced that Facebook found more than 3,000 advertisements in connection with allegedly inauthentic Facebook accounts, and that Facebook shut down the accounts and Pages they identified. *Id.* ¶ 15.  He specifically stated that Facebook conducted a sweeping search looking for all ads that might have originated in Russia – even those with very weak signals of a connection and not

---

[2] The Mueller Investigation concluded with a 388 page report detailing contacts between various Trump officials and various Russian officials.  Significantly, although the report mentions the Internet Research Agency, it does not mention FAN.  *See* Special Counsel, Report on the Investigation into Russian Interference in the 2016 Presidential Election, available at: https://www.justice.gov/storage/report.pdf.

associated with any known organized effort. *Id.* ¶ 16.  Of course, Facebook promptly shared its findings with its collaborators at the U.S. government. *Ibid*.

On April 3, 2018, Facebook blocked FAN's contents on Facebook and deleted its Facebook account, alleging that FAN had violated Facebook's Terms of Service. *Id.* ¶ 4.  FAN's Facebook account was one of 270 Russian language accounts and Pages Facebook removed in its attempt to eliminate allegedly inauthentic Facebook accounts. *Id.* ¶ 30.

FAN is a legitimate news site which publishes Russian domestic and international news stories; and has never knowingly created a false or misleading news article. *Id.* ¶ 26.  It never violated Facebook's Terms of Service, and despite Facebook's unsubstantiated allegations, FAN has no involvement with the IRA or any other entity within "Project Lakhta"- alleged Russian interference operation. *Id.* ¶¶ 39, 40.  The only connection between FAN, the IRA and "Project Lakhta" is their national origin and that of their members. *Id.* ¶ 50.

## III.        LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  The court must accept all factual allegations pled in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co*., 80 F.3d 336, 337-38 (9th Cir. 1996).

To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (*citing Twombly*, 550 U.S. at 556).

 In a motion to dismiss, "determining whether a complaint states a claim, all allegations of material fact are taken as true and construed in the light most favorable to the plaintiff." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (*per curiam*); *see also Estelle v. Gamble*, 429 U.S. 97, 99 (1976).  A complaint may not be dismissed unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Buckey v. Los Angeles*, 957 F.2d 652, 654 (9th Cir. 1992).

In this case, Plaintiffs have pled sufficient facts to survive a Motion to Dismiss and move into the discovery phase of the case.

## IV.        FACEBOOK VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHT

> While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be.  The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

These words from a recent Supreme Court decision perhaps mark the beginning of an effort to understand the internet, its basis as a forum for free thought and the impact private companies, like Facebook, have in the stifling of free speech.  Facebook controls the communications of more than two billion people around the world by creating and controlling a forum that, by its very nature, should be public.  When it engages in content-based limitations on free speech, especially on behalf of a government actor, it violates the First Amendment to the U.S. Constitution.  By blocking FAN's Facebook account and deleting the contents on its web-

based platform, Facebook engaged in content-based restrictions of free speech, and violated Plaintiffs' First Amendment rights.

### A.  Facebook Is A Public Forum

A public forum denotes a place, whether it be a physical place or a location in cyber space that is open to the public for purposes of expression.  Facebook is the definition of a public forum almost precisely.  It operates a freely available public forum, open to any and all people who are at least 13 years old, with internet access and a valid e-mail address. Compl. Ex. 2, Facebook, Terms of Service, at 2.  It is open continuously, 365 days a year, 24 hours every day. Facebook invites users to view its content and connect with individuals and various entities all over the world.  It is not just private physical space, but subject to public forum analysis.

Facebook appears to believe that it is not subject to public forum analysis because it is a private company.  *See* Facebook's Motion to Dismiss, at 9.  This argument, however, fails to recognize that the Supreme Court has never circumscribed public forum analysis solely to government-owned property.  For example, in *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985), the Supreme Court recognized that forum analysis applies "to private property dedicated to public use."  In fact, it is now well established that private companies may establish public fora in certain circumstances.

