ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL AGENCY OF NEWS LLC, and EVGENIY LVOVICH ZUBAREV,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 5:18-cv-07041-LHK<br><br>**DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT**<br><br>Judge:    Hon. Lucy H. Koh<br>Date:     July 18, 2019<br>Time:     1:30 p.m.<br>Crtrm.:   8, 4th Floor |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION.................................................................................................1

II.  ARGUMENT ....................................................................................................2

    A.   Facebook Is Immune From Plaintiffs' Non-Constitutional Claims under CDA Section 230(c)(1)...............................................................................2

    B.   Plaintiffs Have Not Made Out a First Amendment Claim ...........................5

        1.   Facebook Is Not A State Actor and Is Not Subject to the First Amendment .........................................................................................5

            (a)   Facebook is Not a Public Forum ........................................5

            (b)   Facebook Did Not Engage in Joint Action With the Government .......................................................................7

        2.   Plaintiffs Do Not Allege Any Unconstitutional Speech Restriction ..............10

    C.   Plaintiffs Do Not Plausibly Allege Facebook Engaged in Illegal Conduct ................11

            (a)   The Complaint Establishes that Facebook Did Not Remove FAN's Profile on the Basis of FAN's National Origin ......................11

            (b)   Plaintiffs Do Not Plausibly Allege Title II or Unruh Act Violations ........................................................................13

            (c)   Plaintiffs Do Not Plausibly Allege a Breach of Contract or the Covenant of Good Faith ..................................................15

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Algarin v. N.Y.C. Dep't of Corr.*,
No. 06 CIV. 508 (JSR), 2006 WL 1379605 (S.D.N.Y. May 19, 2006) ........................................8

*Alpha Delta Chi-Delta Chapter v. Reed*,
648 F.3d 790 (9th Cir. 2011) ..............................................................................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................................11

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........................................................................................3, 4

*Bonin v. Calderon*,
59 F.3d 815 (9th Cir. 1995) .................................................................................................7

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) ...............................................................................15

*Carroll v. FedFinancial Fed. Credit Union*,
324 F. Supp. 3d 658 (E.D. Va. 2018) ..................................................................................14

*Clegg v. Cult Awareness Network*,
18 F.3d 752 (9th Cir. 1994) ...............................................................................................14

*Collins v. Womancare*,
878 F.2d 1145 (9th Cir. 1989) .............................................................................................8

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ...............................................................................................9

*Crowe v. County of San Diego*,
608 F.3d 406 (9th Cir. 2010) ...............................................................................................8

*Cullen v. Netflix, Inc.*,
880 F. Supp. 2d 1017 (N.D. Cal 2012) ................................................................................14

*Darnaa, LLC v. Google, Inc.*,
No. 15-CV-03221-RMW, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) .....................................4

*Deeths v. Lucile Slater Packard Children's Hosp. at Stanford*,
No. 1:12–CV–02096–LJO, 2013 WL 6185175 (E.D. Cal. Nov. 26, 2013) ........................8, 9, 10

*Dietrich v. John Ascuaga's Nugget*,
548 F.3d 892 (9th Cir. 2008) ...............................................................................................7

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016)................................................................................4

*Ebeid v. Facebook, Inc.*,
    No. 18-cv-07030-PJH, 2019 WL 2059662 (N.D. Cal. May 9, 2019) .............................. 3, passim

*Florer v. Congregation Pidyon Shevuyim, N.A.*,
    639 F.3d 916 (9th Cir. 2011)...........................................................................8, 9

*Fonda v. Gray*,
    707 F.2d 435 (9th Cir. 1983).............................................................................8, 9

*Franklin v. Fox*,
    312 F.3d 423 (9th Cir. 2002)...............................................................................7, 8

*Freedom Watch, Inc. v. Google, Inc.*,
    368 F. Supp. 3d 30 (D.D.C. 2019) .......................................................................6, 7

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000).................................................................................11

*Lee v. Katz*,
    276 F.3d 550 (9th Cir. 2002)....................................................................................6

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972) .............................................................................................6, 7

*Marsh v. Alabama*,
    326 U.S. 501 (1946) ...................................................................................................5

*Martin v. City of Oceanside*,
    360 F.3d 1078 (9th Cir. 2004)............................................................................2, 5

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*,
    869 F. Supp. 2d 196 (D. Mass. 2012) ...................................................................14

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ..........................................................................................6

*Riggs v. MySpace, Inc.*,
    444 F. App'x 986 (9th Cir. 2011)...........................................................................4

*Sciacca v. Apple, Inc.*,
    362 F. Supp. 3d 787 (N.D. Cal. 2019) .................................................................10

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ..............................................................3, 4

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT

1

## TABLE OF AUTHORITIES
### (Continued)

2

Page(s)

3

*Solomon v. N. Am. Life & Cas. Ins. Co.*,
  151 F.3d 1132 (9th Cir. 1998)....................................................................................15

4

5

*Tsao v. Desert Palace, Inc.*,
  698 F.3d 1128 (9th Cir. 2012)......................................................................................6

6

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
  865 F.2d 1539 (9th Cir. 1989).......................................................................................8

7

8

*Univ. v. Google LLC*,
  No. 17-CV-06064-LHK, 2018 WL 1471939 (N.D. Cal. Mar. 26, 2018) .........................2, 5, 6, 7

