1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11
12

FEDERAL AGENCY OF NEWS LLC, et al.,

13

Plaintiffs,

14

v.

15

FACEBOOK, INC.,

16

Defendant.

17

Case No. 18-CV-07041-LHK

**ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE**

Re: Dkt. No. 25

18        Plaintiffs Federal Agency of News LLC ("FAN") and Evgeniy Zubarev (collectively,

19   "Plaintiffs") bring suit against Defendant Facebook, Inc. ("Facebook") because Facebook removed

20   FAN's Facebook account and page. Before the Court is Facebook's motion to dismiss. ECF No.

21   25. Having considered the parties' submissions, the relevant law, and the record in this case, the

22   Court GRANTS Facebook's motion to dismiss without prejudice.

23   I.        **BACKGROUND**

24             **A.  Factual Background**

25        Plaintiff FAN is a "corporation organized and existing under the laws of the Russian

26   Federation" that "gathers, transmits and supplies domestic and international news reports and

27   other publications of public interest." ECF No. 1 ("Compl.") at ¶¶ 2, 5. Plaintiff Evgeniy Zubarev

28

United States District Court
Northern District of California

is "the sole shareholder and General Director of FAN." *Id.* at ¶ 6. Defendant Facebook operates an online social media and social networking platform on which users like FAN can disseminate content by publishing on the users' Facebook page "posts and other content for its Facebook followers." *Id.* at ¶¶ 3-4, 25. Facebook users' utilization of Facebook is governed by Facebook's Terms of Service that, if violated, may result in the deletion of users' Facebook accounts and pages. *Id.* at ¶¶ 4, 53, 94.

On or about December 2014, FAN started "a Facebook page through which FAN has published its posts and other content for its Facebook followers." *Id.* at ¶ 3. After the 2016 United States presidential election, "Facebook began to shut down 'inauthentic' Facebook accounts that allegedly sought to inflame social and political tensions in the United States." *Id.* at ¶ 10. Facebook allegedly shut down such accounts because the accounts' activities were "similar or connected to that of Russian Facebook accounts during the 2016 United States presidential election which were allegedly controlled by the Russia-based Internet Research Agency ('IRA')." *Id.* FAN's Facebook account and page were among those that were shut down. *Id.* at ¶ 52. FAN's Facebook account and page were shut down on April 3, 2018. *Id.*

### 1. FAN's Role in Russian Interference in the 2016 United States Presidential Election

As aforementioned, Facebook shut down Facebook accounts with connections to Russian Facebook accounts allegedly controlled by the IRA. *Id.* at ¶ 10. The IRA was "an agency which allegedly employed fake accounts registered on major social networks . . . to promote the Russian government's interests in domestic and foreign policy." *Id.* at ¶ 11. Specifically, in a United States Intelligence Community report regarding Russian interference in the 2016 presidential election, the IRA was described as an agency of "professional trolls whose likely financier is a close Putin ally with ties to Russian intelligence." *Id.* at ¶ 14 (internal quotation marks omitted). Notably, from "the time of FAN's incorporation and until in or about the middle of 2015, FAN and the IRA were located in the same building" in Saint Petersburg, Russia. *Id.* at ¶ 32.

In addition, FAN's founder and first "General Director" is Aleksandra Krylova. *Id.* at ¶ 29.

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

The Special Counsel investigation into Russian interference in the 2016 presidential election that was headed by Robert Mueller determined that Krylova was employed by the IRA from about September 2013 to about November 2014. *Id.* at ¶¶ 19, 29. However, FAN proclaims that it does not know the veracity of the Special Counsel's finding. *Id.* at ¶ 29. Nevertheless, on February 16, 2018, the Special Counsel indicted Krylova, who was accused of participation in the IRA's "interference operations targeting the United States." *Id.* at ¶ 34.

Moreover, on October 19, 2018, the United States District Court for the Eastern District of Virginia unsealed a criminal complaint. *Id.* at ¶ 36. The criminal complaint divulged that the Federal Bureau of Investigation ("FBI") had uncovered "a Russian interference operation in political and electoral systems targeting populations within the Russian Federation, and other countries, including the United States" codenamed "Project Lakhta." *Id.* In support of the criminal complaint, the FBI asserted that Project Lakhta used "inauthentic user names to create fictitious Facebook profiles" and "published false and misleading news articles intended to influence the U.S. and other elections." *Id.* at ¶¶ 41, 43. Notably, the FBI also attested that FAN, as well as the IRA, were entities within Project Lakhta. *Id.* at ¶ 37. Furthermore, the criminal complaint was filed against Elena Khusyaynova, who has been FAN's chief accountant since August 2, 2016. *Id.* at ¶ 36, 46. However, FAN maintains that it had no involvement in Project Lakhta or a "direct connection" to the IRA. *Id.* at ¶¶ 40, 51.

### 2. Facebook's Role in the United States' Investigation of Russian Interference in the 2016 Presidential Election

On September 6, 2017, Facebook's Chief Security Officer Alex Stamos announced that "Facebook found approximately $100,000 in advertisement spending" between June 2015 and May 2017 "associated with more than 3,000 advertisements in connection with approximately 470 allegedly inauthentic Facebook accounts and Pages." *Id.* at ¶ 15. Stamos stated that "Facebook conducted a sweeping search looking for all ads that might have originated in Russia." *Id.* at ¶ 16. Facebook then "shared these findings with United States authorities" and provided Congress "with information related to the 3,000 advertisements." *Id.* at ¶¶ 16-17.

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

On September 21, 2017, Facebook's cofounder, chairman, and chief executive officer Mark Zuckerberg released a video stating that "Facebook is actively working with the U.S. government on its ongoing investigations into Russian interference" and that Facebook is supplying information to the Special Counsel. *Id.* at ¶ 19.

### 3.  The Removal of FAN's Facebook Account and Page

On April 3, 2018, Facebook shut down FAN's Facebook account and page. *Id.* at ¶ 52. In an email, Facebook explained that FAN's Facebook account and page were shut down because FAN violated Facebook's Terms of Service. *Id.* at ¶ 53. FAN was among the more than 270 Russian language accounts and pages that Facebook shut down on April 3, 2018. *Id.* at ¶ 20. On the same day, Zuckerberg published a blog post explaining Facebook's actions. *Id.* at ¶ 21. Zuckerberg wrote that the accounts and pages taken down on April 3, 2018 were removed because "they were controlled by the IRA" and not because of "the content they shared." *Id.* Specifically, Zuckerberg wrote that the IRA "has repeatedly acted deceptively and tried to manipulate people in the US, Europe, and Russia," and since 2016, when the IRA "had set up a network of hundreds of fake accounts to spread divisive content and interfere in the US presidential election," Facebook has improved its "techniques to prevent nation states from interfering in foreign elections." Mark Zuckerberg, https://www.facebook.com/zuck/posts/10104771321644971 (last visited July 19, 2019).

### B.  Procedural History

On November 20, 2018, Plaintiffs filed their complaint against Facebook. ECF No. 1. On April 15, 2019, Facebook filed the instant motion to dismiss. ECF No. 25 ("Mot."). On May 15, 2019, Plaintiffs filed an opposition. ECF No. 26 ("Opp."). On May 29, 2019, Facebook filed a reply. ECF No. 27 ("Reply"). On June 12, 2019 and June 19, 2019, Facebook filed two separate statements of recent decisions pursuant to Civil Local Rule 7-3(d)(2). ECF Nos. 28-29.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a

short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

**B. Leave to Amend**

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant

5

leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.   DISCUSSION

Plaintiffs' complaint states the following five causes of action: (1) a *Bivens* claim for violation of the First Amendment; (2) "damages under Title II of the U.S. Civil Rights Act of 1964 and 42 U.S.C. Section 1983"; (3) "damages under the California Unruh Civil Rights Act"; (4) breach of contract; and (5) breach of implied covenant of good faith and fair dealing. Compl. at ¶¶ 59-117.

Facebook argues that the Communications Decency Act renders Facebook immune from all of Plaintiffs' federal and state causes of action, except for Plaintiffs' first cause of action: a *Bivens* claim for violation of the First Amendment. Mot. at 6. Moreover, Facebook argues that Plaintiffs' *Bivens* claim for violation of the First Amendment fails because Facebook is not a state actor, and the First Amendment only applies to state actors or private entities whose actions amount to state action. *Id.* at 9.

The Court finds Facebook's arguments persuasive. Therefore, below, the Court first addresses why Plaintiffs' second cause of action for "damages under . . . 42 U.S.C. Section 1983" fails, then how Facebook is immune from most of Plaintiffs' remaining causes of action pursuant to the Communication Decency Act, and finally why Plaintiffs' *Bivens* claim for violation of the First Amendment fails because Facebook is neither a state actor nor a private actor whose actions amount to state action.

### A.  Plaintiffs' Second Cause of Action for Damages under 42 U.S.C. § 1983 Fails

Plaintiffs' second cause of action requests "damages under . . . 42 U.S.C. Section 1983." Compl. at ¶¶ 79-88. It is unclear how Plaintiffs can allege a § 1983 violation. "To sustain an action

United States District Court
Northern District of California

6

1    under § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person

2    acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional

3    right." *Balistreri v. Pacifia Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Plaintiffs' complaint

4    does not allege that any party was acting under color of *state* law. Moreover, this second cause of

5    action also alleges a violation of Title II of the Civil Rights Act of 1964, not a violation of a

6    constitutional right. Therefore, to the extent Plaintiffs allege a violation of § 1983 under Plaintiffs'

7    second cause of action, the Court hereby DISMISSES the § 1983 claim with prejudice.

8    Amendment would be futile and unduly prejudicial to Facebook. *Leadsinger*, 512 F.3d at 532

9    ("[W]hether to grant leave to amend nevertheless remains within the discretion of the district

10   court, which may deny leave to amend due to undue delay, bad faith[,] dilatory motive[,] . . .

11   repeated failure to cure deficiencies, . . . undue prejudice to the opposing party[,] . . . [and] futility

12   of amendment."). No amount of additional pleading can transform Plaintiffs' Title II statutory

13   claim into a claim for violation of a constitutional right. Moreover, it would be prejudicial to

14   require Facebook to continue to litigate a claim that fails as a matter of law.

15       **B.  Communications Decency Act**

16       The Court now turns to the Communications Decency Act, which renders Facebook

17   immune from all of Plaintiffs' causes of action, except for Plaintiffs' *Bivens* claim for violation of

18   the First Amendment.

19       Under the Communications Decency Act, "[n]o provider or user of an interactive computer

20   service shall be treated as the publisher or speaker of any information provided by another

21   information content provider." 47 U.S.C. § 230(c)(1). In interpreting § 230, the Ninth Circuit held

22   en banc that in "passing section 230 [of the Communications Decency Act], . . . Congress sought

23   to immunize the *removal* of user-generated content . . . ." *Fair Hous. Council of San Fernando*

24   *Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (emphasis added).

25   Any "activity that can be boiled down to deciding whether to exclude material that third parties

26   seek to post online is perforce immune under section 230." *Id.* at 1170-71. This immunity extends

27   to causes of action under both state and federal law. *Id.* at 1169 n.24. Moreover, § 230(c)(1)

28

United States District Court
Northern District of California

7

1   "immunizes decisions to delete user profiles." *Riggs v. MySpace, Inc.*, 444 Fed. App'x 986, 987

2   (9th Cir. 2011). However, the Ninth Circuit has not interpreted § 230 to grant immunity for causes

3   of action alleging constitutional violations. *Roommates.Com*, 521 F.3d at 1164.

4          The Communications Decency Act's grant of immunity applies to a defendant if: "(1)

5   Defendant is a provider or user of an interactive computer service; (2) the information for which

6   Plaintiff seeks to hold Defendant liable is information provided by another information content

7   provider; and (3) Plaintiff's claim seeks to hold Defendant liable as the publisher or speaker of that

8   information." *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1092

9   (hereinafter "*Sikhs for Justice I*") (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Justice, Inc. v.*

10  *Facebook, Inc.*, 697 Fed. App'x 526 (9th Cir. 2017) (hereinafter "*Sikhs for Justice II*"). The Court

11  addresses these three prongs in turn.

### 1. Interactive Computer Service

13         To satisfy the first prong of the Communications Decency Act's immunity test, the

14  defendant must be an "interactive computer service." "Interactive computer service" is defined as

15  "any information service, system, or access software provider that provides or enables computer

16  access by multiple users to a computer server, including specifically a service or system that

17  provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2). Facebook is unquestionably an

18  interactive computer service, and Plaintiffs do not even attempt to dispute that Facebook is an

19  interactive computer service. In addition, according to Plaintiffs' complaint, Facebook is a "web

20  based platform or service" with "2.2 billion monthly users" who utilize the internet to gain access

21  to "Facebook account[s], posts, and all content" stored on Facebook's "platform or service."

22  Compl. at ¶¶ 1, 60-61. Thus, Plaintiffs' complaint also supports the notion that Facebook is an

23  interactive computer service.

24         This Court has previously found that Facebook is an "interactive computer service"

25  because Facebook "provides or enables computer access by multiple users to a computer service."

26  *Sikhs for Justice I*, 144 F. Supp. 3d at 1093. This Court's decision in *Sikhs for Justice I* was

27  affirmed by the Ninth Circuit, which also held that "Facebook is an interactive computer service

28

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

provider." *Sikhs for Justice II*, 697 Fed. App'x at 526. Similarly, in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011), this Court found that "Facebook meets the definition of an interactive computer service under the [Communications Decency Act]."

Many other courts have also found Facebook to be an interactive computer service. For instance, the Court of Appeals for the District of Columbia held: "Facebook qualifies as an interactive computer service because it is a service that provides information to multiple users by giving them computer access . . . to a computer server, namely the servers that host its social networking website." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *see also Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065 (N.D. Cal. 2016) ("Plaintiff does not vigorously dispute that Facebook provides or enables computer access by multiple users to a computer service. As such, the court finds, as others have previously, that Facebook provides an interactive computer service." (internal quotation marks and citations omitted)).

Thus, Facebook satisfies the first prong of the Communications Decency Act's immunity test: that Facebook is an interactive computer service.

### 2. Information Provided by Another Information Content Provider

To satisfy the second prong of the Communication Decency Act's immunity test, the information for which Plaintiffs seek to hold Facebook liable—FAN's account, posts, and content—must be information provided by an "information content provider" that is not Facebook. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Plaintiffs do not challenge that the information for which Plaintiffs seek to hold Facebook liable for removing—FAN's Facebook account, posts, and content—was not provided by Facebook, but rather, by FAN. Indeed, Plaintiffs' complaint is unequivocal that "FAN has operated a Facebook page through which FAN has published its posts and other content," that "FAN . . . gathers, transmits, and supplies domestic and international news reports and other publications of public interest," and that "[o]ne of the media that FAN uses to disseminate news,

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

primarily of local interest, throughout the Russian Federation is Facebook." Compl. at ¶¶ 2-3, 25. Thus, Plaintiffs' own complaint admits that FAN is the source of the information that Facebook removed. By contrast, the complaint nowhere alleges that Facebook provided, created, or developed any portion or content of FAN's Facebook account, posts, and content. Therefore, FAN is the information content provider in the instant case.

An analogous case is *Lancaster v. Alphabet Inc.*, 2016 WL 3648608 (N.D. Cal. July 8, 2016). The *Lancaster* plaintiff brought suit against the defendant because the defendant removed some of the plaintiff's videos hosted by the video sharing website YouTube. *Id.* at *3. However, because the removed videos were not created by YouTube, but rather, were the plaintiff's creations or public domain videos, the *Lancaster* court concluded that the information for which the plaintiff sought to hold the defendant liable was information provided by another information content provider (i.e., the *Lancaster* plaintiff) and not YouTube.

Likewise, here, the complaint reveals that FAN's Facebook account, posts, and content were created and disseminated by FAN, not Facebook. Thus, Facebook satisfies the second prong of the Communications Decency Act's immunity test: that the information for which the Plaintiffs seek to hold Facebook liable was information solely provided by FAN, the information content provider in the instant case.

### 3.  Treatment as Publisher

The third and final prong of the Communication Decency Act's immunity test requires that Plaintiffs seek to hold Facebook liable as a publisher or speaker of Plaintiffs' content. "[P]ublication involves reviewing, editing, and deciding whether to publish or to *withdraw from publication* third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added).

Here, Plaintiffs' claims are based on Facebook's decision to remove FAN's account, postings, and content. Note that here, the Court does not broach Count I, Plaintiffs' *Bivens* claim for violation of the First Amendment, because as discussed above, the Communications Decency Act does not immunize a defendant from constitutional claims. However, the Court discusses how

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

Plaintiffs' remaining causes of action are predicated on Facebook's decision to remove FAN's account, postings, and content.

For instance, Count II of Plaintiffs' complaint seeks damages under Title II of the Civil Rights Act of 1964 because "Facebook willfully, intentionally, purposefully, knowingly, recklessly, and/or negligently deprived FAN and its members . . . of Facebook's internet-based social networking service." Compl. at ¶ 84. Count III of Plaintiffs' complaint seeks damages under the California Unruh Civil Rights Act because "Facebook has denied access to Facebook internet connections and the Facebook 'community' based on Russian nationality and/or Russian ethnicity." *Id.* at ¶ 91. Count IV of Plaintiffs' complaint alleges breach of contract because "Facebook breached the contract[, the Facebook Terms of Service,] by removing FAN's Facebook account and blocking FAN's content." *Id.* at ¶ 98. Count V of Plaintiffs' complaint alleges a breach of the implied covenant of good faith and fair dealing because "Facebook breached its implied covenant of good faith and fair dealings [sic] by blocking FAN's access to Facebook users and FAN subscribers." *Id.* at ¶ 106.

Thus, Plaintiffs' claims are based on Facebook's decision *not to publish* FAN's content. The Ninth Circuit has held that it is "immaterial whether [the] decision comes in the form of deciding what to publish in the first place or what to remove among the published material." *Barnes*, 570 F.3d at 1102 n.8. In other words, "removing content is something publishers do, and to impose liability on the basis of such conduct *necessarily involves treating the liable party as a publisher*." *Id.* at 1103 (emphasis added). Indeed, the Ninth Circuit has held en banc that "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230" of the Communications Decency Act. *Roommates.Com*, 521 F.3d at 1163. Thus, because Plaintiffs' second through fifth claims are predicated on Facebook's decision to remove content, Ninth Circuit law under *Barnes* unambiguously establishes that Plaintiffs' claims treat Facebook as a publisher. Therefore, Facebook satisfies the third and final prong of the Communications Decency Act's immunity test: that Plaintiffs seek to hold Facebook liable as a publisher or speaker of Plaintiffs' content.

11

1    Plaintiffs argue that the Communications Decency Act does not immunize Facebook

2    because the instant case "does not concern obscenity or any other form of unprotected speech; it

3    concerns political speech that strikes at the heart of the First Amendment." Opp. at 16. It is telling

4    that Plaintiffs fail to cite any authority for this argument. Immunity under the Communications

5    Decency Act does not contain a political speech exception. The statutory text provides that no

6    "provider or user of an interactive computer service shall be treated as the publisher or speaker of

7    *any information* provided by another information content provider. 47 U.S.C. § 230(c)(1)

8    (emphasis added). No distinction is made between political speech and non-political speech.

9    Numerous courts have held that the Communications Decency Act immunizes a website's

10   removal of political speech. For instance, this Court has held that under the Communications

11   Decency Act, Facebook was immune from liability for blocking access to the plaintiff's Facebook

12   page through which the plaintiff had "organized a number of political and human rights advocacy

13   campaigns." *Sikhs for Justice I*, 144 F. Supp. 3d at 1090, 1094-96. The Ninth Circuit affirmed this

14   Court's order in *Sikhs for Justice I. See Sikhs for Justice II*, 697 Fed. App'x at 526; *see also Ebeid*

15   *v. Facebook, Inc.*, 2019 WL 2059662, at *1-*3 (N.D. Cal. May 9, 2019) (holding that the

16   Communications Decency Act immunized Facebook for "restricting what plaintiff can post on the

17   Facebook platform" by removing the plaintiff's posts "calling for the recall of John Casson, the

18   then-British Ambassador to Egypt").

19   Moreover, Plaintiffs assert that granting Facebook immunity in the instant case is counter

20   to the congressional intent behind the Communications Decency Act. Opp. at 18-19. Plaintiffs'

21   argument misses the mark. The Ninth Circuit has held: "Both parties make a lot of sound and fury

22   on the congressional intent of the immunity under section 230, but such noise ultimately signifies

23   nothing. It is the *language of the statute* that defines and enacts the concerns and aims of

24   Congress; a particular concern does not rewrite the language." *Barnes*, 570 F.3d at 1105 (emphasis

25   added). As explained above, Ninth Circuit case law interpreting the language of the

26   Communications Decency Act, 47 U.S.C. § 230(c)(1), has held that "activity that can be boiled

27   down to deciding whether to exclude material that third parties seek to post online is perforce

28

12

immune under section 230." *Roommates.Com*, 521 F.3d at 1170-71.

### 4.  Summary

Facebook satisfies all three prongs of the test to establish whether the Communications Decency Act immunizes Facebook from non-constitutional federal and state causes of action. Plaintiffs' non-constitutional causes of action are: the second cause of action for damages under Title II of the Civil Rights Act of 1964; the third cause of action for damages under the California Unruh Civil Rights Act; the fourth cause of action for breach of contract; and the fifth cause of action for breach of the implied covenant of good faith and fair dealing. As none of these causes of action are asserted as a constitutional claim, the Communications Decency Act immunizes Facebook from liability for all these causes of action. Therefore, the Court need not reach the merits of these causes of action.

Thus, because of Facebook's immunity under the Communications Decency Act, the Court hereby DISMISSES: the second cause of action for damages under Title II of the Civil Rights Act of 1964; the third cause of action for damages under the California Unruh Civil Rights Act; the fourth cause of action for breach of contract; and the fifth cause of action for breach of the implied covenant of good faith and fair dealing.

Even though the Court is skeptical that Plaintiffs can state a claim, the Court grants leave to amend out of an abundance of caution. *See Leadsinger, Inc.*, 512 F.3d at 532.

### C.  *Bivens* Claim for Violation of the First Amendment

Plaintiffs' sole remaining claim is their first cause of action: a *Bivens* claim for violation of the First Amendment. However, it is axiomatic that the "constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). Thus, it is "undisputed that the First Amendment of the United States Constitution only applies to government actors; it does not apply to private corporations or persons." *Redden v. The Women's Ctr. of San Joaquin Cty.*, 2006 WL 132088, at *1 (N.D. Cal. Jan. 17, 2008) (citing *Manson v. Little Rock Newspapers, Inc.*, 200 F.3d 1172, 1173 (8th Cir. 2000)).

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Indeed, courts have previously rejected attempts to apply the First Amendment to

2  Facebook, a "corporation organized and existing under the laws of the State of Delaware," Compl.

3  at ¶ 7. For instance, the *Freedom Watch, Inc. v. Google, Inc.* court dismissed the plaintiffs' First

4  Amendment claim because "Facebook and Twitter . . . are private businesses that do not become

5  'state actors' based solely on the provision of their social media networks to the public." 368 F.

6  Supp. 3d 30, 40 (D.D.C. 2019); *see also, e.g.*, *Young v. Facebook, Inc.*, 2010 WL 4269304, at *3

7  (N.D. Cal. Oct. 25, 2010) (dismissing the plaintiff's claim against Facebook for violation of the

8  First Amendment because Facebook is not a state actor); *Shulman v. Facebook.com*, 2017 WL

9  5129885, at *4 (D.N.J. Nov. 6, 2017) (rejecting the plaintiff's First Amendment claim against

10  Facebook because Facebook is not a state actor, and noting that "efforts to apply the First

11  Amendment to Facebook . . . have consistently failed"). Here, Plaintiffs make no allegations that

12  the federal government or a state government had any involvement in Facebook's removal of

13  FAN's profile, page, and content. Thus, Facebook's deletion of FAN's profile, page, and content

14  is private conduct that does not constitute governmental action. Therefore, Plaintiffs fail to state a

15  *Bivens* claim against Facebook for violation of the First Amendment.

16    However, Plaintiffs maintain that Facebook's deletion of FAN's profile, page, and content

17  is actionable under the First Amendment. Specifically, Plaintiffs assert that first, Facebook

18  constitutes a "public forum," and second, that Facebook's actions amount to state action. Opp. at

19  9, 12. Neither argument is persuasive. The Court addresses Plaintiffs' two arguments in turn.

20    **1.  Facebook is Not a Public Forum**

21    Plaintiffs argue, without support from any authority, that a "public forum denotes a place,

22  whether it be a physical place or a location in cyber space that is open to the public for purposes of

23  expression." *Id.* at 9. Plaintiffs believe that Facebook is a public forum because Facebook

24  "operates a freely available public forum, open to any and all people who are at least 13 years old,

25  with internet access and a valid e-mail address." *Id.*

26    Facebook argues that Plaintiffs' arguments are incorrect because case law has rejected the

27  notion that private companies such as Facebook are public fora. Mot. at 11. Furthermore,

28
14

1  Facebook asserts that in order for a private entity to operate as a public forum, the entity must

2  have engaged in a function that is both traditionally and exclusively governmental. *Id.* The Court

3  finds Facebook's arguments more compelling, and addresses each of Facebook's arguments in

4  turn.

5          a.   Case Law Establishes that Private Internet Companies are not Public Fora

6          Courts have rejected the notion that private corporations providing services via the internet

7  are public fora for purposes of the First Amendment. For instance, in *Prager Univ. v. Google LLC*,

8  this Court *rejected* the notion that "*private social media corporations . . . are state actors that must

9  regulate the content of their websites according to the strictures of the First Amendment*" under

10  public forum analysis. 2018 WL 1471939, at *8 (N.D. Cal. Mar. 26, 2018) (emphasis in original).

11  In addition, the *Ebeid* court rejected the argument that Facebook is a public forum. 2019 WL

12  2059662, at *6. Moreover, in *Buza v. Yahoo!, Inc.*, the court held that the plaintiff's assertion that

13  "Yahoo!'s services should be seen as a 'public forum' in which the guarantees of the First

14  Amendment apply is not tenable under federal law. As a private actor, Yahoo! has every right to

15  control the content of material on its servers, and appearing on websites that it hosts." 2011 WL

16  5041174, at *1 (N.D. Cal. Oct. 24, 2011). Furthermore, in *Langdon v. Google, Inc.*, the court held

17  that "Plaintiff's analogy of [Google and other] Defendants' private networks to shopping centers

18  and [plaintiff's] position that since they are open to the public they become public forums is not

19  supported by case law." 474 F. Supp. 2d 622, 632 (D. Del. 2007).

20          At bottom, the United States Supreme Court has held that property does not "lose its

21  private character merely because the public is generally invited to use it for designated purposes."

22  *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972). Thus, simply because Facebook has many users

23  that create or share content, it does not mean that Facebook, a private social media company by

24  Plaintiffs' own admission in the complaint, becomes a public forum.

25          Plaintiffs rely on *Marsh v. Alabama*, 326 U.S. 501 (1946), and its progeny for the notion

26  that a "private enterprise [that] exercised semi-official municipal functions as a delegate of the

27  state would be subject to the public fora analysis of the First Amendment." Opp. at 9. However,

28
Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

1   *Marsh* is distinguishable. In *Marsh*, the United States Supreme Court held that the prosecution of a

2   person distributing religious literature on the sidewalk of a private company-owned town violated

3   the First Amendment. 326 U.S. at 508-09. The United States Supreme Court reasoned that

4   although the company-owned town was privately owned, the town was essentially a public

5   municipality subject to the First Amendment because the town exercised the powers of a public

6   municipality. *Id.* at 503-04, 509. However, the United States Supreme Court subsequently cabined

7   the holding in *Marsh* to the situation where a private enterprise assumes "*all* of the attributes of a

8   state-created municipality" such that the private enterprise "was performing the full spectrum of

9   municipal powers and stood in the shoes of the State." *Lloyd Corp.*, 407 U.S. at 569. Plaintiffs do

10  not allege that Facebook assumes all of the attributes of a state-created municipality or that

11  Facebook was performing the full spectrum of municipal powers and stood in the shoes of the

12  state. Thus, *Marsh* does not support Plaintiffs' argument.

13         In sum, Facebook is not a public forum under Ninth Circuit law.

14             b.   For a Private Entity to Operate as a Public Forum, the Entity Must Engage in a
                    Function that is Both Traditionally and Exclusively Governmental

15

16         The Court now turns to Plaintiffs' argument that Facebook operates as a public forum by

17  engaging in functions that are traditionally and exclusively governmental. Whether a private entity

18  operates as a public forum is only relevant to the "public function test," one of four tests the

19  United States Supreme Court has articulated "for determining whether a private [party's] actions

20  amount to state action." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012); *see also*

21  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (holding that because an entity "performs an

22  exclusively and traditionally public function within a public forum, we focus only upon the public

23  function test"). Here, the Court finds that Facebook did not engage in functions that are

24  traditionally and exclusively functions of the state. Examples of functions that are traditionally the

25  exclusive prerogative of the state include "hol[ding public] elections", "govern[ing] a town," or

26  "serv[ing] as an international peacekeeping force." *Brunette v. Humane Society of Ventura Cty.*,

27  294 F.3d 1205, 1214 (9th Cir. 2002). There are no allegations that Facebook holds public

28

16

United States District Court
Northern District of California

1    elections, governs a town, or serves as an international peacekeeping force.

2         This Court has previously held that "private entities who creat[e] their own . . . social

3    media website and make decisions about whether and how to regulate content that has been

4    uploaded on that website" have not engaged in "public functions that were traditionally

5    exclusively reserved to the State." *Prager*, 2018 WL 1471939, at *8 (internal quotation marks

6    omitted). Similarly, the *Ebeid* court held that "Facebook's regulation of speech on its platform" is

7    not a function exclusively reserved for the state, thus Facebook was not a public forum. 2019 WL

8    2059662, at *6. Moreover, the *Harris v. Kern Cty. Sheriffs* court held that Facebook does not

9    satisfy the public function test because Facebook "had [not], "in essence, become the

10   government." 2019 WL 1777976, at *6 (E.D. Cal. Apr. 23, 2019). Furthermore, the *Cyber*

11   *Promotions, Inc. v. Am. Online, Inc.* court held that AOL, "one of many private online companies

12   which allow its members access to the Internet . . . where they can exchange information with the

13   general public," did not satisfy the public function test. 948 F. Supp. 436, 442 (E.D. Pa. 1996).

14        Numerous other courts have also declined to treat similar private social media

15   corporations, as well as online service providers, as state actors. *See, e.g.*, *Howard v. Am. Online,*

16   *Inc.*, 208 F.3d 741, 754 (3d Cir. 2000) (rejecting argument that AOL should be deemed a state

17   actor because it is a "quasi-public utility" that "involves a public trust"); *Kinderstart.com LLC v.*

18   *Google, Inc.*, 2007 WL 831806, at *14 (N.D. Cal. Mar. 16, 2007) ("[T]he emanation of third-party

19   speech from a search engine [does not] somehow transform[] that privately-owned entity into a

20   public forum."); *Nyabwa v. Facebook*, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018)

21   ("Because the First Amendment governs only governmental restrictions on speech, Nyabwa has

22   not stated a cause of action against Facebook."); *Shulman v. Facebook.com*, 2017 WL 5129885, at

23   *4 (D.N.J. Nov. 6, 2017) (rejecting the plaintiff's claims against Facebook for failure to

24   sufficiently allege that Facebook is a state actor); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622,

25   631-32 (D. Del. 2007) (finding that Google is a private entity that is "not subject to constitutional

26   free speech guarantees" and asserting that the United States Supreme Court "has routinely rejected

27   the assumption that people who want to express their views in a private facility, such as a

28

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

*United States District Court*
*Northern District of California*

shopping center, have a constitutional right to do so").

Thus, by operating its social media website, Facebook has not engaged in any functions exclusively reserved for the government. Therefore, Facebook does not operate as a public forum, so Facebook's actions do not amount to state action under the public function test.

### 2.  Facebook's Actions Do Not Amount to State Action

Plaintiffs assert that Facebook's actions satisfy the joint action test, which is one of the four tests the United States Supreme Court has articulated in discerning whether a private party's actions amount to state action subject to the Constitution. Opp. at 12-13. However, Facebook responds by asserting that there are no factual allegations in Plaintiffs' complaint that would support a finding that Facebook satisfies the joint action test. Mot. at 13. Facebook has the better argument.

The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao*, 698 F.3d at 1140 (internal quotation marks omitted). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.* (internal quotation marks omitted). "Ultimately, joint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Id.* Notably, merely "supplying information [to the state] alone does not amount to conspiracy or joint action." *Deeths v. Lucile Slater Packard Children's Hosp. at Stanford*, 2013 WL 6185175, at *10-*11 (E.D. Cal. Nov. 26, 2013); *see also Lockhead v. Weinstein*, 24 Fed. App'x 805, 806 (9th Cir. 2001) ("[T]he mere furnishing of information to police officers does not constitute joint action . . . ."); *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 327 (7th Cir. 1978), *cert. denied*, 444 U.S. 841 ("[W]e decline to hold that the mere act of furnishing information to law enforcement officers constitutes joint (activity) with state officials . . . ." (internal quotation marks omitted)); *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1157 (10th Cir. 2016) ("[W]e have consistently held that furnishing information to law enforcement officers, without more, does not constitute joint action.");

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1    *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (same);

2    *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) (same). The Court first discusses

3    whether Facebook was a willful participant in joint action with the government, and then turns to

4    whether Facebook and the government conspired together.

5             a.   Facebook was not a Willful Participant in Joint Action with the Government

6             As discussed above, the joint action test can be satisfied if the private party was a "willful

7    participant in joint action with the State." *Tsao*, 698 F.3d at 1140. The only allegations that

8    Plaintiffs can muster in support of their joint action theory are:

9    • that Facebook searched for advertisements that "might have originated in Russia," and
10       "shared these findings with United States authorities," Compl. at ¶ 16;

11   • that "Facebook would provide the United States Congress with information," *Id.* at ¶ 17

12   • that Facebook would "do its part 'to make sure investigators have the information they
13       need,'" *Id.* at ¶ 18;

14   • that Facebook was "actively working with the U.S. government" and "providing
15       information" to the Special Counsel, *Id.* at ¶ 19; and

16   • that Facebook acted "at the behest of the government of the United States," *Id.* at ¶ 66.

17   These allegations reveal that Facebook allegedly supplied the government with information that

18   might relate to the government's investigation into Russian interference with the 2016 presidential

19   election. However, the case law is unequivocal that "supplying information [to the state] alone

20   does not amount to conspiracy or joint action." *Deeths*, 2013 WL 6185175, at \*10-\*11. Indeed,

21   the complaint does not even allege that the government was aware that Facebook removed FAN's

22   account and page. Moreover, the allegation that Facebook acted "at the behest of the government"

23   is entirely conclusory and fails to meet the pleading standard set forth in *Twombly* and *Iqbal*. A

24   "bare allegation of . . . joint action will not overcome a motion to dismiss." *Dietrich v. John*

25   *Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir. 2008).

26            The Court finds *Deeths* instructive. In *Deeths*, the plaintiff sued, *inter alia*, Dr. John

27   Stirling for Dr. Stirling's role in Kern County Child Protective Services' social workers'

28    

United States District Court
Northern District of California

19

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

investigation into suspected child abuse by the plaintiff and removal of the plaintiff's child from the plaintiff's care. 2013 WL 6185175, at *10. Specifically, the plaintiff alleged that Dr. Stirling, a private actor, had extensive contact with Kern County social workers on numerous occasions and provided allegedly false information about the health and wellbeing of the plaintiff's child to the Kern County social workers. *Id.* at *3. Moreover, the plaintiff alleged that Dr. Stirling actually *recommended* to Kern County social workers that the plaintiff's child be removed from the plaintiff's care and that the plaintiff's child was removed from Plaintiff's care as a result of Dr. Stirling's recommendation. *Id.* at *4, *10. Thus, even though Kern County social workers relied on Dr. Stirling's information and recommendation to remove the plaintiff's child from the plaintiff's care, the *Deeths* court found no joint action between Dr. Stirling and the government. *Id.* at *10.

By contrast, in the instant case, Plaintiffs argue that Facebook, a private actor, was a willful participant in joint action with the government because Facebook provided the government with information for the government's investigation of Russian interference with the 2016 presidential election. Opp. at 12-15. Plaintiffs' argument lacks merit. The *Deeths* court found that there was no joint action even though a state actor relied upon a private actor's information and recommendation to remove the plaintiff's child from the plaintiff's care. *Id.* at *4, *10. In the instant case, Plaintiffs only allege that Facebook provided the government with information. Compl. at ¶¶ 16-19. Thus, under *Deeths*, Facebook was not a willful participant in joint action with the government.

In addition, Plaintiffs' claims of joint action between Facebook and the government fail for another equally dispositive reason. The Ninth Circuit has held that for there to be joint action, there must be "'state actions' directed by or jointly conceived, facilitated, or performed by the [government actor]." *Brunette*, 294 F.3d at 1213. Plaintiffs' *Bivens* claim for violation of the First Amendment is predicated on the alleged violation of "FAN's First Amendment rights by deleting the contents of FAN's Facebook Page and blocking FAN's access to its Facebook account." Compl. at ¶ 75. However, the only interactions between Facebook and the government alleged in

20

United States District Court
Northern District of California

the complaint pertain to how Facebook provided information to the government for the government's Russian interference with the 2016 presidential election investigation. *See, e.g.*, *Id.* at ¶ 17 ("Facebook would provide the United States Congress with information . . . ."). Plaintiffs do not allege that the government played any role in shutting down FAN's Facebook page or blocking FAN's access to its Facebook account. Thus, Plaintiffs fail to allege any state action "directly by or jointly conceived, facilitated, or performed by the" government that relates to the deletion of FAN's Facebook page or restriction on FAN's access to its Facebook account. *Brunette*, 294 F.3d at 1213. Consequently, there is no joint action here because there is no indication that the government directly or jointly conceived, facilitated, or performed a role in Facebook's decision to shut down FAN's Facebook page or the decision to prevent FAN from accessing its Facebook account.

In sum, the Court finds that there was no joint action because Facebook was not a willful participant in joint action with the government, and the government did not directly or jointly conceive, facilitate, or perform any action relating to Facebook's deletion of FAN's Facebook page or restriction of FAN's access to its Facebook account.

b.   Facebook did not Conspire with the Government

As discussed above, the joint action test can also be satisfied by proving a conspiracy between the government and the private party. *Tsao*, 698 F.3d at 1140. To prove a conspiracy "between private parties and the government," there must be "an agreement or 'meeting of the minds' to violate constitutional rights." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). None of Plaintiffs' allegations support the theory that there was either an agreement or a meeting of the minds between Facebook and the government to violate Plaintiffs' rights.

Thus, there was no joint action because Plaintiffs fail to allege the existence of an agreement or a meeting of the minds between Facebook and the government.

c.   Summary

In sum, Plaintiffs' *Bivens* claim for violation of the First Amendment fails because the First Amendment applies only to federal and state governmental actors with very few exceptions.

21

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1   Plaintiffs assert that under the joint action test, one such exception, the First Amendment applies

2   to private actor Facebook's decision to delete FAN's Facebook page and prevent access to FAN's

3   Facebook account. However, as discussed above, the joint action test has not been satisfied here

4   because Facebook was not a willful participant in joint action with the government, and Facebook

5   did not conspire with the government to violate any constitutional rights.

6   Thus, the Court hereby DISMISSES Plaintiffs' first cause of action: a *Bivens* claim for

7   violation of the First Amendment. Because granting Plaintiffs an additional opportunity to amend

8   the complaint would not be futile, cause undue delay, or unduly prejudice Defendant, and

9   Plaintiffs have not acted in bad faith, the Court grants leave to amend. *See Leadsinger, Inc.*, 512

10  F.3d at 532.

11  **IV.   CONCLUSION**

12  For the foregoing reasons, the Court DISMISSES the following causes of action without

13  prejudice: (1) a *Bivens* claim for violation of the First Amendment; (2) "damages under Title II of

14  the U.S. Civil Rights Act of 1964"; (3) "damages under the California Unruh Civil Rights Act";

15  (4) breach of contract; and (5) breach of implied covenant of good faith and fair dealing. Compl. at

16  ¶¶ 59-117.

17  The Court DISMISSES with prejudice part of Plaintiffs' second cause of action, a claim

18  for damages under § 1983.

19  Should Plaintiffs elect to file an amended complaint curing the deficiencies identified

20  herein, Plaintiffs shall do so within 30 days. Failure to file an amended complaint within 30 days

21  or failure to cure the deficiencies identified in this Order or in Defendant's briefing will result in

22  dismissal with prejudice of the claims dismissed in this Order. Plaintiffs may not add new causes

23  of actions or parties without leave of the Court or stipulation of the parties pursuant to Federal

24  Rule of Civil Procedure 15.

25  **IT IS SO ORDERED.**

26

27  Dated: July 20, 2019

28

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

Lucy H. Koh
_____
LUCY H. KOH
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

23

Case No. 18-CV-07041-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE