Christopher D. Sullivan (148083)
**DIAMOND McCARTHY LLP**
150 California Street, Suite 2200
San Francisco, California 94111
Tel: (415) 692-5200
Email: csullivan@diamondmccarthy.com

Dennis E. Boyle (*Pro Hac Vice*)
Blerina Jasari (*Pro Hac Vice*)
**WHITEFORD, TAYLOR & PRESTON L.L.P.**
1800 M Street, N.W., Suite 450 N
Washington, DC   20036
Telephone: (202) 659-6808
Facsimile: (202) 327-6175
Email: dboyle@wtplaw.com
Email: bjasari@wtplaw.com

Attorneys for FEDERAL AGENCY OF NEWS
LLC, EVGENIY LVOVICH ZUBAREV

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL AGENCY OF NEWS LLC, EVGENIY LVOVICH ZUBAREV<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.<br><br>Defendant. | Case No. 5-18-cv-07041-LHK<br><br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Federal Agency of News LLC ("FAN") and Evgeniy Lvovich Zubarev, by and

through undersigned counsel, file this Amended Complaint against Defendant Facebook, Inc.

("Facebook"), alleging as follows:

## **INTRODUCTION**

1.      This Amended Complaint asks the court to issue a judgment for all harms

suffered by FAN and Mr. Zubarev based on the acts, errors, omissions, and misconduct of

Facebook, to wit: blocking access to FAN's Facebook account, posts, and all content on Facebook's web-based platform or service based on FAN's and Facebook's contractual agreement and FAN's constitutionally-protected activities.

2.     FAN is a duly registered corporation which gathers, transmits and supplies domestic and international news reports and other publications of public interest.

3.     Since in or about December 2014, FAN has operated a Facebook page through which FAN has published its posts and other content for its Facebook followers.

4.     On April 3, 2018, Facebook deleted FAN's Facebook account and page for allegedly violating Facebook's Terms of Service.

## THE PARTIES

5.     Plaintiff Federal Agency of News LLC is a corporation organized and existing under the laws of the Russian Federation with its principal place of business in Saint Petersburg, the Russian Federation.

6.     Plaintiff Evgeniy Lvovich Zubarev is an individual currently residing in Saint Petersburg, the Russian Federation.  Mr. Zubarev is the sole shareholder and General Director of FAN.

7.     Defendant Facebook, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principle place of business in Palo Alto, California.

## JURISDICTION AND VENUE

8.     The United States District Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. 1331.  The United States District Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over FAN's and Mr. Zubarev's claims under the California Unruh Civil Rights Act (California Civil Code 51, *et seq.*).

9.      Upon information and belief, Facebook is subject to personal jurisdiction by this Court.  Facebook has transacted and, at the time of the filing of this Complaint, is continuing to transact business within the Northern District of California.  Upon information and belief, Facebook has a continuing presence and the requisite minimum contacts with the Northern District of California, such that this venue is a fair and reasonable one.  Furthermore, the Northern District of California is the venue required for disputes pursuant to Facebook's Terms of Service.  For all of these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. §§ 1391 (b)-(c) and 1441 (a) and 28 U.S.C. § 1400(b).

## <u>BACKGROUND</u>

**I.      Facebook and the United States Government Target Russian Websites**

10.      After the 2016 United States presidential election, Facebook began to shut down "inauthentic" Facebook accounts that allegedly sought to inflame social and political tensions in the United States, claiming that their activity was similar to or connected to that of Russian Facebook accounts during the 2016 United States presidential election which were allegedly controlled by the Russia-based Internet Research Agency ("IRA").

11.      The IRA was an agency which allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy.

12.      Upon information and belief, the IRA was liquidated on or about December 28, 2016.

13.      The United States government has been complicit in Facebook's efforts to rid the platform of Russian language accounts.

14.     In a United States Intelligence Community report regarding alleged Russian activities and intentions in the 2016 United States presidential election, published in January 2017, the United States Intelligence Community referred to the IRA as an agency of "professional trolls" whose likely financier is "a close Putin ally with ties to Russian intelligence."  United States Intelligence Community, *Assessing Russian Activities and Intentions in Recent U.S. Elections*, available at: https://www.dni.gov/files/documents/ICA_2017_01.pdf.

15.     On September 6, 2017, Facebook's Chief Security Officer, Alex Stamos, announced that Facebook found approximately $100,000.00 in advertisement spending from June of 2015 to May of 2017 associated with more than 3,000 advertisements in connection with approximately 470 allegedly inauthentic Facebook accounts and Pages.  Alex Stamos, *An Update On Information Operations on Facebook*, available at:

https://newsroom.fb.com/news/2017/09/information-operations-update/.

16.     Stamos conceded that Facebook conducted a sweeping search looking for all "ads that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort."  Facebook promptly shared these findings with United States authorities.

17.     On September 21, 2017, Facebook's General Counsel, Colin Stretch, stated that Facebook would provide the United States Congress with information related to the 3,000 advertisements Facebook previously located.  Colin Stretch, *Facebook to Provide Congress With Ads Linked to Internet Research Agency*, available at:

https://newsroom.fb.com/news/2017/09/providing-congress-with-ads-linked-to-internet-research-agency/.

18.     Stretch further explained that Facebook will continue its own review and investigation and do its part "to make sure investigators have the information they need."

19.     On or about September 21, 2017, co-founder, chairman and chief executive officer of Facebook, Mark Zuckerberg, published a video on Facebook explicitly stating that Facebook is "actively working with the U.S. government on its ongoing investigations into Russian interference" and providing information to the United States Department of Justice Office of Special Counsel ("Special Counsel"), headed by Robert Mueller.

20.     On April 3, 2018, after Facebook removed more than 270 Russian language accounts and pages on its web based platform, Stamos published a blog post explaining why Facebook took that action.  Stamos stated that the affected accounts and pages were removed "solely because they were controlled by the IRA – not based on the content."  Alex Stamos, *Authenticity Matters: The IRA Has No Place on Facebook*, available at: https://newsroom.fb.com/news/2018/04/authenticity-matters/.

21.     On the same day, Zuckerberg published a blog post further explaining Facebook's actions of removing Russian language accounts and pages.  He stated that "the pages and accounts [they] took down today were removed because they were controlled by the IRA, not based on the content they shared.  This particular set of pages and accounts was used to target people in Russia and people speaking Russian in neighboring countries like Azerbaijan, Uzbekistan and Ukraine.  In this case, some of the pages [they] removed belong to Russian news organizations that [they] determined were controlled by the Internet Research Agency."  The blog post is available at: https://www.facebook.com/zuck/posts/10104771321644971/.

22.     In addition to removing Facebook accounts and pages, Facebook released sample Facebook content infographics of affected accounts, including two posts by FAN.  A copy of the sample Facebook content infographics are attached hereto and made a part hereof as **Exhibit 1**.

23.     On May 10, 2018, Facebook reported it gave 3,000 Facebook advertisements the IRA ran on Facebook and Instagram between 2015 and 2017 to Congress "so they could better understand the extent of Russian interference in the last US presidential election."  The press release is available at: https://newsroom.fb.com/news/2018/05/russian-ads-released-by-congress/.

24.     On November 13, 2018, Facebook's Head of Cybersecurity Policy, Nathaniel Gleicher, published a press release on Facebook in light of the U.S. midterm elections.  Mr. Gleicher explicitly stated that "finding and investigating potential threats isn't something [Facebook does] alone.  [They] also rely on external partners, like the government."  The press release is available at: https://newsroom.fb.com/news/2018/11/investigating-threats/.

25.     Mr. Gleicher further commented on Facebook's "partnership" with the government and law enforcement agencies, stating that "[t]hese partnerships were especially critical in the lead-up to [the] midterm elections."  Specifically, Mr. Gleicher stated that "the government proved especially valuable because of their broader intelligence work" and shared the following details about Facebook's cooperation with them:

> With backgrounds in cybersecurity, digital forensics, national security, foreign policy and law enforcement, the experts on our security team investigate suspicious behavior on our services. While we can learn a lot from analyzing our own platforms, law enforcement agencies can draw connections off our platform to a degree that we simply can't. For instance, our teams can find links between accounts that might be coordinating an information operation based on how they interact on Facebook or other technical signals that link the accounts together – while a law enforcement

agency could identify additional links based on information beyond our scope.

Tips from government and law enforcement partners can therefore help our security teams attribute suspicious behavior to certain groups, make connections between actors, or proactively monitor for activity targeting people on Facebook.  And while we can remove accounts and pages and prohibit bad actors from using Facebook, governments have additional tools to deter or punish abuse. *That's why we're actively engaged with the Department of Homeland Security, the FBI, including their Foreign Influence Task Force, Secretaries of State across the US ... on our efforts to detect and stop information operations, including those that target elections.*

(Emphasis added).

26.    On January 17, 2019, Mr. Gleicher published a press release on Facebook indicating that, "*based on an initial tip from US law enforcement*, [Facebook] removed 107 Facebook Pages, Groups, and accounts, as well as 41 Instagram accounts, for engaging in coordinated inauthentic behavior as part of a network that originated in Russia and operated in Ukraine" (emphasis added).  The press release is available at:

https://newsroom.fb.com/news/2019/01/removing-cib-from-russia/.

27.    In addition to the previously mentioned incidents, Mr. Gleicher repeatedly reported "working more closely" with the U.S. government and law enforcement with regard to "inauthentic behavior on Facebook."  The press releases are available at:

https://newsroom.fb.com/news/2019/03/cib-iran-russia-macedonia-kosovo/ (March 26, 2019);

https://newsroom.fb.com/news/2019/05/more-cib-from-russia/ (May 6, 2019);

https://newsroom.fb.com/news/2019/07/removing-cib-thailand-russia-ukraine-honduras/ (July 25, 2019).

28.    Upon information and belief, Facebook removed more than 400 Russian language accounts and pages in September 2017, more than 270 in April 2018, and more than 600 in

August 2018.  Since then, Facebook has continued to delete hundreds of additional Facebook accounts and pages.

## II.       Facebook blocks FAN—A Legitimate News Agency

29.     On May 22, 2014, FAN was incorporated in order to satisfy public needs of Russian and foreign legal entities and individuals by way of gathering, transmitting and supplying domestic and international news reports and other publications of public interest.

30.     One of the media that FAN uses to disseminate news, primarily of local interest, throughout the Russian Federation is Facebook.  A copy of FAN's Facebook "Terms of Service" is attached hereto and made a part hereof as **Exhibit 2**.

31.     FAN is an independent, authentic and legitimate news agency which publishes reports that are relevant and of interest to the general public.

32.     As of October 2018, FAN is ranked among the Top 35 most visited websites in Russia by LiveInternet, one of the largest Russian internet blogging platforms; among the Top 20 by Mail.ru, a Russian internet company which reaches approximately 86% of Russian internet users per month; and among the Top 25 by Rambler, a Russian search engine and one of the biggest Russian web portals.

33.     Many of FAN's subscribers are also Facebook users who for at least the past four years were able to access FAN through Facebook and who did, in fact, access FAN through Facebook.

34.     The founder and first General Director of FAN was Aleksandra Yurievna Krylova.  The Special Counsel has alleged that Krylova was an employee of the IRA from in or around September 2013 to in or around November 2014.  FAN has no knowledge of this allegation and therefore does not know if it is accurate or not.

35.     Anna Vitalyevna Botneva succeeded Krylova as General Director of FAN, on November 17, 2014, and on December 24, 2014, Krylova sold 100% of the company's shares to Botneva.

36.     Since August 2, 2016, Evgeniy Lvovich Zubarev has been the General Director of FAN, and since April 5, 2017, he has been the sole shareholder of the company.

37.     At the time of FAN's incorporation and until in or about the middle of 2015, FAN and the IRA were located in the same building at 55A Savushkina Street, Saint Petersburg, the Russian Federation, 197183.

38.     In or about the beginning of 2015, FAN searched for new premises that would be more convenient for its business with regard to a larger space for the office premises.  On July 1, 2015, FAN moved to a business center at 23J Krasnogvardeiskiy Lane, Saint Petersburg, 197342.

39.     On February 16, 2018, the Special Counsel indicted Krylova alleging that she worked in various capacities to carry out the IRA's interference operations targeting the United States.

40.     At the time of Ms. Krylova's indictment, she had no connection with FAN for more than three years.

41.     On October 19, 2018, the United States District Court for the Eastern District of Virginia unsealed a criminal complaint against Elena Alekseevna Khusyaynova, alleging conspiracy to defraud the United States and defrauding the United States.  In support of the complaint, FBI Special Agent David Holt specifically alleged that Ms. Khusyaynova has been employed by various entities within "Project Lakhta" – which it describes as a Russian interference operation in political and electoral systems targeting populations within the Russian

Federation, and other countries, including the United States, members of the European Union, and the Ukraine.

42.     Special Agent Holt further alleged that Ms. Khusyaynova has been employed by various entities within "Project Lakhta," including the IRA, GlavSet, and FAN.

43.     FAN has no knowledge of "Project Lakhta." There is no known business or other organization in the Russian Federation that operates under such name. To the extent it is some sort of informal organization, FAN is unaware of its membership, goals or methods of operation.

44.     FAN is not an entity within "Project Lakhta" and has no relationship with "Project Lakhta," the IRA or GlavSet. To the contrary, FAN is a news gathering and dissemination organization. In that capacity, FAN gathers news from conventional sources and adheres to journalistic standards in its operations.

45.     FAN has no involvement in "Project Lakhta" or any other organization, formal or informal, whose purpose it is to disseminate false or misleading information or to influence any elections.

46.     Special Agent Holt alleged that "Project Lakhta" used inauthentic user names to create fictitious Facebook profiles. FAN has no knowledge of these allegations and does not know whether they are true or not.

47.     In any event, FAN had never created a fictitious name or user account on Facebook or any other social media. FAN's accounts on Facebook were registered under its own name in accordance with Facebook's user agreement.

48.     Special Agent Holt also alleged that "Project Lakhta" published false and misleading news articles intended to influence the U.S. and other elections. FAN has no knowledge of these allegations and does not know if they are true or false.

49.     In any event, FAN has never knowingly created a false or misleading news article and has published all of its news articles under its own name.  It has not sought to interfere with the U.S. elections or any other election.

50.     FAN is a legitimate news organization that adheres to journalistic standards in its publications.

51.     Ms. Khusyaynova has been FAN's chief accountant since at least August 2, 2016. As such, Ms. Khusyaynova has been involved in FAN's day-to-day accounting operations, including the purchase of office equipment and furniture and payments for advertising or other business contracts as assigned by Mr. Zubarev in his capacity as the General Director of FAN.

52.     As the Chief Accountant, Ms. Khusyaynova's duties are akin to those of a bookkeeper in the United States.  She is not an officer of FAN, does not exercise discretionary authority over the editorial content of FAN's publications and is not aware of what stories are going to be published or not published.

53.     To the best of FAN's knowledge, Ms. Khusyaynova's sole employment is with FAN.  In fact, she has explicitly stated that FAN is her sole employer and that she does not provide any services to any other entity and denies any involvement with "Project Lakhta."

54.     FAN has no reason to believe that Ms. Khusyaynova or any of its employees were providing services to another entity, much less to an entity under the umbrella of "Project Lakhta."

55.     The only similarity between FAN and any similar accounts Facebook contends to be "inauthentic" and controlled by the IRA is their national origin and that of their members.

56.     In any event, there was never any evidence that FAN had a direct connection to the IRA and, in fact, it did not have a relationship to the IRA.

57.     On or about April 3, 2018, the same day that Stamos published his blog post regarding the removal of more than 270 majority Russian language accounts and pages, FAN learned that the contents of its web page on Facebook were blocked and that its account was deleted.

58.     Subsequently, Facebook submitted a generic e-mail message notifying FAN that its Facebook account was deleted for allegedly violating its Terms of Service.  Without further explanation of its decision, Facebook stated that "pages containing threats, offensive or indecent content are prohibited," and that "Pages aimed against another user or group of users, as well as Pages created by an unauthorized user will be deleted."  A copy of the Correspondence sent by Facebook is attached hereto and made a part hereof as **Exhibit 3**.

59.     In fact, as explained in greater detail below, FAN had not violated the Terms of Service in any way, nor has it violated any U.S. law.

60.     Despite overwhelming evidence that it was wrong in its conclusions, Facebook continued to and continues to ban FAN from Facebook and access to hundreds of thousands of Russians who obtained their news from FAN.

61.     In fact, Facebook, while claiming to protect the public from "fake news" is actually engaging in censorship and denying FAN subscribers access to a legitimate news organization.

62.     Also, since FAN operated primarily within the Russian Federation publishing articles in the Russian language, Facebook's removal of FAN from Facebook actually interferes with the ability of Russian citizens to gain knowledge of news articles with which Facebook apparently disagrees.

63.     Facebook seeks to dictate news content based upon its own political viewpoint thereby attempting to influence the public media coverage of internal political events in the Russian Federation.

**COUNT I**
**Federal Agency of News LLC and Zubarev v. Facebook, Inc.**
**First Amendment to the U.S. Constitution (*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*)**

64.     Paragraphs 1 through 63 are incorporated herein by reference as if fully restated.

65.     The internet is a public forum available to all persons around the world to post or otherwise publish news articles.  It also is intended to allow persons around the world, including citizens of the United States to access news and opinions from entities around the world.

66.     Facebook has a pervasive influence with 2.2 billion monthly users.  Since there are reportedly 4.2 billion people worldwide with access to the internet, more than one half of the world's population uses Facebook.

67.     In the United States, Facebook's market share is even greater.  There are currently a reported 214 million American Facebook users who spend an average of 39 minutes per day on Facebook.  This represents two-thirds of the population of the United States.  For many of these people, Facebook is a primary source of information.

68.     Because of its pervasive presence on the internet, Facebook users constitute a "community."  Facebook creates rules and regulations for the conduct of this community and functions in the same way as a government entity.

69.     Facebook has the power, and, in fact, does impose punishment, including removal from Facebook, of users who post legitimate news articles and opinions with which Facebook disagrees.

13

70.     The "Rules of Facebook" state that anyone who abides by Facebook's rules and signs a user agreement is entitled to use its forum.

71.     FAN executed Facebook's user agreement and has at all times abided by Facebook's rules.

72.     The constitutional protections of the Bill of Rights of the U.S. Constitution apply to all public fora and, since Facebook is a public forum, or at least a limited public forum, the constitutional protections of the Bill of Rights apply to Facebook and the actions it takes to curtail free speech on the internet.

73.     In addition, Facebook also acts at the behest of the government of the United States in its attempts to regulate free speech.

74.     Facebook founder and CEO, Mark Zuckerberg, published a video on Facebook explicitly stating that Facebook is "actively working with the U.S. government on its ongoing investigations into Russian interference."  In addition, it is believed that many of Facebook's current security personnel are former members of the U.S. intelligence and law enforcement communities.

75.     This agreement between Facebook and the U.S. government constitutes a conspiracy to deny FAN its free speech rights guaranteed under the U.S. Constitution.

76.     The U.S. government had long indicated an interest in restricting the access of certain Russian actors to the internet.

77.     While the U.S. government and Facebook may have a legitimate interest in enforcing laws against identity theft and unlawful interference in U.S. elections, they may not engage in content-based restrictions of free speech.

78.     FAN has not engaged in identity theft, nor has it attempted to unlawfully interfere in U.S. elections.  To the contrary, it has published legitimate news stories in its own name.

79.     There is, therefore, no reason to believe that FAN engaged in any illegal conduct or any conduct that violated Facebook's Terms of Service or any U.S. law.

80.     By banning FAN from Facebook, Facebook engaged in content-based restrictions of free speech.

81.     FAN's publications and posts on Facebook were the exercise of its constitutionally-protected freedom of speech to inform the general public of historical and current events in politics, entertainment and other areas of public interest.

82.     Facebook violated FAN's First Amendment rights by deleting the contents of FAN's Facebook page and blocking FAN's access to its Facebook account.

83.     Facebook took action against FAN in an effort to silence and deter FAN's free speech.

84.     Facebook violated FAN's First Amendment rights solely on account of its origin and its members' national origin.

85.     As a result of Facebook's unlawful conduct, FAN has suffered substantial damages, including, but not limited to:

a.     FAN was deprived of freedom of speech;

b.     FAN was foreclosed from future opportunities to reach its subscribers on social media platforms, including Facebook;

c.     FAN lost status and prestige amongst its Facebook followers, the general public and the journalistic community;

d.     FAN suffered reputational harm; and,

e.      These injuries are continuing in nature requiring injunctive relief.

WHEREFORE, the Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, demand judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## COUNT II
### Federal Agency of News LLC and Zubarev v. Facebook, Inc.
### Damages Under The California Unruh Civil Rights Act

86.     Paragraphs 1 through 85 are incorporated herein by reference as if fully restated.

87.     Facebook denied FAN full and equal accommodations, advantages, facilities, privileges, and services because of its national origin.

88.     Facebook denied, aided or incited a denial of, discriminated against or made a distinction that denied the full and equal accommodations, advantages, facilities, privileges, and services to FAN and its members.  Specifically, Facebook has denied access to Facebook internet connections and the Facebook "community" based upon Russian nationality and/or Russian ethnicity.  The national origin and ethnicity of FAN, its owner and its subscribers were motivating factors behind Facebook's actions.

89.     As a result of Facebook's actions, FAN has suffered harm and continues to suffer harm as more fully described in Paragraph 85 above.

WHEREFORE, the Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, demand judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## COUNT III
### Federal Agency of News LLC and Zubarev v. Facebook, Inc.
#### Breach of Contract

90.     Paragraphs 1 through 89 are incorporated herein by reference as if fully restated.

91.     FAN and Facebook had a contract (Terms of Service) for the use of Facebook's social networking site.

92.     In accordance with the Contract, Facebook was obligated to provide access to Facebook's platform in exchange for FAN properly completing the application and abiding by the Terms of Service.

93.     FAN complied with the terms of the Contract by properly registering with Facebook, paying any fees that were due and complying with all applicable terms of service.

94.     At no time did FAN violate the terms of the contract.

95.     Despite its contractual obligation to provide FAN with access to Facebook, Facebook breached the contract by removing FAN's Facebook account and blocking FAN's content without a legitimate reason.

96.     FAN at no point published materials that were obscene, indecent or were otherwise of a sexual nature.  To the contrary, all content published by FAN was constitutionally protected and was known by Facebook to be constitutionally protected.

97.     By blocking FANS's content, Facebook operated in bad faith.

98.     Facebook, in removing the account and blocking FAN, cited its alleged relationship with the IRA.  This reason, however, was not a legitimate reason in that FAN had no relationship whatsoever with the IRA, and Facebook knew that FAN had no relationship with the IRA.

17

99. As a result of Facebook's breach, FAN has lost subscribers and revenues from subscriber services.  FAN subscribers have also lost access to a legitimate news source.

100. FAN was damaged thereby as more fully described in Paragraph 85 above.

WHEREFORE, the Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, demand judgment against Facebook Inc. for damages and injunctive relief as set forth below.

### COUNT IV
### Federal Agency of News LLC and Zubarev v. Facebook, Inc.
### Breach of Implied Covenant of Good Faith and Fair Dealing

101. Paragraphs 1 through 100 are incorporated herein by reference as if fully restated.

102. FAN and Facebook entered into a contract.

103. The Contract between FAN and Facebook contained an implied covenant of good faith and fair dealing.

104. FAN complied with its contractual obligations in that FAN did not violate the Terms of Service and terms of Community Standards as set by Facebook;

105. Facebook breached its implied covenant of good faith and fair dealings by blocking FAN's access to Facebook users and FAN subscribers.

106. As a result of Facebook's breach, FAN has lost subscribers and revenues from subscriber services.  FAN subscribers have also lost access to a legitimate news source.

107. FAN was damaged thereby as more fully described in Paragraph 85 above.

WHEREFORE, the Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, demand judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## COUNT V
## Federal Agency of News LLC and Zubarev v. Facebook, Inc.
## Breach of Implied Covenant of Good Faith and Fair Dealing

108.    Paragraphs 1 through 107 are incorporated herein by reference as if fully restated.

109.    FAN maintained subscription agreements with tens of thousands of Russian citizens, many of whom utilized Facebook as their primary means of accessing FAN and its news content.

110.    According to the terms of these subscription agreements, FAN was obligated to make its news content available to its subscribers, and the subscribers were obligated to provide valuable consideration to FAN for its service.

111.    In addition, Facebook also markets itself as a platform for companies like FAN to obtain new subscribers or customers.

112.    Facebook was aware that FAN was a news organization with subscribers that were using FAN to reach its already existing subscribers, as well as new subscribers.

113.    By engaging in conduct that has interfered with FAN's ability to provide service to existing subscribers and preventing it from reaching new subscribers, Facebook has made its performance under the subscriber agreement expensive or difficult or impossible.

114.    Facebook intended to interfere with FAN's access to its subscribers and thereby disrupt and damage its business.

115.    As a result of Facebook's actions, FAN has suffered substantial and irreparable harm

116.    The conduct of Facebook was a substantial factor in bringing about this harm.

19

WHEREFORE, the Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, demand judgment against Facebook Inc. for damages and injunctive relief as set forth below.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, Federal Agency of News LLC and Evgeniy Lvovich Zubarev, respectfully request judgment as follows:

A.      that this Court order a temporary and permanent injunction preventing Facebook Inc. from blocking public access to Federal Agency of News LLC's account on Facebook's social networking service;

B.      that this Court award nominal and compensatory damages to Federal Agency of News LLC;

C.      that this Court award punitive damages to Federal Agency of News LLC;

D.      that this Court award Federal Agency of News LLC's costs and expenses of this action, including reasonable attorney's fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and,

E.      any other action which this Court deems appropriate.

Dated:  August 19, 2019                    Respectfully submitted,

                                           */s/ Christopher D. Sullivan*
                                           Christopher D. Sullivan (State Bar No. 148083)
                                           Diamond McCarthy LLP
                                           150 California Street, Suite 2200
                                           San Francisco, California 94111
                                           Telephone: (415) 692-5201
                                           E-Mail: csullivan@diamondmccarthy.com

                                           and

*/s/ Dennis E. Boyle*
Dennis E. Boyle (*Pro Hac Vice*)
Blerina Jasari (*Pro Hac Vice*)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, NW, Suite 450 N
Washington, DC  20036
Telephone: (202) 659-6808
Facsimile: (202) 327-6175
Email: dboyle@wtplaw.com
Email: bjasari@wtplaw.com

*Counsel for Plaintiff*