Christopher D. Sullivan (State Bar No. 148083)
**Diamond McCarthy LLP**
150 California Street, Suite 2200
San Francisco, California 94111
Telephone: (415) 692-5201
E-Mail: csullivan@diamondmccarthy.com

Dennis E. Boyle (*Pro Hac Vice*)
Blerina Jasari (*Pro Hac Vice*)
**Whiteford, Taylor & Preston L.L.P.**
1800 M Street, NW, Suite 450 N
Washington, DC  20036
Telephone: (202) 659-6808
E-mail: dboyle@wtplaw.com
          bjasari@wtplaw.com

Counsel for Federal Agency of News, LLC, and Evgeniy Zubarev

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | |
|---|---|
| FEDERAL AGENCY OF NEWS LLC, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 5:18-cv-07041-LHK<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:  Hon. Lucy H. Koh<br>Date:   January 9, 2020<br>Time:   1:30 p.m.<br>Crtm.: 8, 4th Floor |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    COUNTER-STATEMENT OF FACTS ............................................................. 2

III.   LEGAL STANDARD........................................................................................ 6

IV.   WHETHER FACEBOOK VIOLATED THE FIRST AMENDMENT RIGHTS OF THE
PLAINTIFFS WHERE IT: 1) SERVED IN THE ROLE AS A GOVERNMENT
REGULATOR RESTRICTING FREE SPEECH; AND 2) BECAME AN
INSTRUMENTALITY OF THE GOVERNMENT IN RESTRICTING FREE SPEECH 8

   A.  Facebook is a Public Forum................................................................................ 9

   B.  Facebook is Heavily Entwined with the U.S. Government ............................................. 11

V.    THE COMMUNICATIONS DECENCY ACT DOES NOT IMMUNIZE FACEBOOK 14

VI.   FACEBOOK BREACHED THE TERMS OF SERVICE AND THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING............................................. 18

VII.  FACEBOOK VIOLATED THE CALIFORNIA UNRUH CIVIL RIGHTS ACT .......... 22

VIII.  CONCLUSION................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 7

*Barnes v. Yahoo!, Inc*., 570 F.3d 1096 (9th Cir. 2009) .................................................. 15

*Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994) ...................................................... 7, 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 7

*Boland, Inc. v. Rolf C. Hagen (USA) Corp*., 685 F. Supp. 2d 1094 (E.D. Cal. 2010) ................ 21

*Buckey v. Los Angeles*, 957 F.2d 652 (9th Cir. 1992) ..................................................... 7

*Cahill v. Liberty Mutual Ins. Co*., 80 F.3d 336 (9th Cir. 1996) ................................. 3, 7

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc*., 473 U.S. 788 (1985) ........................... 9

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) ........................................... 15

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................................ 7

*Fair Housing Council of San Fernando Valley v. Roommates.Com*, LLC., 521 F.3d 1157 (9th

    Cir. 2008) ................................................................................................................. 16

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978) ................................................................. 12

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ....................................................... 11, 14

*Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142 (1991) ........................................ 22, 23

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1983) ........................................................ 11

*Koebke v. Bernardo Heights*, 36 Cal. 4th 824 (Cal. 2005) ............................................. 23

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ......................................................... 12

*Melara v. Kennedy*, 541 F.2d 802 (9th Cir. 1976) ........................................................ 11

*Munson v. Del Taco, Inc*., 46 Cal. 4th 661 (2009) ................................................... 22, 23

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ............................................................. 6

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ..................................................... 9, 10, 11

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) .................................................... 10

*Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010) ..................... 8

*Swift v. Zynga Game Network Inc.,* WL 4569889, at *4 (N.D. Cal. 2010) .................................. 16

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ............................................ 11, 12, 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................................. 10

**Statutes**

47 U.S.C. § 230 ........................................................................................................................ 14

California Civil Code § 51 ........................................................................................................ 22

**Rules**

Federal Rule of Civil Procedure 12 ....................................................................................... 6, 7

Federal Rule of Civil Procedure 8 ....................................................................................... 6, 18

<u>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**</u>

Plaintiffs, Federal Agency of News, LLC ("FAN"), and Evgeniy Zubarev (collectively

"Plaintiffs"), by and through undersigned counsel, hereby oppose Defendant Facebook, Inc.'s

("Facebook") Motion to Dismiss the Amended Complaint and, in support thereof, submit this

Opposition and Memorandum of Points and Authorities, and rely on all pleadings and papers on

file, and such other matters as may be presented to this Court.

<u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

WHETHER FACEBOOK VIOLATED THE FIRST AMENDMENT RIGHTS
OF THE PLAINTIFFS WHERE IT: 1) SERVED IN THE ROLE AS A
GOVERNMENT REGULATOR RESTRICTING FREE SPEECH; AND 2)
BECAME OF INSTRUMENTALITY OF THE U.S. GOVERNMENT IN
RESTRICTING FREE SPEECH.

(Suggested Answer in the Affirmative).

WHETHER THE COMMUNICATIONS DECENCY ACT IMMUNIZES
FACEBOOK, A SOPHISTICATED DATA MINING COMPANY, FROM
LIABILITY FOR BREACHING ITS USER AGREEMENT AND THE FIRST
AMENDMENT.

(Suggested Answer in the Negative).

WHETHER FACEBOOK BREACHED THE TERMS OF SERVICE AND THE
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

(Suggested Answer in the Affirmative).

WHETHER FACEBOOK VIOLATED THE CALIFORNIA UNRUH
CIVIL RIGHTS ACT.

(Suggested Answer in the Affirmative).

I.   **INTRODUCTION**

Facebook in its Motion to Dismiss asks the Court to ignore the extensive facts pled in

Plaintiffs' Amended Complaint which demonstrate that it would be wholly inappropriate to

dismiss Plaintiffs' claims at this very preliminary phase of the proceedings. Indeed, Facebook does little more than to recycle its prior briefing.

In point of fact, the Plaintiffs have added substantial facts that show that: 1) Facebook functions much like a government in restricting free speech in a public forum; and 2) Facebook has cooperated with the government in the restriction of free speech to such an extent that it has become an instrumentality of the federal government. As such, the Plaintiffs have set forth a viable claim under the First Amendment to the U.S. Constitution.

The Amended Complaint also raises substantial issues as to whether the Computer Decency Act applies to Facebook or to this case at all. The Communications Decency Act is a statute designed to protect internet service providers from being sued for restricting content that does not enjoy constitutional protection. In this case, the content that Facebook seeks to restrict is clearly protected under the First Amendment. In addition, rather than being merely a neutral service provider, Facebook is a sophisticated data mining operation that collects all manner of information from its "users" and then uses that data to create content that it then inserts into various user "feeds" to further its own business. Because it does so, it forfeits the protections of the Computer Decency Act.

At this phase of the litigation, discovery is necessary to develop the facts necessary to sustain the causes of action alleged. The allegations of the Amended Complaint, however, should be sufficient to withstand the Motion to Dismiss.

## II.   COUNTER-STATEMENT OF FACTS

Plaintiffs summarize below the allegations which are central to the only claims in dispute on this Motion – violation of Plaintiffs' First Amendment right, breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the California Unruh Civil

Rights Act.  These allegations are set forth in detail in Plaintiffs' Amended Complaint.  Plaintiffs also incorporate by reference the statement of facts set forth in its prior opposition to Facebook's motion to dismiss, but do not repeat those facts again here.  Each and every fact alleged in the Amended Complaint must be taken as true for the purposes of this Motion.  *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

Online social media company Facebook was established in 2003 and has since grown its user base to 2.2 billion monthly users.  Am. Compl. ¶ 66.  FAN, a Russian-based news agency, incorporated in 2014, which sought to benefit from Facebook's pervasive influence over approximately one third of the world population, was one of Facebook's users until it was removed from the platform in April 2018.  *Id.* ¶ 3.

FAN is an independent, authentic, and legitimate news agency which strives to inform and educate Russian readers throughout the world.  *Id.* ¶ 31.  As such, FAN relies heavily on Facebook's web-based platform to reach its subscribers directly and without censorship, as many of FAN's subscribers are also Facebook users who frequently accessed content published by FAN through Facebook.  *Id.* ¶ 33.

Following the 2016 U.S. presidential election, Facebook began to closely cooperate with the U.S. government to shut down "inauthentic" Facebook accounts which were allegedly controlled by the Russian-based Internet Research Agency ("IRA") – an agency which allegedly employed fake accounts registered on major social networks, discussion boards, online newspaper sites, and video hosting services to promote the Russian government's interests in domestic and foreign policy.  *Id.* ¶ 10.

Representatives of Facebook and the Chief Executive Officer, Mark Zuckerberg, himself, have repeatedly stated that Facebook has cooperated with the U.S. government in ridding its

web-based platform from publishers based in Russia.  *Id.* ¶¶ 16-27.  On September 21, 2017, Facebook's General Counsel, Colin Stretch, explicitly stated that Facebook would provide the U.S. Congress with information related to 3,000 advertisements Facebook believed were connected with inauthentic Facebook accounts and pages.  *Id.* ¶ 17.  Stretch further explained that Facebook would continue its own review and investigation and do its part "to make sure [congressional] investigators have the information they need."  *Id.* ¶ 18.

On September 21, 2017, Zuckerberg published a video on Facebook emphasizing the fact that Facebook is actively working with the U.S. government on its ongoing investigations into Russian interference and providing information to the U.S. Department of Justice Office of Special Counsel ("Special Counsel"), headed by Robert Mueller.[1]  *Id.* ¶ 19.

Furthermore, Facebook representatives and Zuckerberg made clear that Facebook was removing Facebook accounts for no other reason but for the fact that they originated in Russia.  *Id.* ¶ 16.  On September 6, 2017, Facebook's Chief Security Officer, Alex Stamos, announced that Facebook found more than 3,000 advertisements in connection with allegedly inauthentic Facebook accounts, and that Facebook shut down the accounts and pages they identified.  *Id.* ¶ 15.  He specifically stated that Facebook conducted a sweeping search looking for all "ads that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort."  *Id.* ¶ 16.  Facebook promptly shared its findings with its collaborators at the U.S. government.  *Ibid.*

---

[1] The Mueller Investigation concluded with a 388-page report detailing contacts between various Trump officials and various Russian officials.  Significantly, although the report mentions the Internet Research Agency, it does not mention FAN.  *See* Special Counsel Report on the Investigation into Russian Interference in the 2016 Presidential Election, available at: https://www.justice.gov/storage/report.pdf.

In addition, Facebook's Head of Cybersecurity Policy, Nathaniel Gleicher, published a press release stating that "finding and investigating potential threats isn't something [Facebook does] alone.  [They] also rely on external partners, like the government."  *Id.* at ¶ 24.  Mr. Gleicher further commented on Facebook's "partnership" with the government and law enforcement agencies, stating that "[t]hese partnerships were especially critical in the lead-up to [the] midterm elections."  *Id.* at ¶ 25.  Specifically, Mr. Gleicher stated that "the government proved especially valuable because of their broader intelligence work."  *Ibid.*

Mr. Gleicher further shared critical details that show the intimate connection between Facebook and the government:

> With backgrounds in cybersecurity, digital forensics, national security, foreign policy and law enforcement, the experts on our security team investigate suspicious behavior on our services. While we can learn a lot from analyzing our own platforms, law enforcement agencies can draw connections off our platform to a degree that we simply can't.  For instance, our teams can find links between accounts that might be coordinating an information operation based on how they interact on Facebook or other technical signals that link the accounts together – while a law enforcement agency could identify additional links based on information beyond our scope.

> Tips from government and law enforcement partners can therefore help our security teams attribute suspicious behavior to certain groups, make connections between actors, or proactively monitor for activity targeting people on Facebook.  And while we can remove accounts and pages and prohibit bad actors from using Facebook, governments have additional tools to deter or punish abuse.  That's why we're actively engaged with the Department of Homeland Security, the FBI, including their Foreign Influence Task Force, Secretaries of State across the US … on our efforts to detect and stop information operations, including those that target elections.

*Ibid.*  Based on a tip from U.S. law enforcement, Facebook continued to remove Russian Facebook accounts on its platform.  *Id.* at ¶ 26.  In addition to the previously-mentioned

incidents, Mr. Gleicher repeatedly reported "working more closely" with the U.S. government and law enforcement with regard to "inauthentic behavior on Facebook."  *Id.* at ¶ 27.

On April 3, 2018, Facebook blocked FAN's contents on Facebook and deleted its Facebook account, alleging that FAN had violated Facebook's Terms of Service.  *Id.* ¶ 4.  FAN's Facebook account was one of 270 Russian language accounts and pages Facebook removed in its attempt to eliminate allegedly inauthentic Facebook accounts.  *Id.* ¶ 20.  The "Rules of Facebook" state that that anyone who abides by Facebook's rules and signs a user agreement is entitled to use its forum.  *Id.* at ¶ 70.  Even though FAN executed Facebook's user agreement and has at all times abided by Facebook's rules, Facebook removed FAN's Facebook account solely due to its Russian origin.  *Id.* at ¶ 71.

FAN is a legitimate news site which publishes Russian domestic and international news stories; and has never knowingly created a false or misleading news article.  *Id.* ¶¶ 31, 49.  **It never violated Facebook's Terms of Service**, and despite Facebook's unsubstantiated allegations, FAN has no involvement with the IRA or any other entity within "Project Lakhta"-alleged Russian interference operation.  *Id.* ¶¶ 44, 59.  The only connection between FAN, the IRA and "Project Lakhta" is their national origin and that of their members.  *Id.* ¶ 55.

## III.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  The court must accept all factual allegations pled in the complaint as true, and must construe them

and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill*, 80 F.3d at 337-38.

To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (*citing Twombly*, 550 U.S. at 556).

In a motion to dismiss, "determining whether a complaint states a claim, all allegations of material fact are taken as true and construed in the light most favorable to the plaintiff."  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (*per curiam*); *see also Estelle v. Gamble*, 429 U.S. 97, 99 (1976).  A complaint may not be dismissed unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Buckey v. Los Angeles*, 957 F.2d 652, 654 (9th Cir. 1992).

In this case, Plaintiffs have pled sufficient facts to survive a Motion to Dismiss and move into the discovery phase of the case.  In a motion to dismiss, "determining whether a complaint states a claim, all allegations of material fact are taken as true and construed in the light most favorable to the plaintiff."  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (*per curiam*); *see also Estelle v. Gamble*, 429 U.S. 97, 99 (1976).  A complaint may not be dismissed unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claims which would entitle him to relief.  *Buckey v. Los Angeles*, 957 F.2d 652, 654 (9th Cir. 1992).

In this case, Plaintiffs have pled sufficient facts to survive a motion to dismiss and move into the discovery phase of the case.

7

IV.   **WHETHER FACEBOOK VIOLATED THE FIRST AMENDMENT RIGHTS OF THE PLAINTIFFS WHERE IT: 1) SERVED IN THE ROLE AS A GOVERNMENT REGULATOR RESTRICTING FREE SPEECH; AND 2) BECAME AN INSTRUMENTALITY OF THE GOVERNMENT IN RESTRICTING FREE SPEECH**

Facebook controls the communications of more than two billion people around the world by creating and controlling a forum that, by its very nature, should be public.  Even though private conduct generally does not constitute government action, Facebook's business model, or lack thereof – resembles the structure of a government entity.  Indeed, even Zuckerberg agrees that "Facebook is more like a government than a traditional company."  *See* Ex. 1 (attaching articles).[2]

Plaintiffs' claims in their Amended Complaint, which must be taken as true, lay out a number of occasions in which Facebook representatives and executives, including the founder, chairman, and chief executive officer of Facebook, publicly detailed Facebook's cooperation with the U.S. government in removing hundreds of Facebook accounts.  By blocking FAN's Facebook account and deleting the contents on its web-based platform, Facebook worked with the government and engaged in content-based restrictions of free speech, and thereby violated Plaintiffs' First Amendment rights.

Though Plaintiffs have put forward sufficient facts to prove that Facebook and the government entertained a symbiotic relationship in the removal of Facebook accounts, discovery would undoubtedly expose highly relevant evidence pertaining to the full nature of Facebook and the U.S. government's relationship.  A dismissal of Plaintiffs' Amended Complaint at this stage of the proceedings is inappropriate.

---

[2] The Court is permitted to take judicial notice of publicly available articles, including articles from the Internet.  *See, e.g., Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

A.      **Facebook is a Public Forum**

Facebook's corporate structure does not negate the power it has over at least 2 billion

people worldwide in promoting and controlling speech between billions of voices.  As Plaintiffs

previously noted and Facebook admits, it operates a freely available public forum, open to any

and all people who are at least 13 years old, with internet access and a valid e-mail address. Ex.

2, Terms of Service, at 2.  Facebook has publicly admitted to the impact it has, as well as the

responsibility that comes along with this power.  *See* Ex. 1.  However, when its users seek to

hold Facebook liable for its actions, it cowardly points to its Articles of Incorporation in an

attempt to shake off any responsibility it otherwise assumes in its "social mission…to make the

world more open and connected."  *See* Ex. 1.

It is well established that private companies may establish public fora in certain

circumstances.  *See, e.g., Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788,

801 (1985).  The fact that Facebook is a private company does not mean the First Amendment is

inapplicable to users' Facebook accounts.  The key question is whether the user has opened up a

forum for expressive activity to the public.  *See Packingham v. North Carolina*, 137 S. Ct. 1730,

1736 (2017).

In *Packingham*, the Supreme Court struck down a North Carolina law that made it a

felony for a registered sex offender to access a commercial social networking website where the

sex offender knows that the site permits minor children to become members or to create or

maintain personal web pages.  The law, Justice Anthony M. Kennedy wrote for a majority of the

Court, violated a "fundamental principle of the First Amendment," namely, "that all persons

have access to places where they can speak and listen, and then, after reflection, speak and listen

once more."  *Id*. at 1735.  Furthermore, the Court stated:

9

> A basic rule … is that a street or a park is a quintessential forum for the exercise of First Amendment rights.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989).  Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire.  **While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace – the "vast democratic forums of the Internet" in general**, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997), **and social media in particular**.

*Ibid.* (emphasis added).  In an attempt to show how far reaching the internet really is, the Court noted that "[s]even of ten American adults use at least one internet social networking service. … One of the most popular of these sites is Facebook …".  *Ibid.*  As such, the Supreme Court in *Packingham* analogized social media sites, like FAN's Facebook page, to "traditional" public forums, characterizing the internet as "the most important place[] (in a special sense) for the exchange of views."  *Id*. at 1735.

Facebook, in its Motion to Dismiss, relies on the inapplicable notion that only state actors can provide a forum for speech, *see* Motion to Dismiss, p. 12, completely ignoring the relationship between the First Amendment and the modern Internet.  It is undisputed that Facebook's sole function and purpose is to promote and realize speech and communication, openly and freely, between its users.  Social media sites, like Facebook, offer "relatively unlimited, low-cost capacity for communication of all kinds," *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997), "to users engaged in a wide array of protected First Amendment activity on any number of diverse topics."  *Packingham*, 137 S. Ct. at 1735.

Just like the Supreme Court discussed in *Packingham*, FAN's page operated like the electronic version of a public square that allowed more than 2 billion people on Facebook – almost one third of the world population, and one half of the world population with access to the Internet – to view content and maintain connections to other users and the creators of the pages.

10

Am. Compl. ¶ 66.  As a result, courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks" on the internet, including Facebook.  *Packingham*, 137 S. Ct. at 1736.

### B.      Facebook is Heavily Entwined with the U.S. Government

The fact that Facebook is a public forum makes any government efforts to restrict free speech problematic, especially in a case like the present case where Facebook works with and at the behest of the federal government to stifle free speech.  Plaintiffs added a number of allegations to the already excessive list of allegations showing the symbiotic relationship between Facebook and the government in blocking Facebook users from its web-based platform to make its cause of action more clear.  Am. Compl. ¶¶ 15-27.  These allegations demonstrate that Facebook has actually become an instrumentality of the federal government.

In deciding whether the conduct of private parties amounts to government action, it is necessary to engage in **a highly factual inquiry**.  *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (emphasis added).  While "there is no specific formula for defining state action," *ibid*. (*quoting Melara v. Kennedy*, 541 F.2d 802, 805 (9th Cir. 1976)), the U.S. Supreme Court has articulated four tests for determining whether a private party's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.  *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1140 (9th Cir. 2012) (*quoting Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002)).

The "joint action test" focuses on "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Tsao*, 698 F.3d at 1140 (*quoting Franklin*, 312 F.3d at 445).  "Joint action" exists where the government **affirms**, **authorizes**, **encourages**, or **facilitates** unconstitutional conduct through its involvement with a

private party, *see, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Flagg Bros. v. Brooks*, 436 U.S. 149, 157 (1978), or otherwise has "so far insinuated itself into a position of interdependence with [the non-governmental party] that it must be recognized as a joint participant in the challenged activity," *Tsao*, 698 F.3d at 1140 (internal quotation marks omitted).

Taking all allegations of material fact as true and construing them in the light most favorable to Plaintiffs, as this Court is required to do here, *Barnett*, 31 F.3d at 816; *see also Estelle*, 429 U.S. at 99, the Amended Complaint demonstrates that the relationship between Facebook and the U.S. government is more than sufficiently intertwined to create a triable issue of fact as to whether Facebook's actions are "fairly attributable to the [s]tate." *Lugar*, 457 U.S. at 937.

To summarize the allegations in Plaintiffs' Amended Complaint and Plaintiffs' previous Opposition, Plaintiffs note at least ten occasions on which Facebook representatives and executives publicly detailed their close cooperation with the government in blocking and removing Facebook accounts:

- On September 6, 2017, Facebook's Chief Security Officer, Alex Stamos, announced that Facebook found approximately $100,000.00 in advertisement spending from June of 2015 to May of 2017 associated with more than 3,000 advertisements in connection with approximately 470 allegedly inauthentic Facebook accounts and pages. *Id.* ¶ 15.  Stamos conceded that Facebook conducted a sweeping search looking for all ads that might have originated in Russia – even those with very weak signals of a connection and not associated with any known organized effort. *Id.* ¶ 16.  On September 21, 2017, Facebook's

General Counsel, Collin Stretch, stated that Facebook would provide the U.S. Congress with information related to the 3,000 advertisements Facebook previously located.  *Id.* ¶ 17.

- Stretch stated that Facebook will do its part to make sure investigators have the information they need.  *Id.* ¶ 18.

- On September 21, 2017, Zuckerberg conceded that Facebook is "actively working with the U.S. government on its ongoing investigations into Russian interference and providing information to the [Special Counsel]."  *Id.* ¶ 19.

- On May 10, 2018, Facebook reported it gave 3,000 advertisements the IRA ran on Facebook and Instagram between 2015 and 2017 to Congress "so they could better understand the extent of Russian interference in the last US presidential election."  *Id.* ¶ 23.

- On November 13, 2018, Facebook's Head of Cybersecurity Policy, Nathaniel Gleicher, published a press release on Facebook in light of the U.S. midterm elections.  Mr. Gleicher explicitly stated that "finding and investigating potential threats isn't something [Facebook does] alone.  [They] also rely on external partners, like the government."  *Id.* ¶ 24.

  - Mr. Gleicher further commented on Facebook's "partnership" with the government and law enforcement agencies, stating that "[t]hese partnerships were especially critical in the lead-up to [the] midterm elections."  Specifically, Mr. Gleicher stated that "the government proved especially valuable because of their broader intelligence work."  *Id.* ¶ 25.

13

- On January 17, 2019, Mr. Gleicher published a press release on Facebook indicating that, "*based on an initial tip from US law enforcement*, [Facebook] removed 107 Facebook pages, groups, and accounts, as well as 41 Instagram accounts, for engaging in coordinated inauthentic behavior as part of a network that originated in Russia and operated in Ukraine."  *Id.* ¶ 26.

- Mr. Gleicher repeatedly reported "working more closely" with the U.S. government and law enforcement with regard to "inauthentic behavior on Facebook."  *Id.* ¶ 27.

These statements, alongside the government's focus on social media platforms, such as Facebook (as outlined in Plaintiffs' previous Opposition), with regard to its investigations show that there has been significant cooperation between Facebook and the U.S. government which reasonably led to the conclusion that the parties "have acted in concert in effecting" the blocking of Plaintiffs' Facebook account.  *Tsao*, 698 F.3d at 1140 (*quoting Franklin*, 312 F.3d at 445).

Facebook, in attempting to have this action dismissed at this early stage of the proceedings, is evidently attempting to bar Plaintiffs from presenting highly relevant evidence pertaining to the full nature of Facebook and the U.S. government's relationship.  The Court should not reward Facebook by dismissing this action.

## V.  THE COMMUNICATIONS DECENCY ACT DOES NOT IMMUNIZE FACEBOOK

In its Motion to Dismiss, Facebook argues that it is excused from compliance with the First Amendment by The Federal Communication Decency Act, 47 U.S.C. § 230 ("CDA") because all elements for CDA immunity under Subsection (c)(1) apply.  *See* Facebook's Motion to Dismiss (Doc. No. 40), at 7.  Not only do these elements not apply in this case, but Plaintiffs reemphasize that the CDA seeks to regulate indecency and obscenity in cyberspace, with the

14

primary goal to control the exposure of minors to indecent material over the internet.  This case does **not** concern obscenity or any other form of unprotected speech; it concerns political speech that strikes at the heart of the First Amendment.  Contrary to Facebook's belief, the CDA does not declare "a general immunity from liability." *Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1100 (9th Cir. 2009); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (noting that Congress has not provided an "all-purpose get-out-of-jail-free card for businesses that publish user content on the internet.").  In this case, the CDA does not immunize Facebook.

Turning to the elements of Section 230(c)(1), the CDA grants immunity if defendant (1) is a provider or user of an interactive computer service; (2) the information for which plaintiff seeks to hold the defendant liable is information provided by another information content provider; and (3) plaintiff's claim seeks to hold the defendant liable as the publisher or speaker of that information  *See* 47 U.S.C. §230 (c)(1).

To begin with, Facebook is an information content provider; not an "interactive computer service."  The CDA defines an "interactive computer service" as "any information service, system … **that provides or enables computer access by multiple users to a computer server**." § 230(f)(2) (emphasis added).  It is clear from the allegations of the Amended Complaint and Facebook's Terms of Service that it is far more than an "interactive computer service".  It does much more, as explained below, than simply provide an interactive computer service.  The term used in the statute to describe companies like Facebook as an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).  This term describes Facebook.

It should be noted at the outset that even interactive computer service providers may be held liable notwithstanding the CDA.  In enacting the CDA, Congress sought to immunize the removal of user-generated content, not the creation of content by interactive computer service providers.  *Swift v. Zynga Game Network Inc.,* WL 4569889, at *4 (N.D. Cal. 2010), *citing Fair Housing Council of San Fernando Valley v. Roommates.Com*, LLC., 521 F.3d 1157, 1163 (9th Cir. 2008).  An interactive computer service provider may be found liable if it is responsible, in whole or in part, for creating or developing the content.  *Zynga*, WL 4569889, at *5.  Facebook creates and manipulates content continuously.  The CDA, for this reason alone, should not apply to Facebook's conduct.

An interactive computer service provider falls within the exceptions to the CDA and becomes liable if it contributes materially to the alleged illegality of the conduct.  *Zynga*, WL 4569889 at *4, citing *Roommates.Com, LLC*, 521F.3d at 1166.  While there is a distinction between a website that merely provides "neutral tools" that may be utilized by third parties to post unlawful content and websites that both elicit the allegedly illegal conduct and make aggressive use of it in conducting business, Facebook's web-based platform clearly falls in the latter category.  *Zynga*, WL 4569889 at *4.

It is undisputed that Facebook is an online social-networking service that allows users to share content with others and opinions about world events.  Users are able to view content other Facebook users share on one or more of the hundreds of millions of Facebook pages.  However, Facebook's overly simplified characterization of its platform is disingenuous and misleading.  According to Facebook's Terms of Service, Facebook receives information (data mining) from users whether they interact with Facebook or not.  *See* Ex. 2, Terms of Service, at 1-2.  Facebook

uses the data it collects from its users for a number of purposes, including, most notably, to "analy[ze] the data … and understand[] how people use [its] Products." *Id.* at 2.

By using data collected from Facebook users to "make suggestions for you and others," Facebook is able to increase the profitability of advertisements on its platform. The uniqueness of the data that Facebook has access to has even spawned new forms of advertising. Page owners hoping to increase the visibility of data shared between "friends" on Facebook can pay for sponsored content, and thereby increase the likelihood that a user will be directed to their page. *See id.* at 1. Far from a passive forum for the purposes of posting data and sharing that data with others, Facebook is a data mine that utilizes its platform to direct users to content in order to generate billions in revenue. Thus, Facebook should be deemed to be a content provider subject to liability.

However, just as Plaintiffs have been required to state with specificity their allegations, and they have done so in two separate Complaints, each with more details, Facebook should be held to the same standard. Facebook should not be allowed to merely allege that it is an interactive computer service and therefore not responsible under any law in the United States without providing factual support for that allegation. Simply put, Facebook needs to prove its defense by evidence at trial. Plaintiffs should have the opportunity to conduct discovery in order to delve into Facebook's business model and that the CDA does not apply to Facebook or its actions. To do otherwise would provide Facebook with exemptions from federal law without requiring it to prove that it is entitled to those exemptions – and, to date, it has done nothing but state broad generalities and ask the Court to accept them as exemptions from legal responsibility. The Court should look carefully at those broad generalities when judged against Plaintiffs' specific allegations.

## VI.   FACEBOOK BREACHED THE TERMS OF SERVICE AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs allege in their Amended Complaint that FAN entered into a contract with Facebook for access to Facebook's social networking site.  Am. Compl. ¶ 91.  Facebook breached said contract when it removed FAN's Facebook account.  *Id.* ¶ 95.  Plaintiffs have suffered damage as a result of Facebook's breach of the Terms of Service.  *Id.* ¶ 99.  Clearly, Plaintiffs have alleged in the Amended Complaint the (1) existence of a contract; (2) breach of said contract; and (3) damages resulting therefrom.  For purposes of Federal Rule of Civil Procedure 8(a)(2), Plaintiffs' Amended Complaint properly states a short plain statement for breach of contract.

Facebook claims that its Terms of Service do not entitle its users to access to its services, Facebook's Motion to Dismiss, p. 9.  This position would appear contrary to the user agreement itself.  The language used by Facebook is that the Terms of Service do not "guarantee or otherwise promise continued access **when** users fail to comply with such terms," *Ibid,* (emphasis added).  The obvious corollary is that the Terms of Service **do** guarantee access if users comply with Facebook's Terms.  In fact, it would be odd if a sophisticated data mining company like Facebook were able to obtain all of its users' personal data without incurring any reciprocal obligations.

As Plaintiffs have discussed in detail in their previous Opposition to Facebook's Motion to dismiss, Facebook obliges its users to allow Facebook to sell their personal data and information to third parties and agree to make a number of commitments.  *See* Ex. 2, Facebook, Terms of Service, at 2.  Facebook users do not agree to give up their sensitive personal information for profit in exchange for nothing, as Facebook seems to believe.  Plaintiffs submit,

18

and Facebook admits, that so long as users do not breach the Terms of Service, Facebook is obligated to continue to provide its services to them pursuant to the contract.

To summarize Plaintiffs' previous arguments, Facebook explicitly promises in its Terms of Service to provide "products, features, apps, technologies and software" to its users, *id.* at 1, and to "connect [users] with people, groups, businesses, organizations, and others that matter to [the users]," and invites users "to express [themselves] and communicate about what matters to [them]" by "sharing status updates, photos, videos and stories across the Facebook Products that [they] use, sending messages to a friend or several people, creating events or groups, or adding content to [their] profile[s]." *Ibid.*

In exchange for "provid[ing] these services," Facebook "collect[s] and use[s] personal data" regarding "the connections [users] make, the choices and settings [they] select, and what [they] share and do **on and off** [Facebook's] Products" (emphasis added). *Id.* at 1-2. Facebook further expects that users allow Facebook to analyze and sell their data to third parties in order to refine the types of ads, offers, and other sponsored content these parties show to the users. ("Our partners pay us to show their content to you."). *Id.* at 1.

Furthermore, Facebook expects its users to make several commitments to use Facebook's services in accordance with the Terms of Service, Community Standards, and other applicable terms and policies. *Id.* at 2. Pursuant to Facebook's Community Standards, Facebook reserves the right to remove content and disable accounts if:

(1)     "[T]here is a genuine risk of physical harm or direct threats to public safety;"

(2)     "[O]rganisations or individuals … are engaged in [or express support or praise for groups, leaders or individuals involved in terrorist activity, organised hate, mass or serial murder, human trafficking, and organised violence or criminal activity;"

19

(3)    Users post "[c]ontent depicting, admitting or promoting [various] criminal acts committed by [the user] or [their] associates;"

(4)    Users post "statements of intent, calls to action or advocating for [various criminal activities];"

(5)    Users post "[c]ontent about non-medical drugs (other than alcohol or tobacco);"

(6)    Users post "[c]ontent that identifies and negatively targets victims or survivors of self-injury or suicide seriously, humorously or rhetorically;"

(7)    Users post "[c]ontent that sexually exploits or endangers children;"

(8)    Users post "images that depict incidents of sexual violence and intimate images shared without permission from the people pictured;"

(9)    Users post "[c]ontent that purposefully targets private individuals with the intention of degrading or shaming them;"

(10)    Users post "[c]ontent that glorifies violence or celebrates the suffering or humiliation of others;"

(11)    Users post "[c]ontent [that] facilitates, encourages or coordinates sexual encounters between adults;"

(12)    "[P]eople … use misleading or inaccurate information to collect likes, followers or shares;"

(13)    People do not use their authentic identities; and

(14)    "[P]eople … post content that breaches someone else's intellectual property rights, including copyright and trademark."

Facebook, Community Standards, available at: https://www.facebook.com/communitystandards.

Facebook had at least 14 reasons to block FAN's Facebook account, but is unable to provide even one single reason because FAN, at all times, fully complied with Facebook's Terms of Service.  Am. Compl. ¶ 94.  As a legitimate news outlet, FAN used Facebook to publish national and international news reports and other publications of public interest.  *Id.* ¶ 2.  It maintained a Facebook account that was authentic and legitimate, and it did not publish content that could be considered violent, criminal or objectionable in any way.  *Id.* ¶ 31.

FAN complied with all of Facebook's terms at all times and, in turn, Facebook must provide reciprocal services to FAN to restore its control of its account and valuable content.  By blocking FAN's Facebook account for no other reason than its national origin, Facebook breached its contract with FAN.

The implied covenant of good faith and fair dealing "requires contracting parties to exercise discretion given to them under the contract in a way consistent with the parties' expectations at the time of contracting."  *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1103 (E.D. Cal. 2010).  "A party breaches this duty when it acts in a way that deprives another contracting party of benefits conferred by the contract.  Such a breach does not require subjective bad faith or a breach of the contract's express terms."  *Ibid*.

Facebook permanently deprived FAN of all benefits of the contract.  Am. Compl. ¶ 99. This violated Facebook's duty of good faith.  Facebook maintained full benefit of its bargain by depriving FAN of its valuable data, and blocked FAN's Facebook account despite the lack of any violation of its Terms of Service.  Facebook now claims that it blocked FAN's Facebook account because of "evidence that FAN was involved in a conspiracy to use Facebook to interfere with the 2016 presidential election."  *See* Facebook's Motion to Dismiss, p. 10.  However, Facebook fails to provide any such alleged evidence.  The reason for that is simple: there is no evidence

because FAN was not involved in any conspiracy.  As a legitimate news agency, FAN has only ever published Russian domestic and international news stories.  Facebook and the government plainly searched for Facebook accounts which originated in Russia, *see* Am. Compl. ¶ 16, found FAN's account, and removed it.  Afterwards, Facebook sent a generic e-mail to FAN simply stating that its account has been disabled.  It did nothing to ensure FAN would maintain any benefit of its bargain.

**VII.    FACEBOOK VIOLATED THE CALIFORNIA UNRUH CIVIL RIGHTS ACT**

In their Amended Complaint, Plaintiffs sufficiently pleaded an "intentional discrimination in public accommodations in violation of the terms of the [Unruh Civil Rights Act]."  *See Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009) (*quoting Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175 (1991)).

First, Facebook's web-based platform is a public accommodation within the meaning of the Unruh Civil Rights Act.  The full and equal accommodations, advantages, facilities, privileges, or services must be guaranteed in "all business establishments **of every kind whatsoever**."  Cal. Civ. Code § 51(b) (emphasis added).  Facebook falls within that category as it is a social media and social networking service company which provides services to its users through an online platform.

As set forth in Plaintiffs' Amended Complaint, Facebook discriminated against FAN and its member base on the basis of their national origin.  Facebook now claims that the basis for the removal of FAN's Facebook account was its alleged involvement in a conspiracy to use Facebook to interfere with the 2016 presidential election.  *See* Facebook's Motion to Dismiss, p. 10.  This is false and Facebook has no evidence to support this outrageous allegation.

Furthermore, it was never Facebook's intention to remove Facebook accounts of companies and individuals who were involved in such a conspiracy.  It was Facebook's intention to rid the social media site of Russian accounts specifically, Am. Compl. ¶ 16, and Facebook admitted to it.  According to Facebook's Chief Security Officer, Alex Stamos, himself, Facebook specifically looked for and removed Russian Facebook accounts regardless of their association with any known organized effort.  *Ibid.*  Facebook's sweeping search for Russian Facebook accounts and Stamos' explicit remarks regarding Facebook's actions show that Facebook intentionally discriminated against FAN and its member base.  *See also Munson*, 46 Cal. 4th at 668 (*quoting Harris*, 52 Cal.3d at 1175).  This conduct shows "willful, affirmative misconduct" on the part of Facebook as required by the California Supreme Court.  *See Koebke v. Bernardo Heights*, 36 Cal. 4th 824, 854-54 (Cal. 2005).

## VIII.    CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.

Dated:  October 11, 2019                    Respectfully submitted,

*/s/Christopher D. Sullivan*
Christopher D. Sullivan, Esquire
Diamond McCarthy LLP
150 California Street, Suite 2200
San Francisco, California 94111
Telephone: (415) 692-5201
E-Mail: csullivan@diamondmccarthy.com

*/s/Dennis E. Boyle*
Dennis E. Boyle, Esquire (*Pro Hac Vice*)
Blerina Jasari, Esquire (*Pro Hac Vice*)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, NW, Suite 450 N
Washington, D.C.  20036
Telephone: (202) 659-6808
E-mail: dboyle@wtplaw.com

*Counsel for Plaintiffs*

23