United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FEDERAL AGENCY OF NEWS LLC, et al.,

Plaintiffs,

v.

FACEBOOK, INC.,

Defendant.

Case No. 18-CV-07041-LHK

**ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE**

Re: Dkt. No. 40

Plaintiffs Federal Agency of News LLC ("FAN") and Evgeniy Zubarev (collectively, "Plaintiffs") bring suit against Defendant Facebook, Inc. ("Facebook") because Facebook removed FAN's Facebook account and page. The Court previously granted Facebook's motion to dismiss without prejudice. ECF No. 33. Before the Court is Facebook's second motion to dismiss. ECF No. 40. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS Facebook's motion to dismiss with prejudice.

# I. BACKGROUND

## A. Factual Background

Plaintiff FAN is a "corporation organized and existing under the laws of the Russian Federation" that "gathers, transmits and supplies domestic and international news reports and

other publications of public interest." ECF No. 36 ("First Amended Complaint" or "FAC") ¶¶ 2, 5. Plaintiff Evgeniy Zubarev is "the sole shareholder and General Director of FAN." *Id.* ¶ 6. Defendant Facebook operates an online social media and social networking platform on which users like FAN can disseminate content by publishing on the users' Facebook page "posts and other content for its Facebook followers." *Id.* ¶¶ 3, 30. Facebook users' utilization of Facebook is governed by Facebook's Terms of Service that, if violated, may result in the deletion of users' Facebook accounts and pages. *Id.* ¶¶ 4, 58, 91.

On or about December 2014, FAN started "a Facebook page through which FAN has published its posts and other content for its Facebook followers." *Id.* ¶ 3. After the 2016 United States presidential election, "Facebook began to shut down 'inauthentic' Facebook accounts that allegedly sought to inflame social and political tensions in the United States." *Id.* ¶ 10. Facebook allegedly shut down such accounts because the accounts' activities were "similar to or connected to that of Russian Facebook accounts during the 2016 United States presidential election which were allegedly controlled by the Russia-based Internet Research Agency ('IRA')." *Id.* FAN's Facebook account and page were among those that were shut down. *Id.* ¶ 57. FAN's Facebook account and page were shut down on April 3, 2018. *Id.*

**1. FAN's Role in Russian Interference in the 2016 United States Presidential Election**

As aforementioned, Facebook shut down Facebook accounts with connections to Russian Facebook accounts allegedly controlled by the IRA. *Id.* ¶ 10. The IRA was "an agency which allegedly employed fake accounts registered on major social networks . . . to promote the Russian government's interests in domestic and foreign policy." *Id.* ¶ 11. Specifically, in a United States Intelligence Community report regarding alleged Russian interference in the 2016 presidential election, the IRA was described as an agency of "professional trolls whose likely financier is a close Putin ally with ties to Russian intelligence." *Id.* ¶ 14 (internal quotation marks omitted). Notably, from "the time of FAN's incorporation and until in or about the middle of 2015, FAN and the IRA were located in the same building" in Saint Petersburg, Russia. *Id.* ¶ 37.

In addition, FAN's founder and first "General Director" is Aleksandra Yurievna Krylova. *Id.* ¶ 34. The Special Counsel investigation into Russian interference in the 2016 presidential election that was headed by Robert Mueller determined that Krylova was employed by the IRA from about September 2013 to about November 2014. *Id.* ¶¶ 19, 34. However, FAN proclaims that it does not know the veracity of the Special Counsel's finding. *Id.* ¶ 34. Nevertheless, on February 16, 2018, the Special Counsel indicted Krylova, who was accused of participation in the IRA's "interference operations targeting the United States." *Id.* ¶ 39.

Moreover, on October 19, 2018, the United States District Court for the Eastern District of Virginia unsealed a criminal complaint. *Id.* ¶ 41. The criminal complaint divulged that the Federal Bureau of Investigation ("FBI") had uncovered "a Russian interference operation in political and electoral systems targeting populations within the Russian Federation, and other countries, including the United States" codenamed "Project Lakhta." *Id.* In support of the criminal complaint, the FBI asserted that Project Lakhta used "inauthentic user names to create fictitious Facebook profiles" and "published false and misleading news articles intended to influence the U.S. and other elections." *Id.* ¶¶ 46, 48. Notably, the FBI also attested that FAN, as well as the IRA, were entities within Project Lakhta. *Id.* ¶ 42. Furthermore, the criminal complaint was filed against Elena Alekseevna Khusyaynova, who has been FAN's chief accountant since August 2, 2016. *Id.* ¶¶ 41, 51. However, FAN maintains that it was not involved in Project Lakhta and that it had no "direct connection" to the IRA. *Id.* ¶¶ 45, 56.

**2. Facebook's Role in the United States' Investigation of Russian Interference in the 2016 Presidential Election**

On September 6, 2017, Facebook's Chief Security Officer Alex Stamos announced that "Facebook found approximately $100,000.00 in advertisement spending" between June 2015 and May 2017 "associated with more than 3,000 advertisements in connection with approximately 470 allegedly inauthentic Facebook accounts and Pages." *Id.* ¶ 15. Stamos stated that "Facebook conducted a sweeping search looking for all ads that might have originated in Russia." *Id.* ¶ 16 (quotation marks omitted). Facebook then "shared these findings with United States authorities"

United States District Court
Northern District of California

and provided Congress "with information related to the 3,000 advertisements." *Id.* ¶¶ 16-17.

On September 21, 2017, Facebook's cofounder, chairman, and chief executive officer Mark Zuckerberg released a video stating that "Facebook is actively working with the U.S. government on its ongoing investigations into Russian interference" and that Facebook is providing information to the Special Counsel. *Id.* ¶ 19.

**3. The Removal of FAN's Facebook Account and Page**

On April 3, 2018, Facebook shut down FAN's Facebook account and page. *Id.* ¶ 57. In an email, Facebook explained that FAN's Facebook account and page were shut down because FAN allegedly violated Facebook's Terms of Service. *Id.* ¶ 58. FAN was among the more than 270 Russian language accounts and pages that Facebook shut down on April 3, 2018. *Id.* ¶ 20. On the same day, Zuckerberg published a blog post explaining Facebook's actions. *Id.* ¶ 21. Zuckerberg wrote that the accounts and pages taken down on April 3, 2018 were removed because "they were controlled by the IRA" and not because of "the content they shared." *Id.* Specifically, Zuckerberg wrote that the IRA "has repeatedly acted deceptively and tried to manipulate people in the US, Europe, and Russia," and since 2016, when the IRA "had set up a network of hundreds of fake accounts to spread divisive content and interfere in the US presidential election," Facebook has improved its "techniques to prevent nation states from interfering in foreign elections." Mark Zuckerberg, https://www.facebook.com/zuck/posts/10104771321644971 (last visited January 9, 2020); *see* FAC ¶ 21 (referencing Zuckerberg's blog post).

**B. Procedural History**

On November 20, 2018, Plaintiffs filed their complaint against Facebook. ECF No. 1 ("Compl."). Plaintiffs originally alleged five causes of action: (1) a *Bivens* claim for violation of the First Amendment; (2) "damages under Title II of the U.S. Civil Rights Act of 1964 and 42 U.S.C. Section 1983"; (3) "Damages under the California Unruh Civil Rights Act"; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing. *Id.* ¶¶ 59-117.

On April 15, 2019, Facebook filed a motion to dismiss Plaintiffs' Complaint. ECF No. 25. The Court granted Facebook's motion to dismiss without prejudice on July 20, 2019. ECF No. 33.

United States District Court
Northern District of California

The Court first dismissed Plaintiff's second cause of action under Title II of the U.S. Civil Rights Act of 1964 and 42 U.S.C. § 1983 because Plaintiffs did not allege that any party was acting under color of state law. *Id.* at 7.

The Court then addressed Defendant's argument under 47 U.S.C. § 230(c)(1) ("Section 230"), or the Communications Decency Act ("CDA"). Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Court concluded that Facebook fulfilled all three prerequisites necessary to claim Section 230 immunity. ECF No. 33 at 8-13. First, Facebook qualified as an "interactive computer service" based on Plaintiffs' allegations and ample case law. *Id.* at 8-9. Second, Plaintiffs sought to hold Facebook liable for removing information provided by an "information content provider" that was not Facebook. *Id.* at 9. Specifically, Plaintiffs sought to hold Facebook liable for content provided by FAN. *Id.* at 9-10. Third, Plaintiffs sought to hold Facebook liable as a publisher or speaker of Plaintiff's content because "Plaintiffs' claims [were] based on Facebook's decision *not to publish* FAN's content." *Id.* at 11. Accordingly, the Court determined that the CDA barred all of Plaintiffs' causes of action except for Plaintiffs' *Bivens* claim for a violation of the First Amendment. *Id.*

As to the *Bivens* claim, the Court concluded that Facebook could not be held liable for violating the First Amendment because Facebook was not a "public forum" and Facebook's actions did not amount to state action. *Id.* at 14-22. As a result, the Court dismissed all of Plaintiffs' causes of action with leave to amend. The Court notified Plaintiffs that "failure to cure the deficiencies identified in this Order or in Defendant's briefing will result in dismissal with prejudice of the claims dismissed in this Order." *Id.* at 22.

On August 19, 2019, Plaintiffs filed their First Amended Complaint ("FAC"). ECF No. 36. The FAC makes minor grammatical edits and adds ten paragraphs. *Id.* ¶¶ 23-27, 70-71, 75, 96-97. Five paragraphs mainly pertain to allegations involving the 2018 midterm elections and Facebook's alleged "partnership with government and law enforcement agencies," *id.* ¶ 25, but none of these allegations, however, relate to Facebook's decision to remove FAN's profile and

content following the 2016 presidential election. *Id.* ¶¶ 23-27. Two other paragraphs add allegations about Facebook's user agreements, *id.* ¶¶ 70-71; one paragraph makes a conclusory allegation that Facebook's work with the U.S. government "constitutes a conspiracy to deny FAN its free speech rights," *id.* ¶ 75, and the final two paragraphs simply allege that FAN did not publish obscene, indecent, or sexual content and that Facebook "operated in bad faith." *Id.* ¶¶ 96-97.

Additionally, Plaintiffs elected not to reallege their cause of action pursuant to "Title II of the U.S. Civil Rights Act of 1964 and 42 U.S.C. Section 1983." *Compare* Compl. ¶¶ 59-117, *with* FAC ¶¶ 64-116. Instead, the FAC alleges five causes of action similar to those pled in Plaintiffs' Complaint: (I) a *Bivens* claim for violation of the First Amendment; (II) a claim for "Damages under the California Unruh Civil Rights Act"; (III) a claim for breach of contract; and (IV) and (V) two claims of breach of the implied covenant of good faith and fair dealing. FAC ¶¶ 64-116. Counts IV and V both plead breaches of the implied covenant of good faith and fair dealing. FAC ¶¶ 101-116. It is not entirely clear how Plaintiffs' theories of liability differ as to each count, as both counts allege that FAN "lost subscribers and revenues from subscriber services" or that "Facebook has made [FAN's] performance under [its agreements with subscribers] expensive or difficult or impossible." *Id.* ¶¶ 106, 113.

On September 16, 2019, Facebook filed a motion to dismiss Plaintiff's FAC. ECF No. 40 ("Mot."). On October 11, 2019, Plaintiffs filed an opposition to Facebook's motion to dismiss. ECF No. 41 ("Opp."). On October 8, 2019, Facebook filed a reply. ECF No. 42 ("Reply.")

## II. LEGAL STANDARD

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The United States Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Additionally, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

**B. Leave to Amend**

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). At the same time, a court is justified in denying leave to amend when a plaintiff "repeated[ly] fail[s] to cure deficiencies by amendments previously allowed." *See Carvalho v.*

*Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010). Indeed, a "district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (quotation marks omitted).

**III. DISCUSSION**

The FAC states the following causes of action: (I) a *Bivens* claim for violations of the First Amendment; (II) a claim for "Damages under the California Unruh Civil Rights Act"; (III) a claim for breach of contract; and (IV) and (V) two claims for breach of the implied covenant of good faith and fair dealing. FAC ¶¶ 64-116.

Facebook again argues that Section 230 of the CDA renders Facebook immune from all of Plaintiffs' federal and state causes of action, except for Plaintiffs' first cause of action: a *Bivens* claim for violation of the First Amendment. Mot. at 6. Additionally, Facebook contends that Plaintiffs' *Bivens* claim for violations of the First Amendment fails because Facebook is not a public forum and the First Amendment only applies to state actors or private entities whose actions amount to state action. *Id.* at 11.

As before, the Court agrees with Facebook. At bottom, the FAC fails to cure fundamental defects identified in the Court's previous Order. The Court first addresses Facebook's CDA arguments before turning to Plaintiff's *Bivens* claim.

**A. Communications Decency Act**

Under Section 230 of the Communications Decency Act, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Put another way, Section 230 "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). In interpreting Section 230, the Ninth Circuit held en banc that in "passing section 230 [of the Communications Decency Act], . . . Congress sought to immunize the *removal* of user-generated content." *Id.* at 1163 (emphasis added). Any

"activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Id.* at 1170-71. Indeed, Section 230 "immunizes decisions to delete user profiles." *Riggs v. MySpace, Inc.*, 444 Fed. App'x 986, 987 (9th Cir. 2011). Furthermore, Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Roommates*, 521 F.3d at 1175. Section 230 immunity extends to causes of action under both state and federal law, though the Ninth Circuit has not interpreted Section 230 to grant immunity for causes of action alleging constitutional violations. *Roommates*, 521 F.3d at 1164, 1169 n.24.

Section 230 mandates dismissal when: "(1) Defendant is a provider or user of an interactive computer service; (2) the information for which Plaintiff seeks to hold Defendant liable is information provided by another information content provider; and (3) Plaintiff's claim seeks to hold Defendant liable as the publisher or speaker of that information." *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1092 (hereinafter "*Sikhs for Justice I*") (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 Fed. App'x 526 (9th Cir. 2017) (hereinafter "*Sikhs for Justice II*"). The Court addresses these three elements in turn.

**1. Interactive Computer Service**

To satisfy the first prong of the Section 230's immunity test, the defendant must be an "interactive computer service." An "[i]nteractive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). Facebook is unquestionably an interactive computer service, as the Court previously held. ECF No. 33 at 8-9. According to the FAC, Facebook is a "web-based platform or service" with "2.2 billion monthly users" who utilize the internet to gain access to "Facebook account[s], posts, and all content" stored on Facebook's "platform or service." FAC ¶¶ 1, 65-66. Thus, the FAC supports the notion that Facebook is an interactive computer service.

Furthermore, this Court has previously found that Facebook is an "interactive computer

service" because Facebook "provides or enables computer access by multiple users to a computer service." *Sikhs for Justice I*, 144 F. Supp. 3d at 1093. This Court's decision in *Sikhs for Justice I* was affirmed by the Ninth Circuit, which also held that "Facebook is an interactive computer service provider." *Sikhs for Justice II*, 697 Fed. App'x at 526. Similarly, in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011), this Court found that "Facebook meets the definition of an interactive computer service under the [Communications Decency Act]."

Many other courts have also found Facebook to be an interactive computer service. For instance, the United States Court of Appeals for the District of Columbia held that "Facebook qualifies as an interactive computer service because it is a service that provides information to multiple users by giving them computer access . . . to a computer server, namely the servers that host its social networking website." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *see also Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065 (N.D. Cal. 2016) ("[T]he court finds, as others have previously, that Facebook provides an interactive computer service." (internal quotation marks and citations omitted)).

Thus, because Facebook qualifies as an "interactive computer service," Facebook satisfies the first prong of Section 230's immunity test.

**2. Information Provided by Another Information Content Provider**

To satisfy the second prong necessary to claim Section 230 immunity, Facebook must demonstrate that the information for which Plaintiffs seek to hold Facebook liable—namely, FAN's account, posts, and content—is information provided by an "information content provider" that is not Facebook. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

The FAC is unequivocal that Plaintiffs seek to hold Facebook liable for removing FAN's Facebook account, posts, and content, and that this content was provided by FAN and not Facebook. The FAC alleges that "FAN has operated a Facebook page through which FAN has published its posts and other content," that "FAN . . . gathers, transmits, and supplies domestic and

international news reports and other publications of public interest," and that "[o]ne of the media that FAN uses to disseminate news, primarily of local interest, throughout the Russian Federation is Facebook." FAC ¶¶ 2-3, 30. Thus, the FAC itself admits that FAN is the source of the information that Facebook removed.

An analogous case is *Lancaster v. Alphabet Inc.*, 2016 WL 3648608 (N.D. Cal. July 8, 2016). The *Lancaster* plaintiff brought suit against the defendant because the defendant removed some of the plaintiff's videos hosted by the video sharing website YouTube. *Id.* at *3. However, because the removed videos were not created by YouTube, but rather, were the plaintiff's creations or public domain videos, the *Lancaster* court concluded that the information for which the plaintiff sought to hold the defendant liable was information provided by another information content provider (i.e., the *Lancaster* plaintiff) and not YouTube. Likewise, here, the FAC reveals that FAN's Facebook account, posts, and content were created and disseminated by FAN, not Facebook.

Indeed, the FAC nowhere alleges that Facebook provided, created, or developed any portion or content of FAN's Facebook account, posts, and content. Plaintiffs argue in their opposition, however, that Facebook is an information content provider because it "creates and manipulates content continuously." Opp. at 16. But even if the Court overlooks Plaintiffs' failure to plead such allegations in the FAC, Plaintiffs' argument is immaterial. Section 230 immunity can apply even if Facebook is responsible for other alleged "content" on its website, as Section 230 "still bar[s] [Plaintiffs'] claims unless [Facebook] created or developed the particular information at issue." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003); *id.* at 1125 (holding that the defendant was entitled to Section 230 immunity because the defendant "did not play a significant role in creating, developing or 'transforming' *the relevant information*" (emphasis added)). Here, at best, Plaintiffs contend that Facebook is liable simply because it created other content, but the instant case relates solely to FAN's Facebook account, posts, and content—all of which were created and disseminated by FAN, not Facebook.

Plaintiffs' only other response is that Facebook utilizes "data mining" "to direct users to

content in order to generate billions in revenue" and therefore creates content such that Facebook's actions fall outside the ambit of Section 230's protections. Opp. at 17. Again, even if the Court overlooks Plaintiffs' failure to plead these allegations in the FAC, Plaintiffs' argument fails as a matter of law.

First, even if Facebook utilizes "data mining" "to direct users to content," *id.* at 17, the Ninth Circuit has held that "[t]hese functions—[akin to] recommendations and notifications—are tools meant to facilitate the communication and content of others"; "[t]hey are not content in and of themselves." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). In *Dyroff*, the defendant "used features and functions, including algorithms, to analyze user posts . . . and recommended other user groups." *Id.* Here, Plaintiffs make a similar argument—that recommending FAN's content to Facebook users through advertisements makes Facebook a provider of that content. The Ninth Circuit, however, held that such actions do not create "content in and of themselves." *Id.*; *see also Force v. Facebook*, 934 F.3d 53, 66 (2d Cir. 2019) ("Accepting plaintiffs' argument would eviscerate Section 230(c)(1); a defendant interactive computer service would be ineligible for Section 230(c)(1) immunity by virtue of simply organizing and displaying content exclusively provided by third parties.").

Second, insofar as Plaintiffs assert that Section 230 does not protect Facebook's "data mining" efforts because they "generate billions in revenue," Opp. at 17, there is no "for-profit exception to § 230's broad grant of immunity," *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011). The "fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interact service provider 'creates' or 'develops' that content." *Goddard v. Google*, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008); *accord Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *8 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) ("[T]raditional editorial functions often include subjective judgments informed by political and financial considerations. Determining what motives are permissible and what are not could prove problematic." (citations omitted)). Accordingly, the Court rejects Plaintiffs' argument that Facebook's profit motive transforms Facebook's alleged "data mining"

actions into the provision of FAN's content.

Therefore, the Court concludes that information for which the Plaintiffs seek to hold Facebook liable was information solely provided by FAN. As a result, Facebook satisfies the second element necessary to claim Section 230 immunity.

**3. Treatment as Publisher**

The third and final prong of Section 230's immunity test requires that Plaintiffs seek to hold Facebook liable as a publisher or speaker of Plaintiffs' content. "[P]ublication involves reviewing, editing, and deciding whether to publish or to *withdraw from publication* third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added).

Here, Plaintiffs' claims are based on Facebook's decision to remove FAN's account, postings, and content. Note that here, the Court does not broach Count I, Plaintiffs' *Bivens* claim for violation of the First Amendment, because as discussed above, Section 230 does not immunize a defendant from constitutional claims. However, the Court discusses how Plaintiffs' remaining causes of action are predicated on Facebook's decision to remove FAN's account, postings, and content.

For instance, Count II of the FAC seeks damages under the California Unruh Civil Rights Act because "Facebook has denied access to Facebook internet connections and the Facebook 'community' based on Russian nationality and/or Russian ethnicity." FAC ¶ 88. Count III of the FAC alleges breach of contract because "Facebook breached the contract[, the Facebook Terms of Service,] by removing FAN's Facebook account and blocking FAN's content without a legitimate reason." *Id.* ¶ 95. Counts IV and V of the FAC allege breaches of the implied covenant of good faith and fair dealing because Facebook "block[ed] FAN's access to Facebook users and FAN subscribers" and thereby "interfered with FAN's ability to provide service to existing subscribers and preventing it from reaching new subscribers. *Id.* ¶¶ 106, 113.

Thus, Plaintiffs' claims are based on Facebook's decision *not to publish* FAN's content. The Ninth Circuit has held that it is "immaterial whether [the] decision comes in the form of deciding what to publish in the first place or what to remove among the published material."

*Barnes*, 570 F.3d at 1102 n.8. In other words, "removing content is something publishers do, and to impose liability on the basis of such conduct *necessarily involves treating the liable party as a publisher*." *Id.* at 1103 (emphasis added). Indeed, the Ninth Circuit has held en banc that "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates*, 521 F.3d at 1163. Thus, because Plaintiffs' second through fifth claims are predicated on Facebook's decision to remove content, Ninth Circuit law under *Barnes* unambiguously establishes that Plaintiffs' claims treat Facebook as a publisher. Therefore, Facebook satisfies the third and final prong of the Communications Decency Act's immunity test: that Plaintiffs seek to hold Facebook liable as a publisher or speaker of Plaintiffs' content.

Plaintiffs again argue that Section 230 does not immunize Facebook because the instant case "does not concern obscenity or any other form of unprotected speech; it concerns political speech that strikes at the heart of the First Amendment." Opp. at 15 (emphasis omitted). It is telling that Plaintiffs fail to cite any authority for this argument. Immunity under the Section 230 does not contain a political speech exception. The statutory text provides that no "provider or user of an interactive computer service shall be treated as the publisher or speaker of *any information* provided by another information content provider. 47 U.S.C. § 230(c)(1) (emphasis added). No distinction is made between political speech and non-political speech.

Numerous courts have held that Section 230 immunizes a website's removal of political speech. For instance, in *Sikhs for Justice I*, 144 F. Supp. 3d at 1090, 1094-96, this Court held that under Section 230, Facebook was immune from liability for blocking access to the plaintiff's Facebook page through which the plaintiff had "organized a number of political and human rights advocacy campaigns." The Ninth Circuit affirmed this Court's order in *Sikhs for Justice I*. *See Sikhs for Justice II*, 697 Fed. App'x at 526; *see also Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *1-*3 (N.D. Cal. May 9, 2019) (holding that Section 230 immunized Facebook for "restricting what plaintiff can post on the Facebook platform" by removing the plaintiff's posts "calling for the recall of John Casson, the then-British Ambassador to Egypt"). In short, Facebook satisfies the

third prong of Section 230's immunity test because Plaintiffs seek to hold Facebook liable as a publisher or speaker of Plaintiffs' content.

Accordingly, Section 230 immunizes Facebook from Plaintiff's non-constitutional federal and state causes of action: the second cause of action for damages under the California Unruh Civil Rights Act; the second cause of action for breach of contract; and the fourth and fifth causes of action for breach of the implied covenant of good faith and fair dealing. As none of these causes of action are asserted as a constitutional claim, Section 230 prohibits Plaintiffs from holding Facebook liable for all of these causes of action. Therefore, the Court need not reach the merits of these causes of action.

Thus, because of Facebook's immunity under Section 230, the Court hereby DISMISSES: the second cause of action for damages under the California Unruh Civil Rights Act; the third cause of action for breach of contract; and the fourth and fifth causes of action for breach of the implied covenant of good faith and fair dealing. Plaintiffs failed to cure the same deficiencies the Court previously identified in its prior Order, and the FAC offers no new facts to justify a different conclusion. *See* ECF No. 33 at 7-13. As the Court previously warned, "failure to cure the deficiencies identified in this Order or in Defendant's briefing will result in dismissal with prejudice." *Id.* at 22. Furthermore, courts are justified in denying leave to amend when a plaintiff "repeated[ly] fail[s] to cure deficiencies by amendments previously allowed." *Carvalho*, 629 F.3d at 892. That is precisely the situation here. The Court GRANTS Defendants' motion to dismiss Plaintiffs' second, third, fourth, and fifth causes of action with prejudice.

**B. *Bivens* Claim for Violation of the First Amendment**

Plaintiffs' sole remaining cause of action is their *Bivens* claim for violation of the First Amendment. However, it is axiomatic that the "constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). Thus, it is "undisputed that the First Amendment of the United States Constitution only applies to government actors; it does not apply to private corporations or persons." *Redden v. The Women's Ctr. of San Joaquin Cty.*, 2006 WL 132088, at *1 (N.D. Cal.

United States District Court
Northern District of California

Jan. 17, 2008) (citing *Manson v. Little Rock Newspapers, Inc.*, 200 F.3d 1172, 1173 (8th Cir. 2000)).

Indeed, courts have previously rejected attempts to apply the First Amendment to Facebook, a "corporation organized and existing under the laws of the State of Delaware," FAC ¶ 7. For instance, the *Freedom Watch, Inc. v. Google, Inc.* court dismissed the plaintiffs' First Amendment claim because "Facebook and Twitter . . . are private businesses that do not become 'state actors' based solely on the provision of their social media networks to the public." 368 F. Supp. 3d 30, 40 (D.D.C. 2019); *see also, e.g.*, *Young v. Facebook, Inc.*, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010) (dismissing the plaintiff's claim against Facebook for violation of the First Amendment because Facebook is not a state actor); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (rejecting the plaintiff's First Amendment claim against Facebook because Facebook is not a state actor, and noting that "efforts to apply the First Amendment to Facebook . . . have consistently failed"). Here, Plaintiffs make no allegations that the federal government or a state government had any involvement in Facebook's removal of FAN's profile, page, and content. Thus, Facebook's deletion of FAN's profile, page, and content is private conduct that does not constitute governmental action. Therefore, Plaintiffs fail to state a *Bivens* claim against Facebook for violation of the First Amendment.

Nonetheless, Plaintiffs maintain that Facebook's deletion of FAN's profile, page, and content is actionable under the First Amendment. Specifically, Plaintiffs assert that first, Facebook constitutes a "public forum," and second, that Facebook's actions amount to state action. Opp. at 9, 12. It should be noted that Plaintiffs raised these exact arguments in their opposition to the prior motion to dismiss. The Court rejected them then, and does so again. Nothing in Plaintiff's briefing alters the Court's conclusion. ECF No. 33 at 13-22. The Court addresses Plaintiffs' two arguments in turn.

**1. Facebook is Not a Public Forum**

Plaintiffs argue that Facebook is a public forum because Facebook "operates a freely available public forum, open to any and all people who are at least 13 years old, with internet

access and a valid e-mail address." *Id.* at 9. As the Court previously held, case law has rejected the notion that private companies such as Facebook are public fora. ECF No. 33 at 15-16. Nonetheless, Plaintiffs persist in arguing otherwise. Furthermore, Facebook asserts, and the Court previously determined, that in order for a private entity to operate as a public forum, the entity must have engaged in a function that is both traditionally and exclusively governmental. Mot. at 11; ECF No. 33 at 16-18. At the risk of being redundant, the Court again addresses these arguments.

a. Case Law Establishes that Private Internet Companies are not Public Fora

Courts have rejected the notion that private corporations providing services via the internet are public fora for purposes of the First Amendment. For instance, in *Prager Univ. v. Google LLC*, this Court *rejected* the notion that "*private social media corporations* . . . are state actors that must regulate the content of their websites according to the strictures of the First Amendment" under public forum analysis. 2018 WL 1471939, at *8 (N.D. Cal. Mar. 26, 2018) (emphasis in original). In addition, the *Ebeid* court rejected the argument that Facebook is a public forum. 2019 WL 2059662, at *6. Moreover, in *Buza v. Yahoo!, Inc.*, the court held that the plaintiff's assertion that "Yahoo!'s services should be seen as a 'public forum' in which the guarantees of the First Amendment apply is not tenable under federal law. As a private actor, Yahoo! has every right to control the content of material on its servers, and appearing on websites that it hosts." 2011 WL 5041174, at *1 (N.D. Cal. Oct. 24, 2011). Furthermore, in *Langdon v. Google, Inc.*, the court held that "Plaintiff's analogy of [Google and other] Defendants' private networks to shopping centers and [plaintiff's] position that since they are open to the public they become public forums is not supported by case law." 474 F. Supp. 2d 622, 632 (D. Del. 2007).

At bottom, the United States Supreme Court has held that property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972). Thus, simply because Facebook has many users that create or share content, it does not mean that Facebook, a private social media company by Plaintiffs' own admission in the complaint, becomes a public forum.

United States District Court
Northern District of California

Plaintiffs rely on *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), for the proposition that social media sites, like Facebook, are analogous to "traditional" public fora and should be treated as such. Opp. at 9-10. But as this Court previously held, "*Packingham* did not, and had no occasion to, address whether *private social media corporations* like YouTube [and Facebook] are state actors that must regulate the content of their websites according to the strictures of the First Amendment." *Prager*, 2018 WL 1471939, at *8. As a result, *Packingham* does not undermine the Court's conclusion that Facebook does not constitute a public forum.

b. For a Private Entity to Operate as a Public Forum, the Entity Must Engage in a Function that is Both Traditionally and Exclusively Governmental

The Court now turns to Plaintiffs' argument that Facebook operates as a public forum by engaging in functions that are traditionally and exclusively governmental. Whether a private entity operates as a public forum is only relevant to the "public function test," one of four tests the United States Supreme Court has articulated "for determining whether a private [party's] actions amount to state action." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012); *see also Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (holding that because an entity "performs an exclusively and traditionally public function within a public forum, we focus only upon the public function test"). Here, the Court holds, as it did before, that Facebook did not engage in functions that are traditionally and exclusively functions of the state. Examples of functions that are traditionally the exclusive prerogative of the state include "hol[ding public] elections", "govern[ing] a town," or "serv[ing] as an international peacekeeping force." *Brunette v. Humane Society of Ventura Cty.*, 294 F.3d 1205, 1214 (9th Cir. 2002); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019) ("The Court has stressed that 'very few' functions fall into that category. Under the Court's cases, those functions include, for example, running elections and operating a company town. The Court has ruled that a variety of functions do not fall into that category, including, for example: running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity."

(citations omitted)). There are no allegations that Facebook holds public elections, governs a town, or serves as an international peacekeeping force.

This Court has previously held that "private entities who creat[e] their own . . . social media website and make decisions about whether and how to regulate content that has been uploaded on that website" have not engaged in "public functions that were traditionally exclusively reserved to the State." *Prager*, 2018 WL 1471939, at *8 (internal quotation marks omitted). Similarly, the *Ebeid* court held that "Facebook's regulation of speech on its platform" is not a function exclusively reserved for the state, thus Facebook was not a public forum. 2019 WL 2059662, at *6. Moreover, the *Harris v. Kern Cty. Sheriffs* court held that Facebook does not satisfy the public function test because Facebook "had [not], "in essence, become the government." 2019 WL 1777976, at *6 (E.D. Cal. Apr. 23, 2019). Furthermore, the *Cyber Promotions, Inc. v. Am. Online, Inc.* court held that AOL, "one of many private online companies which allow its members access to the Internet . . . where they can exchange information with the general public," did not satisfy the public function test. 948 F. Supp. 436, 442 (E.D. Pa. 1996). And most importantly, just last term, the United States Supreme Court held that "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1930.

Numerous other courts have also declined to treat similar private social media corporations, as well as online service providers, as state actors. *See, e.g.*, *Howard v. Am. Online, Inc.*, 208 F.3d 741, 754 (3d Cir. 2000) (rejecting argument that AOL should be deemed a state actor because it is a "quasi-public utility" that "involves a public trust"); *Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806, at *14 (N.D. Cal. Mar. 16, 2007) ("[T]he emanation of third-party speech from a search engine [does not] somehow transform[] that privately-owned entity into a public forum."); *Nyabwa v. Facebook*, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018) ("Because the First Amendment governs only governmental restrictions on speech, Nyabwa has not stated a cause of action against Facebook."); *Shulman v. Facebook.com*, 2017 WL 5129885, at

*4 (D.N.J. Nov. 6, 2017) (rejecting the plaintiff's claims against Facebook for failure to sufficiently allege that Facebook is a state actor); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631-32 (D. Del. 2007) (finding that Google is a private entity that is "not subject to constitutional free speech guarantees" and asserting that the United States Supreme Court "has routinely rejected the assumption that people who want to express their views in a private facility, such as a shopping center, have a constitutional right to do so").

Thus, by operating its social media website, Facebook has not engaged in any functions exclusively reserved for the government. Therefore, Facebook does not operate as a public forum, so Facebook's actions do not amount to state action under the public function test.

**2. Facebook's Actions Do Not Amount to Joint Action**

Plaintiffs assert that Facebook's actions also satisfy the joint action test, which is another one of the four tests the United States Supreme Court has articulated in discerning whether a private party's actions amount to state action subject to the Constitution. Opp. at 11-14. Plaintiffs argue that the FAC adds new allegations that demonstrate "the symbiotic relationship between Facebook and the government in blocking Facebook users from its web-based platform." *Id.* at 11 (citation omitted). Facebook responds by asserting that these new factual allegations still fail to demonstrate joint action. Mot. at 12-18. The Court agrees with Facebook.

The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao*, 698 F.3d at 1140 (internal quotation marks omitted). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.* (internal quotation marks omitted). "Ultimately, joint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Id.* Notably, merely "supplying information [to the state] alone does not amount to conspiracy or joint action." *Deeths v. Lucile Slater Packard Children's Hosp. at Stanford*, 2013 WL 6185175, at *10-*11 (E.D. Cal. Nov. 26, 2013); *see also Lockhead v. Weinstein*, 24 Fed. App'x 805, 806 (9th Cir. 2001) ("[T]he

mere furnishing of information to police officers does not constitute joint action . . . ."); *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 327 (7th Cir. 1978), *cert. denied*, 444 U.S. 841 ("[W]e decline to hold that the mere act of furnishing information to law enforcement officers constitutes joint (activity) with state officials . . . ." (internal quotation marks omitted)); *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1157 (10th Cir. 2016) ("[W]e have consistently held that furnishing information to law enforcement officers, without more, does not constitute joint action."); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (same); *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) (same).

The Court applies the joint action test below. The Court first discusses whether Facebook was a willful participant in joint action with the government, and then turns to whether Facebook and the government conspired together.

a. Facebook Was Not a Willful Participant in Joint Action with the Government

As discussed above, the joint action test can be satisfied if the private party was a "willful participant in joint action with the State." *Tsao*, 698 F.3d at 1140. The Court previously held that Plaintiffs' allegations "revealed that Facebook allegedly supplied the government with information that might relate to the government's investigation into Russian interference with the 2016 presidential election." ECF No. 33 at 19. The Court found these allegations insufficient because "supplying information to the state alone does not amount to conspiracy or joint action." *Id.* (quoting *Deeths*, 2013 WL 6185175, at *10-11). The Court explained that "[t]he *Deeths* court found that there was no joint action even though a state actor relied upon a private actor's information and recommendation to remove the plaintiff's child from the plaintiff's care. . . . Plaintiffs only allege that Facebook provided the government with information. Thus, under *Deeths*, Facebook was not a willful participant in joint action with the government." *Id.* at 20 (citations omitted).

Here, Plaintiffs' new allegations in the FAC fare no better. Plaintiffs' new additions to the FAC allege that "[o]n May 10, 2018, Facebook reported it gave 3,000 Facebook advertisements the IRA ran on Facebook and Instagram between 2015 and 2017 to Congress" to help better

United States District Court
Northern District of California

understand the extent of Russian interference in the 2016 presidential election. FAC ¶ 23. Other new allegations state that Facebook's Head of Cybersecurity Policy, Nathaniel Gleicher, made the following statements in various press releases in late 2018 and early 2019:

- "[F]inding and investigating potential threats isn't something Facebook does alone. They also rely on external partners, like the government." *Id.* ¶ 24 (internal alterations omitted).
- Facebook has a "partnership" with the government and law enforcement agencies, which was "especially critical in the lead-up to the midterm elections" in 2018 because of the government's "broader intelligence work." He shared that "law enforcement agencies can draw connections off our platform to a degree that we simply can't" and "[t]ips from government and law enforcement partners can therefore help our security teams attribute suspicious behavior to certain groups, make connections between actors, or proactively monitor for activity targeting people on Facebook." This information, as well as the government's "tools to deter or punish abuse," are the reasons why Facebook is "actively engaged with the Department of Homeland Security, the FBI, including their Foreign Influence Task Force, Secretaries of State across the US . . . on our efforts to detect and stop information operations, including those that target elections." *Id.* ¶ 25 (internal alterations and emphasis omitted).
- "[B]ased on an initial tip from US law enforcement, Facebook removed 107 Facebook Pages, Groups, and accounts, as well as 41 Instagram accounts [in January 2019], for engaging in coordinated inauthentic behavior as part of a network that originated in Russia and operated in Ukraine." *Id.* ¶ 26 (emphasis omitted).
- Facebook is "working more closely" with the U.S. government and law enforcement with regard to "inauthentic behavior on Facebook." *Id.* ¶ 27.

These new allegations do little to demonstrate joint action in the instant case, as most of

these new allegations post-date the relevant conduct that allegedly injured Plaintiffs. The instant case revolves around Plaintiff's allegations surrounding the 2016 presidential election and allegations that Facebook removed FAN's accounts and content in April 2018. The FAC's new allegations, however, concern activity in late 2018 and early 2019 relating to investigations into the 2018 midterm elections. Indeed, these new allegations do not mention FAN at all. To properly plead joint action, a "plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008) (internal quotation marks omitted); *accord Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 842 (9th Cir. 2017) (holding that courts must "pay[] careful attention to the gravamen of the plaintiff's complaint" and "identify the specific conduct of which the plaintiff complains." (quotation marks omitted)). Most of Plaintiffs' new allegations are unconnected with Facebook's April 3, 2018 decision to delete FAN's Facebook page and block FAN content and restrict access to FAN's account, and as a result, these new allegations do not establish joint action between Facebook and the government.

In regards to paragraph 23, the only new allegation that mentions Facebook's actions relating to FAN, Plaintiffs plead that "[o]n May 10, 2018, Facebook reported it gave 3,000 Facebook advertisements the IRA ran on Facebook and Instagram between 2015 and 2017 to Congress." FAC ¶ 23. But as the Court previously held, case law is unequivocal that supplying information to the government alone does not amount to joint action. *See, e.g.*, *Deeths*, 2013 WL 6185175, at *10-*11; *see also Lockhead*, 24 Fed. App'x at 806 ("[T]he mere furnishing of information to police officers does not constitute joint action . . . ."); *Butler*, 589 F.2d at 327 ("[W]e decline to hold that the mere act of furnishing information to law enforcement officers constitutes joint (activity) with state officials . . . ." (internal quotation marks omitted)); *Schaffer*, 814 F.3d at 1157 ("[W]e have consistently held that furnishing information to law enforcement officers, without more, does not constitute joint action."); *Ginsberg*, 189 F.3d at 272 (same); *Moldowan*, 578 F.3d at 399 (same). That is all Plaintiffs allege in paragraph 23, and accordingly, this new allegation does not cure any of the fatal defects identified by the Court in its previous

United States District Court
Northern District of California

order.

Accordingly, the Court finds that there was no joint action because Facebook was not a willful participant in joint action with the government relating to Facebook's April 3, 2018 decision to delete FAN's Facebook page and restrict FAN's access to its Facebook account.

b. Facebook Did Not Conspire with the Government

As discussed above, the joint action test can also be satisfied by proving a conspiracy between the government and the private party. *Tsao*, 698 F.3d at 1140. To prove a conspiracy "between private parties and the government," there must be "an agreement or 'meeting of the minds' to violate constitutional rights." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). The Court previously dismissed this claim, and in the FAC, Plaintiffs add a single conclusory allegation that Facebook's work with the U.S. government concerning Russian interference in U.S. elections is a "conspiracy to deny FAN its free speech rights guaranteed under the U.S. Constitution." FAC ¶¶ 74-75. Such a "bare allegation of . . . joint action will not overcome a motion to dismiss." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir. 2008). In short, and as the Court previously determined, none of Plaintiffs' allegations support the theory that there was either an agreement or a meeting of the minds between Facebook and the government to violate Plaintiffs' rights. Thus, there was no joint action because Plaintiffs fail to allege specific facts establishing the existence of an agreement or a meeting of the minds between Facebook and the government relating to Facebook's deletion of FAN's Facebook page or restriction of FAN's access to its Facebook account.

In sum, Plaintiffs' *Bivens* claim for violation of the First Amendment fails because the First Amendment applies only to federal and state governmental actors with very few exceptions. Plaintiffs assert that under one such exception—the joint action test—the First Amendment applies to private actor Facebook's decision to delete FAN's Facebook page and to prevent access to FAN's Facebook account. However, as discussed above, the joint action test has not been satisfied here because Facebook was not a willful participant in joint action with the government, and Facebook did not conspire with the government to violate any constitutional rights.

United States District Court
Northern District of California

Thus, the Court hereby DISMISSES Plaintiffs' first cause of action: a *Bivens* claim for violation of the First Amendment. Plaintiffs failed to cure the same deficiencies the Court previously identified in its prior Order, and the FAC offers no new facts to justify a different conclusion. *See* ECF No. 33 at 14-22. As the Court previously warned, "failure to cure the deficiencies identified in this Order or in Defendant's briefing will result in dismissal with prejudice." *Id.* at 22. Furthermore, courts are justified in denying leave to amend when a plaintiff "repeated[ly] fail[s] to cure deficiencies by amendments previously allowed." *Carvalho*, 629 F.3d at 892. That is precisely the situation here. The Court GRANTS Defendants' motion to dismiss Plaintiffs' first cause of action with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Facebook's motion to dismiss with prejudice.

**IT IS SO ORDERED.**

Dated: January 13, 2020

Lucy H. Koh

LUCY H. KOH
United States District Judge