Beginning with *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court held that a private enterprise exercised semi-official municipal functions as a delegate of the state would be subject to the public fora analysis of the First Amendment.  Two decades later, in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308 (1968) the Court held that First Amendment rights must be respected within a privately-owned shopping center which is freely accessible and open to people.  Then, in *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), the Court introduced the notion that free speech in the space depends on the owner's dedicated purpose.

9

There, the Court noted that the primary purpose of the mall was to promote shopping and goodwill rather than have the public use the mall for any purpose it chose. *Id.*, 407 U.S. at 564-65.

Further, the *Lloyd* majority distinguished the picketers in *Logan Valley* who lacked other "reasonable opportunities" to convey their message. *Id.* at 563. The case of *Hudgens v. NLRB*, 424 U.S. 507 (1975), confirmed that *Lloyd* overruled *Logan Valley* because speech on private property is not protected by the First Amendment if the property is not dedicated to "public use." *Hudgens*, 424 U.S. at 518-20. Finally, in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), the Supreme Court confirmed that no First Amendment right generally exists in a shopping mall as private property, but allowed the State of California to expand protection to speakers under its own state constitution.

Overall, the key Supreme Court precedents of *Marsh*, *Lloyd* and *Pruneyard* reduce the query to this: What is the dedicated purpose of a speech forum where social networking users surf, connect, publish, and read content? The sole function and purpose of a social networking site is to promote and realize speech and communication, openly and freely, between its users. There quite simply is no other possible "dedicated" purpose for Facebook's web-based platform. The private ownership of the Pruneyard shopping mall was undisputed, as is the private ownership of Facebook's web-based platform (albeit Facebook's stock is publicly traded). But use of the space of the Pruneyard mall was to promote sales. Facebook's web-based platform simply delivers free information as speech between billions of voices and speakers.

Furthermore, "Congress [has] recognized the internet and interactive computer services as offering 'a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.'" *Zeran v. Am. Online, Inc.*, 129 F.3d

327, 330 (4th Cir. 1997) (*quoting* 47 U.S.C. § 230(a)(3)); *cf. Bland v. Roberts*, 730 F.3d, 385, 386 (4th Cir. 2013) (finding post to campaign Facebook Page "constituted pure speech").  And the Supreme Court recently analogized social media sites, like FAN's Facebook Page, to "traditional" public forums, characterizing the internet as "the most important place[] (in a special sense) for the exchange of views." *Packingham,* 137 S. Ct. at 1735.

Social media sites offer "relatively unlimited, low-cost capacity for communication of all kinds," *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997), "to users engaged in a wide array of protected First Amendment activity on any number of diverse topics." *Packingham*, 137 S. Ct. at 1735.  On Facebook, "users can debate religion and politics with their friends and neighbors or share vacation photos."  *Ibid*.  In short, users employ Facebook "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'"  *Id.* at 1735-36 (*citing Reno*, 521 U.S. at 870).

An "exchange of views" is precisely what FAN sought when it published content on its Facebook Page and invited users to visit the Page and comment on any issues it published. Compl. ¶ 3.  Facebook specifically invites public discourse through such Pages.  Any Facebook user, including businesses, organizations, and public figures, may promote a business or an agenda and/or encourage debate between other users by opening up a Facebook Page and inviting anybody to like, share, or to discuss content in the comments section – the interactive component of the Page.[3] Compl. Ex. 2, Facebook, Terms of Service, at 1.  As such, Facebook Pages, like FAN's Page, operate like the electronic version of a public square.  This virtual public square, however, is much larger as it allows more than 2 billion people on Facebook –

---

[3] Liking or sharing on Facebook is a way for Facebook users to share information with each other.  *See Bland,* 730 F.3d at 385.

almost one third of the world population – to view content and maintain connections to other users and the creators of the Pages. Compl. ¶ 61.  In addition, Facebook allows Page promotions and boosted posts to allow communication with an even larger audience. *See* Compl. Ex. 2, Facebook, Terms of Service, at 5.

FAN used Facebook in this exact way; to update its subscribers on Facebook with statuses, links, photographs, and videos of Russian domestic and international concern. Compl. ¶ 3.  FAN created a platform for its subscribers to consume content, but also to share opinions and discuss with others directly and free of censorship. *Ibid.*  Facebook, including FAN's Page, are, no doubt, a public forum.

### B.      Facebook Is Heavily Entwined With The U.S. Government

Even if Facebook were not a public forum, which it clearly is, it still would not be able to shield itself from First Amendment liability where, as here, it works with and at the behest of the federal government to stifle free speech.  State action is present whenever a private firm such as Facebook is heavily entwined with the U.S. government in key state-like functions, as alleged in the complaint.  Indeed, the government seeks to make Facebook a "content policeman" to enforce government defined, content-based free speech.  The First Amendment simply does not permit a private company, acting on behalf of the federal government, to restrict the free speech of its users.

In deciding whether the conduct of private parties amounts to government action, it is necessary to engage in a highly factual inquiry.  *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983).  While "there is no specific formula for defining state action," *ibid.* (*quoting Melara v. Kennedy*, 541 F.2d 802, 805 (9th Cir. 1976)), the U.S. Supreme Court has articulated four tests for determining whether a private party's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (*quoting Franklin v. Fox*, 312
F.3d 423, 444-45 (9th Cir. 2002)).

The "joint action test" focuses on "'whether state officials and private parties have acted
in concert in effecting a particular deprivation of constitutional rights.'"  *Tsao*, 698 F.3d at 1140
(*quoting Franklin*, 312 F.3d at 445).  "Joint action" exists where the government affirms,
authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a
private party, *see, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Flagg Bros. v.
Brooks*, 436 U.S. 149, 157 (1978), or otherwise has "so far insinuated itself into a position of
interdependence with [the non-governmental party] that it must be recognized as a joint
participant in the challenged activity," *Tsao*, 698 F.3d at 1140 (internal quotation marks
omitted).

Taking all allegations of material fact as true and construing them in the light most
favorable to Plaintiffs, as this Court is required to do here, *Barnett*, 31 F.3d at 816; *see also
Estelle*, 429 U.S. at 99, the Complaint demonstrates that the relationship between Facebook and
the U.S. government is sufficiently intertwined to create a triable issue of fact as to whether
Facebook's actions are "fairly attributable to the [s]tate."  *Lugar*, 457 U.S. at 937.

In May 2017, Deputy Attorney General Rod Rosenstein, in his role as Acting Attorney
General, appointed the Special Counsel to investigate Russian interference in the 2016 U.S.
presidential election, as well as alleged secretive links between Trump associates and Russian
officials. Department of Justice, Press Release (May 17, 2017), available at:
https://www.justice.gov/opa/pr/appointment-special-counsel.  The investigation's scope included
allegations of Donald Trump's presidential campaign coordinating with the Russian government
in order to manipulate the election, and included a criminal investigation which ultimately led to

the indictment of 34 individuals in the U.S. and in Russia.  *See* Department of Justice, Special Counsel's Office, available at: https://www.justice.gov/sco.  The primary focus of the Special Counsel's investigation with regard to Russia's influence on U.S. voters was Facebook.  *See* Special Counsel, Report on the Investigation into Russian Interference in the 2016 Presidential Election, at 24, available at: https://www.justice.gov/storage/report.pdf.

Just after the 2016 U.S. presidential election and the initiation of the Special Counsel's investigation, Facebook began to shut down "inauthentic" Facebook accounts that allegedly sought to inflame social and political tensions in the United States,[4] claiming that their activity was similar or connected to that of Russian Facebook accounts during the election which were allegedly controlled by the Russia-based Internet Research Agency ("IRA"). Compl. ¶ 10.  The IRA was an agency which allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy. *Id.* ¶ 11.

Pursuant to a United States Intelligence Community report regarding alleged Russian activities and intentions in the 2016 United States presidential election, published in January 2017, social media platforms became the playing field for the IRA and, by extension, The Kremlin, and, therefore, the main focus for the Special Counsel's investigation. *See* United States Intelligence Community, Background to "Assessing Russian Activities and Intentions in

---

[4] Unfortunately, in a democratic society, not everyone agrees on all aspects of public policy.  It is not for the government to determine which viewpoints are correct and which ones are not – it is far more dangerous to have a private company like Facebook make that determination.  The fact that some people feel passionately about their viewpoints is not a reason to restrict their speech, even if it comes into conflict with the viewpoints of opponents who hold equally passionate views.

Recent US Elections:" The Analytic Process and Cyber Incident Attribution, available at:

https://www.dni.gov/files/documents/ICA_2017_01.pdf.

Facebook played a crucial role in this part of the investigation as it provided internal data and information to government investigators. *See* Compl. ¶¶ 16-19.  On September 6, 2017, Facebook's Chief Security Officer, Alex Stamos, announced that Facebook found approximately $100,000.00 in advertisement spending from June of 2015 to May of 2017 associated with more than 3,000 advertisements in connection with approximately 470 allegedly inauthentic Facebook accounts and Pages. *Id.* ¶ 15.  Stamos conceded that Facebook conducted a sweeping search looking for all ads that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort. *Id.* ¶ 16.

On September 21, 2017, Facebook's General Counsel, Collin Stretch, stated that Facebook would provide the U.S. Congress with information related to the 3,000 advertisements Facebook previously located. *Id.* ¶ 17.  Stretch further stated that Facebook will do its part to make sure investigators have the information they need. *Id.* ¶ 18.  On September 21, 2017, Zuckerberg himself conceded that Facebook is "actively working with the U.S. government on its ongoing investigations into Russian interference and providing information to the [Special Counsel]." *Id.* ¶ 19.

These statements show that there has been significant cooperation between Facebook and the U.S. government which reasonably led to the conclusion that the parties "have acted in concert in effecting" the blocking of Plaintiffs' Facebook account.  *Tsao*, 698 F.3d at 1140 (*quoting Franklin*, 312 F.3d at 445).  Granting Facebook's Motion to Dismiss without permitting discovery would bar Plaintiffs from presenting highly relevant evidence pertaining to the full nature of Facebook and the U.S. government's relationship.

## V.   THE COMMUNICATIONS DECENCY ACT CANNOT EXCUSE CONSITUTIONAL VIOLATIONS

In its Motion to Dismiss, Facebook argues that it is excused from compliance with the First Amendment by The Federal Communication Decency Act, 47 U.S.C. §230 ("CDA"). *See* Facebook's Motion to Dismiss (Doc. No. 25), at 6.  The CDA seeks to regulate indecency and obscenity in cyberspace, with the primary goal to control the exposure of minors to indecent material over the internet.  Of course, obscenity is not "protected speech" under the First Amendment, and Congress has a right, if not the duty, to protect minors from accessing materials that are not constitutionally protected.  The present case, however, does not concern obscenity or any other form of unprotected speech; it concerns political speech that strikes at the heart of the First Amendment.  The CDA therefore does not provide Facebook with a shield under the facts of this case as alleged in the Complaint.

An "important purpose of [the CDA] was to encourage [Internet] service providers to self-regulate the dissemination of offensive materials over their services."  *Zeran* at 327, 331, *cert*. den., 524 U.S. 937 (1998); *see* § 230(b)(4) ("It is the policy of the United States - …(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material.").  Thus, section 230(c)(2) immunizes from liability an interactive computer service provider or user who makes good faith efforts to restrict access to material deemed "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" – speech that is not constitutionally protected.  *See* § 230(c)(2)(A).

A second objective of the CDA was to avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery. *Zeran*, 129 F.3d at

16

330–331; *see also* § 230(b) ("It is the policy of the United States (1) to promote the continued development of the Internet and other interactive computer services and other interactive media; (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation…".).

The CDA, however, does not declare "a general immunity from liability." *Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1100 (9th Cir. 2009). Congress has not provided an "all-purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016).

Ultimately, and despite the CDA's goal of restricting children's access to objectionable or inappropriate online material, Congress insisted on the following findings:

> (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.
> …
> (3) The internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.
> (4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.
> (5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

47 U.S.C. §230(a).

FAN is a Russia based news agency which was incorporated in 2014 with the purpose of gathering, transmitting, and supplying domestic and international news reports and other publications of public interest. Compl. ¶ 24. It is an independent, authentic, and legitimate news agency which strives to inform and educate its Russian readers throughout the world. *Id.* ¶ 26.

As of October 2018, FAN was ranked among the Top 35 most visited websites in Russia by LiveInternet, one of the largest Russian internet blogging platforms; among the Top 20 by Mail.ru, a Russian internet company which reaches approximately 86% of Russian internet users per month; and among the Top 25 by Rambler, a Russian search engine and one of the biggest Russian web portals. *Id.* ¶ 27.

Many of FAN's subscribers are also Facebook users who frequently accessed content published by FAN through Facebook. *Id.* ¶ 28. As an independent news outlet in Russia, FAN relies heavily on Facebook's web-based platform to reach its subscribers directly and without censorship. *Id.* ¶ 3. As such, it is vital to FAN's independence to maintain its platform on Facebook.

Following the 2016 U.S. presidential election, Facebook ramped up its efforts to combat fake news stories and began to cooperate with the U.S. government in order to shut down "inauthentic" Facebook accounts which were allegedly controlled by the IRA. *Id.* ¶ 10. According to Facebook's Chief Security Officer Stamos, Facebook conducted sweeping searches looking for "inauthentic" Facebook accounts and Pages that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort. *Id.* ¶ 16.

Facebook never deemed FAN's Facebook content to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Facebook simply removed FAN's Facebook account because FAN originated in Russia, and has a Russian member base. *Ibid.*

Supplying a "provider or user of an interactive computer service" with immunity in a case like this is inconsistent with Congress's expressly stated purposes in adopting 47 U.S.C.

§230.  Immunizing providers of "interactive computer service[s]" for blocking accounts and

restricting constitutionally protected speech contravenes the Congressional purpose of

encouraging the "development of the Internet."  *See* § 230(a).

It is bad when the government is permitted to restrict speech that is constitutionally

protected, but it is far worse when private companies with monopolistic powers are permitted to

do it.

## VI.      FACEBOOK BREACHED THE TERMS OF SERVICE

For their claims of breach of contract and implied covenant of good faith and fair dealing,

Plaintiffs allege that: (1) a contract existed between FAN and Facebook; (2) Plaintiffs performed

under the contract; (3) Facebook breached the Terms of Service (the contract) and implied

obligations thereunder; and (4) Plaintiffs were damaged by Facebook's breach.

### A.      Facebook Breached Express and Implied Obligations Under The Contract

Facebook essentially ignores its promises in its unilaterally imposed Terms of Service

and argues that Facebook is obligated to do absolutely nothing.  *See* Facebook's Motion to

Dismiss, at 17, 18.  In contrast, Facebook obliges its users to allow Facebook to sell their

personal data and information to third parties and agree to make a number of commitments. *See*

Compl. Ex. 2, Facebook, Terms of Service, at 2.  If Facebook believes that its Terms of Service

do not create an obligation vis-à-vis its users, one must wonder why Facebook users agree to

give up their sensitive personal information for profit if it is not for the continued use of

Facebook's services.  Plaintiffs submit that so long as users do not breach the Terms of Service,

Facebook is obligated to continue to provide its services to them pursuant to the contract.

Facebook explicitly promises in its Terms of Service to provide "products, features, apps,

technologies and software" to its users. *Id.* at 1.  Specifically, Facebook promises to "connect

[users] with people, groups, businesses, organizations, and others that matter to [the users]," and

invites users "to express [themselves] and communicate about what matters to [them]" by

"sharing status updates, photos, videos and stories across the Facebook Products that [they] use,

sending messages to a friend or several people, creating events or groups, or adding content to

[their] profile[s]." *Ibid.* Furthermore, Facebook promises to "develop[], and continue to explore,

new ways for people to use technology, such as augmented reality and 360 video to create and

share more expressive and engaging content on Facebook." *Ibid.*

In exchange for "provid[ing] these services," Facebook "collect[s] and use[s] personal

data" regarding "the connections [users] make, the choices and settings [they] select, and what

[they] share and do *on and off* [Facebook's] Products" (emphasis added). *Id*. at 1-2.  Facebook

further expects that users allow Facebook to analyze and sell their data to third parties in order to

refine the types of ads, offers, and other sponsored content these parties show to the users. ("Our

partners pay us to show their content to you."). *Id.* at 1.  In the Terms of Service, Facebook

further lays out the permissions users grant to it in detail:

> Permission to use content that you create and share: … To provide
> our services … we need you to give us some legal permissions to
> use this content.  Specifically, when you share, post or upload
> content that is covered by intellectual property rights (e.g. photos or
> videos) on or in connection with our Products, you grant us a non-
> exclusive, transferable, sub-licensable, royalty-free and worldwide
> license to host, use, distribute, modify, run, copy, publicly perform
> or display, translate and create derivative works of your content …
> This means, for example, that if you share a photo on Facebook, you
> give us permission to store, copy and share it with others … such as
> service providers that support our service or other Facebook
> Products that you use.
>
> Permission to use your name, profile picture and information about
> your actions with ads and sponsored content: You give us
> permission to use your name and profile picture and information
> about actions that you have taken on Facebook next to or in
> connection with ads, offers and other sponsored content that we
> display across our Products, without any compensation to you.  For
> example, we may show your friends that you are interested in an

> advertised event or have liked a Page created by a brand that has
> paid us to display its ads on Facebook.

*Id*. at 3.

Furthermore, Facebook expects its users to make several commitments to use Facebook's services in accordance with the Terms of Service, Community Standards, and other applicable terms and policies. *Id*. at 2.

In its Motion to Dismiss, Facebook states that "[t]hese terms limit the ways in which users are entitled to use Facebook's products and services, but they do not guarantee or otherwise promise continued access to those products and services *if* the user fails to comply," Facebook's Motion to Dismiss, at 18 (emphasis added), acknowledging that Facebook is obligated to provide its services to its users if they *do* comply with its terms.

Facebook's Community Standards set out the parameters for the removal of content from its web-based platform. Pursuant to these standards, content that encourages "real-world harm, including (but not limited to) physical, financial and emotional injury" will be removed. Specifically, Facebook reserves the right to remove content and disable accounts if:

(1) "[T]here is a genuine risk of physical harm or direct threats to public safety;"

(2) "[O]rganisations or individuals … are engaged in [or express support or praise for groups, leaders or individuals involved in terrorist activity, organised hate, mass or serial murder, human trafficking, and organised violence or criminal activity;"

(3) Users post "[c]ontent depicting, admitting or promoting [various] criminal acts committed by [the user] or [their] associates;"

(4) Users post "statements of intent, calls to action or advocating for [various criminal activities];"

(5) Users post "[c]ontent about non-medical drugs (other than alcohol or tobacco);"

(6) Users post "[c]ontent that identifies and negatively targets victims or survivors of self-injury or suicide seriously, humorously or rhetorically;"

(7) Users post "[c]ontent that sexually exploits or endangers children;"

(8) Users post "images that depict incidents of sexual violence and intimate images shared without permission from the people pictured;"

(9)     Users post "[c]ontent that purposefully targets private individuals with the intention of degrading or shaming them;"

(10)    Users post "[c]ontent that glorifies violence or celebrates the suffering or humiliation of others;"

(11)    Users post "[c]ontent [that] facilitates, encourages or coordinates sexual encounters between adults;"

(12)    "[P]eople … use misleading or inaccurate information to collect likes, followers or shares;"

(13)    People do not use their authentic identities; and

(14)    "[P]eople … post content that breaches someone else's intellectual property rights, including copyright and trademark."

Facebook, Community Standards, available at: https://www.facebook.com/communitystandards.

Despite the numerous reasons Facebook may remove content and disable accounts on its web-based platform, Facebook was and is unable to name even one alleged violation by FAN. In fact, Facebook cannot name a violation because FAN never violated any terms. FAN fully complied with the terms of the contract by properly registering with Facebook and complying with all applicable terms of service. Compl. ¶ 96. At no time did FAN violate the terms of the contract. *Id.* ¶ 97. FAN, just like many other news outlets, used Facebook to publish national and international news reports and other publications of public interest. *Id.* ¶¶ 24, 25. It maintained a Facebook account that was authentic and legitimate, and it did not publish content that could be considered violent, criminal or objectionable in any way. *Id.* ¶ 26.

Facebook breached an express and implied duty under the contract. As set forth above, FAN complied with all of Facebook's terms at all times. Facebook in turn must provide reciprocal services to FAN to restore its control of its account and valuable content.

### B.  Facebook Breached Its Implied Covenant of Good Faith and Fair Dealing

Under California law, the implied covenant of good faith and fair dealing "requires contracting parties to exercise discretion given to them under the contract in a way consistent with the parties' expectations at the time of contracting." *Boland, Inc. v. Rolf C. Hagen (USA) Corp*., 685 F. Supp. 2d 1094, 1103 (E.D. Cal. 2010).  "A party breaches this duty when it acts in a way that deprives another contracting party of benefits conferred by the contract.  Such a breach does not require subjective bad faith or a breach of the contract's express terms." *Ibid*.

Facebook permanently deprived FAN of all benefits of the contract. Compl. ¶ 78.  This violated Facebook's duty of good faith.  Facebook maintained full benefit of its bargain by depriving FAN of its valuable data, and blocked FAN's Facebook account despite the lack of any violation of its terms of service.  Facebook merely sent a generic e-mail to FAN simply stating that its account has been disabled.  It did nothing to ensure FAN would maintain any benefit of its bargain.

## VII.  FACEBOOK VIOLATED TITLE II OF THE CIVIL RIGHTS ACT OF 1964

Facebook violated Title II of the Civil Rights Act of 1964 ("Title II") by depriving FAN and its members of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Facebook's social networking platform because Facebook's web-based platform is a place of public accommodation, and Facebook discriminated against FAN and its member base on the basis of their national origin.  *See* 42 U.S.C. § 1983.

### A.  Facebook Is A Public Accommodation Within The Meaning of Title II

Pursuant to section 2000a(a) of Title II, "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations *of any place of public accommodation*," 42 U.S.C. § 2000a(a) (emphasis added), not *at* or *in* a place of public accommodation.  *See, e.g., Carroll v. FedFinancial Federal Credit Union*, -- F. Supp.

3d --, 2018 WL 3212023, at *4-*6 (E.D. Va. 2018); *National Association of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 201 (D. Mass. 2012) (within the context of the Americans with Disabilities Act, the court found that the statute "covers the services 'of' a public accommodation, not services 'at' or 'in' a public accommodation.").

As the U.S. Supreme Court recognized, "[t]he Internet's prevalence and power have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018). Facebook cites to cases which were decided over a decade ago to support its argument that Facebook cannot be considered a "public accommodation" within the meaning of Title II. *See* Facebook's Motion to Dismiss, at 15. It is the year 2019 and internet platforms have rapidly expanded and continue to expand throughout the world with more than four billion people using the internet regularly – almost 60% of the world's population. The internet is continuously changing the way we conduct business and the way we communicate. To apply a rigid definition of a "public accommodation" is outdated and inappropriate in this day and age.

Construing Title II so that persons like Plaintiffs are deprived of the equal opportunity to use Facebook's web-based platform is at odds with the purpose of the statute to prohibit the deprivation of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations on the basis of an individual's race, color, religion, or national origin.

### B.    Facebook Discriminated Against Plaintiffs On The Basis Of Their National Origin

Facebook blocked FAN's access to its Facebook account solely on the basis of its national origin. In its quest to dictate news content based upon its own political viewpoint, Facebook, alongside the U.S. government, made it their mission to rid Facebook's web-based platform of Russian news outlets. Compl. ¶ 16.

24

FAN is an independent, authentic, and legitimate news agency which strives to inform and educate its Russian readers throughout the world. *Id.*, ¶ 26.  As of October 2018, FAN was ranked among the Top 35 most visited websites in Russia by LiveInternet, one of the largest Russian internet blogging platforms; among the Top 20 by Mail.ru, a Russian internet company which reaches approximately 86% of Russian internet users per month; and among the Top 25 by Rambler, a Russian search engine and one of the biggest Russian web portals. *Id.* ¶ 27.

When Facebook began removing accounts on its web-based platform, it made it clear that Facebook conducted a sweeping search looking for all ads that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort.  Facebook knew that FAN never violated its terms of service, but it did not care because FAN originated in Russia, is operated by Russian nationals, and addresses a Russian audience. Compl. ¶ 57.  These facts were evidently sufficient for Facebook to get rid of FAN and its member base.  As such, Facebook deprived FAN and its member base of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations on the basis of their national origin.

## VIII.   FACEBOOK VIOLATED THE CALIFORNIA UNRUH CIVIL RIGHTS ACT

Section 51(b) of the California Civil Code or "the Unruh Civil Rights Act" provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  Further, Section 52(a) provides "[w]hoever denies, aids or incites denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense… suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."  Cal. Civ. Code § 52(a).

Furthermore, section 51.5 provides "[n]o business establishment of any kind whatsoever shall discriminate against … any person in this state on account of any characteristic listed or defined in subdivision (b) … of Section 51."  Cal. Civ. Code § 51.5.  Finally, section 51(c)(1)-(3) provides that "any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint …" against a party who deprived that person of the full enjoyment of rights under this law.  Cal. Civ. Code § 51(c)(1)-(3).

A violation of the Unruh Act may be maintained only where a plaintiff pleads "intentional discrimination in public accommodations in violation of the terms of the Act." *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009) (*quoting Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175 (1991)).  The California Supreme Court has concluded that the Act requires allegations of "willful, affirmative misconduct," and that a plaintiff must allege more than the disparate impact of a facially neutral policy on a particular group.  *See Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854-54 (2005).

As set forth in section 51(b), the full and equal accommodations, advantages, facilities, privileges, or services must be guaranteed in "all business establishments *of every kind whatsoever*."  Cal. Civ. Code § 51(b) (emphasis added).  Facebook arguably falls within that category as it is a social media and social networking service company which provides services to its users through an online platform.

As set forth above, Facebook discriminated against FAN and its member base on the basis of their national origin.  According to Facebook's Chief Security Officer, Alex Stamos, Facebook specifically looked for and removed Russian Facebook accounts regardless of their association with any known organized effort.  Facebook's sweeping search for Russian Facebook accounts and Stamos' explicit remarks regarding Facebook's actions show that Facebook

intentionally discriminated against FAN and its member base. Compl. ¶ 16; *see also Munson*, 46 Cal. 4th at 668 (*quoting Harris*, 52 Cal.3d at 1175).  This conduct shows "willful, affirmative misconduct" on the part of Facebook as required by the California Supreme Court.  *See Koebke*, 36 Cal. 4th at 854-54.

## IX.     CONCLUSION

For the foregoing reasons, the Court should deny Defendant Facebook, Inc.'s Motion to Dismiss.

Respectfully Submitted,

*/s/Christopher D. Sullivan*
Christopher D. Sullivan, Esquire
Diamond McCarthy LLP
150 California Street, Suite 2200
San Francisco, California 94111
Telephone: (415) 692-5201
E-Mail: csullivan@diamondmccarthy.com

*/s/Dennis E. Boyle*
Dennis E. Boyle, Esquire (*Pro Hac Vice forthcoming*)
Blerina Jasari, Esquire (*Pro Hac Vice forthcoming*)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, NW, Suite 450 N
Washington, D.C.  20036
Telephone: (202) 659-6808
E-mail: dboyle@wtplaw.com

Dated: May 15, 2019                 *Counsel for Plaintiffs*