9

10

*Young v. Facebook, Inc.*,
  5:10-cv-03579-JF/PVT, 2010 WL 4269304 (N.D. Cal. Oct. 25, 2010).......................15

11

**STATE CASES**

12

*Kathleen R. v. City of Livermore*,
  87 Cal. App. 4th 684 (2001).........................................................................................2

13

14

**FEDERAL STATUTES**

15

47 U.S.C. § 230 ............................................................................................... 1, passim

16

**STATE STATUTES**

17

Unruh Act...............................................................................................................11, 12, 13

18

**CONSTITUTIONAL PROVISIONS**

19

First Amendment............................................................................................ 1, passim

20

**OTHER AUTHORITIES**

21

Alex Stamos, *An Update on Information Operations of Facebook*, *available at*
  https://newsroom.fb.com/news /2017/09/information-operations-update/ ...................13

22

23

Alex Stamos, *Authenticity Matters: The IRA Has No Place on Facebook* (April 3,
  2018), *at* https://newsroom.fb.com/news/2018/04/authenticity-matters/................11, 12

24

25

Mark Zuckerberg, *Facebook Post* (April 2, 2018), *at*
  https://www.facebook.com/zuck/posts/10104771321644971/ ...............................11, 12

26

27

28

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT

## I.      **INTRODUCTION**

Plaintiffs' Opposition ("Opp.") confirms that the Court should dismiss this action with prejudice.  Plaintiffs seek to hold Facebook liable for removing FAN's profile page from the Facebook platform.  Yet they have failed to establish that Facebook can be subject to liability under either the First Amendment or any of the statutory and common law causes of action they assert.

*First*, as Facebook established in the Motion to Dismiss ("Mot."), the Communications Decency Act ("CDA") provides it with immunity from all of Plaintiffs' non-constitutional claims.  In arguing to the contrary, Plaintiffs' Opposition misconstrues Facebook's arguments, confuses the relevant legal standard, and simply fails to address the substantial, unbroken body of case law confirming Facebook's immunity here.

*Second*, with respect to Plaintiffs' First Amendment claim, as Facebook has demonstrated, it is a private company, operating independently of any government, and its actions are not governed by the First Amendment.  In their Opposition, Plaintiffs do not identify any alleged facts that would merit treating Facebook as a state actor.  Instead, they simply restate their allegations that Facebook cooperated with an ongoing federal investigation.  But the Ninth Circuit has made plain that mere cooperation does not convert a private party into a state actor.

Finally, even if Plaintiffs' non-constitutional claims were not preempted by the CDA, Plaintiffs have not plausibly alleged that Facebook acted unlawfully.  All of Plaintiffs' claims depend on their assertion that Facebook removed FAN's profile "solely on the basis of [FAN's] national origin."  Opp. 24.  Yet the one factual allegation that Plaintiffs rely on to support this theory is a misrepresentation of a benign statement by a Facebook executive that lends no support to their entirely speculative allegations.  In fact, Plaintiffs' *own* Complaint makes evident that Facebook removed FAN's profile "'because [it] [was] controlled by the IRA,'" Complaint ("Compl.") ¶ 20 (quoting Facebook Chief Security Officer Alex Stamos), which "allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy," *id*. ¶ 11.  Plaintiffs do not contest that removing FAN's profile for that reason is entirely permissible under Facebook's terms and the law.  The Court should dismiss the Complaint with prejudice.

## II.   ARGUMENT[1]

### A.   Facebook Is Immune From Plaintiffs' Non-Constitutional Claims under CDA Section 230(c)(1).

Under well-settled law, the CDA bars Plaintiffs' non-constitutional claims.  Plaintiffs do not—and could not—contest that Facebook is an interactive computer service provider, and that Plaintiffs' causes of action treat it as a publisher of content provided by another information content provider—FAN itself.  *See* Mot. 7–9.  Instead, Plaintiffs attempt to sidestep these dispositive elements through a series of confused arguments that lack any support in the statute or case law. The CDA bars Plaintiffs' non-constitutional claims.

At the outset, in arguing that Facebook cannot be protected from liability under the CDA for engaging in allegedly unconstitutional conduct (Opp. 16), Plaintiffs necessarily assume that Facebook is actually subject to the First Amendment.  As explained below, it is not.  But even if Facebook were a state actor subject to the First Amendment's constraints, that would not affect the CDA's application to Plaintiffs' *non-constitutional* claims.[2]  *See Kathleen R. v. City of Livermore*, 87 Cal. App. 4th 684, 692–97 (2001) (holding public library protected by CDA for publishing decisions; "Appellant contends that section 230(c)(1) immunity does not extend to governmental entities.  Nothing in the text or stated purposes of that provision supports this argument.").

Plaintiffs further argue that the CDA cannot shield removal of political speech that is typically protected from government restraint.  Opp. 16.  But there is no political-speech exception to CDA immunity.  *See* 47 U.S.C. § 230(c)(1) (preventing a provider of an interactive computer service from being "treated as the publisher" of "*any* information provided by another information

---

[1] Plaintiffs do not contest that this Court should decline to exercise supplemental jurisdiction over their state law claims if it dismisses their First Amendment and Title II claims.  *See* Mot. 19–20; *Univ. v. Google LLC*, No. 17-CV-06064-LHK, 2018 WL 1471939, at *13 (N.D. Cal. Mar. 26, 2018).  They also do not contest that, should this Court determine that Plaintiffs have failed to make out a cause of action, it should dismiss the Complaint with prejudice.  *See* Mot. 20.  Plaintiffs have thereby waived any arguments to the contrary.  *See Martin v. City of Oceanside*, 360 F.3d 1078, 1081 (9th Cir. 2004).

[2] Plaintiffs appear to suggest that the CDA precludes liability against Facebook under the First Amendment, not that it forecloses the remainder of the counts in their Complaint.  *See* Opp. 16 ("The Communications Decency Act Cannot Excuse Constitutional Violations.").  Facebook did not argue the opposite; Plaintiffs' entire CDA response thus appears misdirected at a defense to the First Amendment claim that Facebook did not raise.  *See id.* at 16–19.

content provider" (emphasis added)).  Plaintiffs provide no basis for asserting such an exception, and they completely ignore the numerous cases holding that the CDA protects a website's removal of political speech.  *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1090, 1094–96 (N.D. Cal. 2015) (CDA barred claims that Facebook improperly removed Plaintiff's Facebook page where "Plaintiff has organized a number of political and human rights advocacy campaigns"); *Ebeid v. Facebook, Inc.*, No. 18-cv-07030-PJH, 2019 WL 2059662 , at *1, *3–5 (N.D. Cal. May 9, 2019)  (holding Facebook is immune under CDA for allegedly removing "advertisement campaign on the ECL [Facebook] page calling for the recall of John Casson, the then-British Ambassador to Egypt").

Plaintiffs next argue that Facebook's decision to remove FAN's profile does not fit within CDA Section 230(c)(2)(A), which grants immunity to a provider who makes a good faith effort to remove material it deems "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  *See* Opp. 16.  They claim that Facebook "never deemed FAN's Facebook content to" fit within one of those categories, and therefore its removal decision cannot be immunized.[3]  *Id.* at 18.  But Facebook did not argue that Section (c)(2) protects its conduct from liability.  It argued—consistent with numerous decisions of the Ninth Circuit and this Court—that Section <u>(c)(1)</u> provides it with immunity for removing FAN's third-party content.  *See* Mot. 6–9.  Under Section (c)(1), Facebook's decision to remove FAN's page is a protected publisher decision, regardless of the content of those pages or *why* Facebook may have decided to remove them.[4]  *See* *Sikhs for Justice*, 144 F. Supp. 3d at 1095 (CDA applied to claims predicated on content removal

---

[3] Even FAN's incorrect and unresponsive argument requires ignoring that Facebook did, in fact, determine that FAN's profile was objectionable.  *See infra* II.C.(a).

[4] As the Ninth Circuit has explained in distinguishing Sections (c)(1) and (c)(2): for those websites that fall within Section (c)(1), that section, "by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1105 (9th Cir. 2009).  By contrast, for Section (c)(2), "[c]rucially, the persons who can take advantage of this liability shield are not merely those whom subsection (c)(1) already protects, but *any* provider of an interactive computer service." *Id.*  "Thus, even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue," may be able to take advantage of section (c)(2). *Id.*  In other words, for those sites where the content at issue is entirely generated by third parties, as is the case here, the immunity afforded under (c)(1) is necessarily broader than and subsumes that available under (c)(2).

even though Facebook allegedly "was motivated solely by unlawful discrimination"; "[T]he act that Defendant allegedly conducted in a discriminatory manner is the removal of the SFJ Page in India," and "removing content is something publishers do"); *Darnaa, LLC v. Google, Inc.*, No. 15-CV-03221-RMW, 2016 WL 6540452, at *8 (N.D. Cal. Nov. 2, 2016) (CDA barred claim based on content removal as such claim "seeks to hold defendants liable for 'an action that is quintessentially that of a publisher,' regardless of defendants' alleged motive"); *see also Ebeid*, 2019 WL 2059662, at *5 ("[D]efendant's decision to remove plaintiff's posts undoubtedly falls under 'publisher' conduct."); *Riggs v. MySpace, Inc.,* 444 F. App'x 986, 987 (9th Cir. 2011) (holding Section 230(c)(1) immunizes "decisions to delete [plaintiff's] user profiles").

Finally, Plaintiffs wrongly spend several pages arguing that application of the CDA here would be inconsistent with Congress's objectives in passing the statute, which include the dissemination of information and free speech on the Internet.  Opp. 16–19.  To begin with, because the alleged conduct plainly falls within the scope of protected publisher activity as defined by the statute and binding case law from this Circuit, Congress's purported intent in enacting the CDA cannot be read to override its specific provisions.  *See, e.g.*, *Barnes*, 570 F.3d at 1105 ("Both parties make a lot of sound and fury on the congressional intent of the immunity under section 230, but such noise ultimately signifies nothing.  It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language.").  And in any event, Plaintiffs ignore that immunizing Facebook's decision to remove FAN's pages is wholly consistent with other stated congressional objectives, including to provide "'[p]rotection for 'Good Samaritan' blocking and screening of offensive material.'"  *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851–52 (9th Cir. 2016) (discussing application of Section (c)(1) of CDA).  As the Ninth Circuit has held, "[t]hat means a website should be able to act as a 'Good Samaritan' to self-regulate offensive third party content without fear of liability."  *Id*.

For these reasons, "granting leave to amend would be futile because [these] claim[s] [are] barred as a matter of law" by the CDA, and "the CDA must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."  *Sikhs for Justice*, 144 F. Supp. 3d at 1096.

**B.**    **Plaintiffs Have Not Made Out a First Amendment Claim**

**1.**    **Facebook Is Not A State Actor and Is Not Subject to the First Amendment**

Plaintiffs' attempt to treat Facebook as a state actor subject to the First Amendment is contrary to well-settled law.  The Opposition fails to even acknowledge—much less distinguish or dispute the reasoning in—the numerous cases, including many from this Court, rejecting their position.  As the allegations of the Complaint and the case law makes clear, Facebook is a private actor, operating independently of any government, and is therefore not subject to the First Amendment.  Plaintiffs' First Amendment claim should be dismissed with prejudice.[5]

*(a)     Facebook is Not a Public Forum*

Contrary to Plaintiffs' erroneous assertion (Opp. 9–12), Facebook is not a public forum for purposes of the First Amendment.  As explained in the Motion, and as the allegations of the Complaint confirm, Facebook is private property.  Mot. 10.  There is no basis for treating a private company as a state actor simply because the public engages in speech on its property, and Plaintiffs do not identify any such basis.  To be sure, Plaintiffs attempt to rely on the line of cases beginning with *Marsh v. Alabama*, 326 U.S. 501 (1946), but that reliance is misplaced.  As this Court recently explained, those cases establish that entities like Facebook are *not* subject to the First Amendment:

> *Marsh*'s holding stands for the proposition that a private entity that owns all the property and controls all the municipal functions of an entire town is a state actor that must run the town in compliance with the Constitution. Thus, contrary to Plaintiff's position, *Marsh* does not compel the conclusion that Defendants are state actors that must comport with the requirements of the First Amendment when regulating access to [their private social online platform].  Unlike the private corporation in *Marsh*, Defendants do not own all the property and control all aspects and municipal functions of an entire town.  Far from it, Defendants merely regulate content that is uploaded on a . . . website that they created as part of a private enterprise.

*Prager Univ. v. Google LLC*, No. 17-CV-06064-LHK, 2018 WL 1471939, at *6 (N.D. Cal. Mar. 26, 2018).  Further, the Supreme Court has made clear that *Marsh*'s holding applies only where "a

---

[5] As explained in the Motion, there are only four instances in which a private entity may be treated as a state actor for purposes of the First Amendment.  Mot. 11.  Of these, Plaintiffs argue only that Facebook operates a public forum (Opp. 9–12) and that it engaged in "joint action" with the United States government (*id.* 12–15).  Plaintiffs accordingly have forfeited any argument that Facebook qualifies as a state actor under any of the other tests.  *See Martin*, 360 F.3d at 1081.

private enterprise [takes on] *all* of the attributes of a state-created municipality and the exercise by that enterprise of semiofficial municipal functions as a delegate of the State," such that "the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972). The Court specifically held that a private shopping center, even if held out as open to the public, did not engage in a public function when it moderated speech that took place on its property. *Id.* There is no basis to distinguish Facebook's moderation of its private online platform.

The numerous courts to address arguments like those Plaintiffs assert have rejected them for this reason. *See* Mot. 11–12 & n.7 (listing cases); *see also Ebeid*, 2019 WL 2059662, at *6 (rejecting argument that Facebook is a "public forum"; "Because Facebook is a private entity and because plaintiff has failed to show that Facebook should be treated as a state actor, plaintiff has failed to state a First Amendment claim."). And they have specifically rejected the argument Plaintiffs assert here that *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017), compels a different result (Opp. 8). As this Court noted, "*Packingham* did not, and had no occasion to, address whether *private social media corporations* . . . are state actors that must regulate the content of their websites according to the strictures of the First Amendment." *Prager*, 2018 WL 1471939, at *8; *see also Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40–41 (D.D.C. 2019) (same; explaining that *Packingham* "did not create a new cause of action against a private entity for an alleged First Amendment violation"). Plaintiffs' failure to address these cases speaks volumes.

Indeed, Plaintiffs' argument that Facebook constitutes a public forum depends on an erroneous interpretation of that term. Plaintiffs assert that a public forum is "a place, whether it be a physical place or a location in cyber space that is open to the public for purposes of expression." Opp. 9. And they suggest that, because Facebook "delivers free information as speech between billions of voices and speakers," it operates such a forum. *Id.* at 10. But Plaintiffs' argument ignores that whether an entity operates a "public forum" is relevant only under the "public function test." *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). And that test requires that the private entity have engaged in a function that is "both traditionally and exclusively governmental." *Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002). As this Court has explained,

"private entities who create their own . . . social media website[s] and make decisions about whether and how to regulate content that has been uploaded on th[ose] website[s]" have not "engaged in one of the 'very few' public functions that were traditionally 'exclusively reserved to the state.'" *Prager*, 2018 WL 1471939, at *8; *Freedom Watch*, 368 F. Supp. 3d at 41 (same).  Plaintiffs appear to believe that "public" in the term "public forum" and "public function" refers to whether the public at large engages on the platform or in the forum. *See* Opp. 11–12.  But in the state action context, "public" refers to the *government*.  Because Plaintiffs cannot demonstrate that Facebook is owned by or operates as the government, the fact that it invites the public to use its private platform is irrelevant under any state action test. *See Tanner*, 407 U.S. at 569 ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.").

In sum, Plaintiffs cannot overcome the fact that Facebook is not a "public forum" for purposes of the First Amendment.

> ### (b)   Facebook Did Not Engage in Joint Action With the Government

Plaintiffs also argue that their allegations show Facebook has engaged in "joint action" with the United States government and thus should be treated as a state actor for purposes of the First Amendment.  Opp. 12–15.  As with the public forum argument, this claim is meritless.

Plaintiffs have failed to identify any factual allegations in their Complaint that would permit an inference that Facebook, when it decided to remove FAN's profile, engaged in "joint action" with any individual or department of the United States government.  Because "a bare allegation of . . . joint action will not overcome a motion to dismiss," *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir. 2008), Plaintiffs' generalized allegations of joint action and cooperation with the government fail.  And because any new allegations suggesting that a government entity directed Facebook's removal decision would be rank speculation contrary to other allegations in the Complaint, permitting Plaintiffs to amend the Complaint would be futile. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Under the joint action test, the question is "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002).  The focus is on "whether the state has so far insinuated itself into a

position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 926 (9th Cir. 2011).  "A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" *Franklin*, 312 F.3d at 445 (quoting *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989)).  In order to plead a conspiracy between state actors and private parties, a plaintiff must allege the existence of "an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989); *see also Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010).  Likewise, a showing of willful, joint participation between the state and private entity requires a plaintiff to establish that "the state knowingly accept[ed] the benefits derived from unconstitutional behavior." *Florer*, 639 F.3d at 926. Merely "supplying information [to the government] alone does not amount to conspiracy or joint action under color of state law." *Deeths v. Lucile Slater Packard Children's Hosp. at Stanford*, No. 1:12–CV–02096–LJO, 2013 WL 6185175, at *10–11 (E.D. Cal. Nov. 26, 2013); *see also Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983).  And the mere allegation that a party "acted 'at the behest of . . . [a state actor] and possibly other state actors'" is "far too conclusory to survive a motion to dismiss." *Algarin v. N.Y.C. Dep't of Corr.*, No. 06 CIV. 508 (JSR), 2006 WL 1379605, at *1 (S.D.N.Y. May 19, 2006).

Contrary to Plaintiffs' assertion, the Complaint does not demonstrate that the "relationship between Facebook and the U.S. government is sufficiently intertwined to create a triable issue of fact" on the question of joint action.  Opp. 13.  Plaintiffs allege neither a conspiracy between Facebook and any government official, nor "willful, joint participation," in the removal of FAN's profile.  They do not allege any factual basis to suggest that the U.S. government was even *aware* that Facebook removed FAN's profile, much less a "meeting of the minds" to take that action, *Franklin*, 312 F.3d at 445, or that the state "knowingly accept[ed]" any possible "benefits" from that decision, *Florer*, 639 F.3d at 926.

While Plaintiffs now argue that Facebook "works with and at the behest of the federal government to stifle free speech" (Opp. 12), the actual factual allegations in the Complaint Plaintiffs

reference simply do not support that statement.  The following three allegations comprise the totality

of Plaintiffs' "joint action" theory[6]:

- A United States Intelligence Community report concluded that social media platforms like Facebook were used by the IRA and Russian government, and that the platforms were a focus of the Special Counsel's investigation into those entities' actions.  *Id.* at 14–15; *see* Compl. ¶ 14.

- Facebook "actively work[ed] with the U.S. government on its ongoing investigations into Russian interference," "provided internal data and information to government investigators," and "ma[d]e sure investigators ha[d] the information they need."  Opp. 15 (citing Compl. ¶¶ 17–19).

- Months later, Facebook shut down certain Facebook accounts on the basis that their activity was connected to that of the IRA, which employed fake accounts to promote Russia's interests in domestic and foreign policy.  Opp. 14 (citing Compl. ¶¶ 10–11).

As Plaintiffs admit, these allegations at best show only "cooperation between Facebook and

[a department of] the U.S. government" in the context of an investigation.  Opp. 15.  But the case

law makes clear that cooperation in an investigation, including "supplying information" to the

government, does not amount to joint action.  *See Deeths*, 2013 WL 6185175, at *10 (noting that

where "alleged facts show that the [government official] requested and obtained information from

the [private entity] for their own use in their investigation," plaintiffs had failed to show joint

action); *Fonda*, 707 F.2d at 438 (stating that the mere acquiescence of private actors to the

investigation request of state actors is insufficient to prove a conspiracy).  More importantly, the

only alleged cooperation—indeed, the only alleged interaction at all—between Facebook and the

government does not even concern the conduct that Plaintiffs actually challenge as a speech

restriction.  The alleged interactions between the government and Facebook relate only to

Facebook's sharing of information with the government in its investigation—they do *not* relate to

Facebook's *removal* of FAN's profile, which occurred months later.  Because the joint action

doctrine requires that government officials have exercised some amount of control over *that*

decision, Plaintiffs' allegations are insufficient to satisfy the test.  *See Florer*, 639 F.3d at 927 n.6;

---

[6] Though immaterial, Plaintiffs also point to various documents available online concerning the Special Counsel's criminal investigation into Russian interference in the 2016 election.  *See* Opp. 13–14.  These materials, none of which are alleged, cannot be considered on a motion to dismiss. *See Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997).

*Deeths*, 2013 WL 6185175, at *10.

At bottom, Plaintiffs never allege that Facebook actually removed FAN's account specifically because the U.S. government told it to do so, or even because Facebook was overtly encouraged by the government to engage in this action.  Nor do they allege that the government knowingly accepted any benefits from such removal.  In fact, the factual allegations in the Complaint lead to the opposite conclusion—that Facebook *itself* determined that FAN's profile was out of compliance with the Terms of Service and concluded that it should no longer appear on Facebook's platform.  *See* Compl. ¶¶ 20–22 (describing basis for *Facebook's* decision); *infra* II.C.(a).  Indeed, Plaintiffs' entire argument on this front is contradictory.  They conclusorily assert that Facebook acted at the U.S. government's "behest" in removing FAN's profile, without any supporting facts, but also allege in the Complaint that the U.S. government "has not taken any actions whatsoever against FAN," *id.* ¶ 71.  Plaintiffs' unsupported, contradictory theory does not amount to joint action and cannot serve as a basis to treat Facebook as a state actor.

## 2.    Plaintiffs Do Not Allege Any Unconstitutional Speech Restriction

As an initial matter, Plaintiffs fail to address Facebook's argument that, even if Facebook was a state actor subject to the First Amendment, the Complaint does not allege an unconstitutional restriction on free speech.  *See* Mot. 14.  Plaintiffs have therefore waived any response.  *See, e.g.*, *Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 801–02 (N.D. Cal. 2019) ("[B]ecause Plaintiff has failed to respond to Apple's arguments, the Court grants Apple's motion to dismiss the breach of the implied warranty of merchantability claim with prejudice because Plaintiff has waived the issue." (emphasis removed)).

Plaintiffs conclusorily assert that "[b]y blocking FAN's Facebook account and deleting the contents on its web-based platform, Facebook engaged in content-based restrictions of free speech." Opp. 8–9.  But deleting "contents" of a profile does not itself equate to a content-based restriction on speech.  And Plaintiffs never explain how neutral application of Facebook's Terms of Service— prohibiting use of Facebook for illegal aims—is an impermissible content-based restriction.  That's because the policy is reasonable, and content- and viewpoint-neutral.  *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 797–98, 803 (9th Cir. 2011); Mot. 14.  There is no basis in the

1  Complaint to support the notion that Facebook removed FAN's profile for any reason other than its

2  affiliation with the IRA and its illegal scheme.  *See infra* II.C.(a).

3      Because Plaintiffs do not allege an unconstitutional restriction on speech, the Court need not

4  even address the question whether Facebook can be treated as a state actor.  For this reason too,

5  Plaintiffs' First Amendment claim should be dismissed.

6      **C.**      **Plaintiffs Do Not Plausibly Allege Facebook Engaged in Illegal Conduct**

7          Apart from the CDA, Plaintiffs' remaining claims also fail on the merits.

8                  *(a)*      *The Complaint Establishes that Facebook Did Not Remove FAN's*
                            *Profile on the Basis of FAN's National Origin*

9

10  In responding to Facebook's merits arguments concerning Plaintiffs' non-constitutional

11  claims, Plaintiffs' primary retort is that Facebook's decision was motivated "solely on the basis of

12  [FAN's] national origin."  Opp. 24.  Indeed, every one of Plaintiffs' claims depends on the Court

13  accepting that allegation as true.  *See id.* 8–9 (First Amendment claim), 22 (contract claims), 24–25

14  (Title II claim), 26–27 (Unruh Act claim); *see also id.* 18–19 (CDA argument).  But as explained in

15  Facebook's Motion, Plaintiffs have failed to provide even one creditable factual allegation

16  supporting that premise.  Instead, the Complaint itself plainly demonstrates that the basis for

17  Facebook's removal decision was *not* FAN's Russian origin, but rather Facebook's own

18  determination that FAN's profile was part of a coordinated effort to use Facebook to deceive and

19  manipulate users.  *See* Compl. ¶¶ 20–21 (citing Alex Stamos, *Authenticity Matters: The IRA Has No*

20  *Place on Facebook* (April 3, 2018), *at* https://newsroom.fb.com/news/2018/04/authenticity-matters/;

21  Mark Zuckerberg, *Facebook Post* (April 2, 2018), *at* https://www.facebook.com/zuck/posts

22  /10104771321644971/).[7]  Where, as here, a plaintiff's arguments opposing a motion to dismiss

23  depend on a factual premise unsupported by the allegations in the Complaint, those arguments must

24  fail.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

25      The only plausible construction of the Complaint shows that Facebook removed FAN's

26  profile on an entirely legitimate and lawful basis.  When Facebook removed FAN's profile, it issued

27  ────────────────
   [7] As Facebook's blog posts are expressly cited in the Complaint as support for Plaintiffs'
   allegations, the Court may take judicial notice of their contents in considering the motion.  *See*

28  *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000).

two statements setting forth its reasons.  Compl. ¶¶ 20–21 (citing Stamos, *Authenticity Matters*; Zuckerberg, *Facebook Post*).  As the Complaint alleges, those posts explained that Facebook took down the accounts "'because they were controlled by the IRA—not based on the content'" they shared.  Compl. ¶ 20 (quoting Stamos, *Authenticity Matters*).  As the Complaint further alleges, the "IRA was an agency which allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy," and Facebook's removal of accounts "controlled" by the IRA was part of its effort "to shut down 'inauthentic' Facebook accounts that allegedly sought to inflame social and political tensions in the United States."  *Id.* ¶¶ 11, 10.[8] Likewise, an email Facebook sent to FAN explained that its decision was based on violation of the Terms of Service.  *Id.* ¶¶ 52–53.  Thus, Plaintiffs' own allegations establish that Facebook removed FAN's page based on its belief that FAN was controlled by the IRA and engaged in deceptive election interference activities in violation of Facebook's Terms.  And Plaintiffs do not claim, nor could they, that removing FAN's profile on that basis would violate either the First Amendment, Title II, the Unruh Act, or constitute a breach of contract or of the covenant of good faith.

Plaintiffs instead dispute that they in fact engaged in any such interference effort, *see* Compl. ¶¶ 44, 45, 51, 99, but that is irrelevant.  The only relevant fact for each of Plaintiffs' claims is *Facebook's* motive in removing FAN's profile.  And nothing in the Complaint (or elsewhere) supports the proposition that Facebook acted for any reason other than the one Facebook gave.

Plaintiffs' Opposition reveals that their claims rely on nothing more than baseless speculation of bad faith.  As their only basis for asserting that Facebook's true motive was FAN's national origin, Plaintiffs repeatedly reference a statement by Alex Stamos, Facebook's Chief Security Officer, posted on September 6, 2017.  That post, however, was unrelated to Facebook's

---

[8] Facebook CEO Mark Zuckerberg further explained in the blog post cited in the Complaint (¶ 21) that Facebook "found that the Russian IRA had set up a network of hundreds of fake accounts to spread divisive content and interfere in the US presidential election," and Facebook "began investigating their activity globally and taking down their pages and accounts" because "we don't want them on Facebook anywhere in the world."  Zuckerburg, *Facebook Post*, available at https://www.facebook.com/zuck/posts/10104771321644971/.

decision to remove *FAN's profile*, which occurred some seven months after the fact.  It instead addressed Facebook's investigation into the Russian government's attempted use of Facebook in its election interference efforts, and explained that Facebook was conducting a search for "'ads that might have originated in Russia.'"  *See, e.g.*, Opp. 6; Compl. ¶¶ 15–16 (citing Alex Stamos, *An Update on Information Operations of Facebook*, *available at* https://newsroom.fb.com/news/2017/09/information-operations-update/).  Mr. Stamos did not suggest that profiles connected with those ads were removed from Facebook, or that they would be.  He simply described the scope of Facebook's investigation and the information provided to U.S. officials.  *See* Stamos, *An Update*. To support their claims, Plaintiffs misleadingly summarize Mr. Stamos, attempting to suggest that he "made clear that Facebook was removing Facebook accounts for no other reason but for the fact that they origina[te] in Russia."  Opp. 6.  The statement, however, suggests no such thing.

> (b)    *Plaintiffs Do Not Plausibly Allege Title II or Unruh Act Violations*

As shown, nothing in Plaintiffs' Complaint or Opposition plausibly suggests that Facebook removed FAN's profile as an act of national-origin based discrimination.  Instead, Plaintiffs simply assert that Facebook somehow "knew that FAN never violated its terms of service, but it did not care because FAN originated in Russia, is operated by Russian nationals, and addresses a Russian audience."  Opp. 25.  Here too, Plaintiffs' only support for this assertion is the misrepresentation of Mr. Stamos' statement regarding Facebook's advertising investigation, which as explained, did not even relate to FAN's profile removal.  *See id*.  Because discrimination on the basis of national origin is a required element of both Plaintiffs' Title II and Unruh Act claims, those claims cannot proceed. *See* Mot. 15–17.  As the recently decided *Ebeid* case explained in dismissing a similar Title II claim against Facebook, "[w]hile the complaint alleges plaintiff's national origin, . . . other than a conclusory allegation," it "does nothing to connect that national origin to Facebook's alleged conduct."  *Ebeid*, 2019 WL 2059662, at *5.  The same is true here.  "Indeed, the complaint's allegations suggest that, if anything, Facebook denied plaintiff access to its services based on" Plaintiffs' relationship to the IRA and its misleading and unlawful conduct in violation of Facebook's terms, not their national origin.  *Id*.

Moreover, Plaintiffs have failed to establish that Title II applies to Facebook's platform.

1   Their argument that Facebook should be deemed a "public accommodation" within the meaning of

2   Title II ignores the extensive case law that Facebook cited rejecting that proposition, *see* Mot. 15

3   (listing cases), as well as a more recent decision reaffirming that point, *see Ebeid*, 2019 WL

4   2059662, at *6 ("Facebook is not a public accommodation covered by Title II.").  Instead of

5   explaining how that precedent does not foreclose application of the statute to Facebook, Plaintiffs

6   seem to invite the Court to treat this as a matter of first impression.  *See* Opp. 24.  But they provide

7   no basis in the *statute* for questioning courts' longstanding interpretation of "public

8   accommodation" as referring only to physical establishments.  Courts in this District have

9   reaffirmed that interpretation, including just weeks ago, explaining how it follows directly from

10   binding Ninth Circuit precedent.  *See Ebeid*, 2019 WL 2059662, at *6 (citing *Clegg v. Cult*

11   *Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994)).

12       Plaintiffs suggest that Facebook's platform should nonetheless be covered by Title II as a

13   service "of" a public accommodation.  *See* Opp. 23.  But this theory depends on Facebook, either as

14   a corporation, or its physical headquarters, being a public accommodation.  Facebook is aware of no

15   court in this Circuit that has treated either an online platform, or the corporation operating such a

16   platform, as a public accommodation within the meaning of Title II.  And Plaintiffs completely

17   disregard Facebook's explanation that its physical headquarters are *not* a public accommodation.

18   *See* Mot. 15.  They also disregard the cases Facebook cited demonstrating that even if Facebook's

19   headquarters were a public accommodation, Facebook's platform would not be a service of that

20   place because there must be a nexus between the public accommodation and the good or service

21   denied, which Plaintiffs cannot demonstrate here.  *See id*.  The cases Plaintiffs rely on in their

22   Opposition do not support a different conclusion.  *See* Opp. 23–24; *Carroll v. FedFinancial Fed.*

23   *Credit Union*, 324 F. Supp. 3d 658, 665–67 (E.D. Va. 2018) (not reaching question whether website

24   was public accommodation within meaning of Americans with Disabilities Act and relying on facts

25   that established a clear nexus between the defendant's physical establishment and its website, such

26   as that the website was offered as a service of brick-and-mortar location, and barriers on site

27   deterred plaintiff from accessing brick-and-mortar location); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d

28   1017, 1023 (N.D. Cal 2012) (recognizing that *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp.

2d 196, 200–01 (D. Mass. 2012), is contrary to Ninth Circuit precedent).

     *(c)*  *Plaintiffs Do Not Plausibly Allege a Breach of Contract or the*
         *Covenant of Good Faith*

    Like their other claims, Plaintiffs' contract claims depend on the Court accepting the baseless assertion that Facebook removed FAN's profile because of FAN's national origin.  *See* Opp. 22–23. They do not contest that removing FAN's profile for being affiliated with the IRA and its misleading and unlawful activity is permissible under the Terms of Service.  And because their attempt to disregard that basis for the removal decision cannot be credited, their contract claims must fail.

    Plaintiffs also have not rebutted Facebook's demonstration that the Terms do not place any affirmative obligation on Facebook to continue to provide access to its service indefinitely, or in any particular circumstance.  Mot. 18.  Nor have they suggested a basis in the contract for permitting a user to challenge Facebook's determination that the user has violated Facebook's Terms.  *Id.* at 19. Plaintiffs point to various limitations Facebook places on users' use of the platform, as well as the permissions that users grant Facebook.  *See* Opp. 19–21.  But they still cannot identify any provision *requiring* Facebook to continue to provide its service under any circumstances.  And they state no basis for distinguishing or ignoring the cases Facebook cited adopting Facebook's interpretation of its Terms.  *See* Mot. 18 (citing *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1064 (N.D. Cal. 2016); *Young v. Facebook, Inc.*, 5:10-cv-03579-JF/PVT, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010) (holding that "while these provisions place restrictions on users' behavior, they do not create affirmative obligations" on Facebook to provide service)).[9]  Because "a party cannot be held liable on a bad faith claim for doing what is expressly permitted in the agreement," this forecloses both Plaintiffs' breach of contract and breach of good faith claims.  *Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1137 (9th Cir. 1998); *Ebeid*, 2019 WL 2059662, at *8.

---

[9] Plaintiffs also argue that "Facebook was and is unable to name even one alleged violation by FAN" that would fall within the "reasons Facebook may remove content and disable accounts." Opp. 21–22.  Of course, it is not Facebook's burden to establish FAN's breach of contract on a motion to dismiss.  Still, in impermissibly relying on materials outside of the Complaint to "set out the parameters for the removal of content" (Opp. 21), Plaintiffs conveniently fail to mention that the Terms of Service expressly state that accounts which are either fraudulent or engage in illegal activity may be removed.  Compl. Ex. 2, at 3.  And the Complaint itself establishes that Facebook removed FAN's profile for that reason.  Even if Facebook had affirmative obligations under the Terms, the Complaint demonstrates they were fulfilled here.

1   DATED:  May 29, 2019                    MUNGER, TOLLES & OLSON LLP
2                                               ROSEMARIE T. RING
                                                JONATHAN H. BLAVIN
3

4                                           By:      _/s/ Rosemarie T. Ring_
5                                                 ROSEMARIE T. RING
                                            Attorneys for Defendant Facebook, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT